# Exhibit 13

```
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                            MARSHALL DIVISION

 3   CONSTELLATION DESIGNS, LLC.,    (   CAUSE NO. 2:21-CV-448-JRG
                                     (
 4             Plaintiff,            (
                                     (
 5   vs.                             (
                                     (
 6   LG ELECTRONICS, INC.,           (
     et al.,                         (   MARSHALL, TEXAS
 7                                   (   JULY 7, 2023
               Defendants.          (   8:30 A.M.
 8   ------------------------------------------------------------

 9

10                             VOLUME 3

11   ------------------------------------------------------------

12                        TRIAL ON THE MERITS

13                BEFORE THE HONORABLE RODNEY GILSTRAP
                  UNITED STATES CHIEF DISTRICT JUDGE
14                          and a jury

15   ------------------------------------------------------------

16

17

18

19

20

21

22                  SHAWN McROBERTS, RMR, CRR
                       100 E. HOUSTON STREET
23                   MARSHALL, TEXAS  75670
                         (903) 923-8546
24              shawn_mcroberts@txed.uscourts.gov

25
```

```
                               INDEX
                  EXAMINATION

                  Witness Name                                    Page
                  RYAN SULLIVAN, PH.D.
                      Direct By MR. CURRY ....................... 7
                      Redirect By MR. CURRY .................... 113
                      Recross By MR. McKEON ................... 128
                  TAE HEE AHN
                      BY VIDEO DEPOSITION ..................... 140
                  NAGARAJ NANDHAKUMAR
                      BY VIDEO DEPOSITION ..................... 150
                  HYO YEONG KIM
                      BY VIDEO DEPOSITION ..................... 153
                  LEE DAEHAN
                      BY VIDEO DEPOSITION ..................... 156
                  WOO SUK KO
                      BY VIDEO DEPOSITION ..................... 157
                  BYEONGKOOK KANG
                      BY VIDEO DEPOSITION ..................... 159
                  RICHARD LEWIS
                      Direct By MR. CALDWELL .................. 161
                      Redirect By MR. CALDWELL ............... 253
                      Recross By MR. REGER ................... 272
                      Redirect By MR. CALDWELL .............. 273
                  DAVID BAILEY
                      BY VIDEO DEPOSITION ..................... 277
                  DAVID LOO
                      BY VIDEO DEPOSITION ..................... 283
                  KIRSTEN BURRELL
                      BY VIDEO DEPOSITION ..................... 286
                  GORDON MACPHERSON
                      BY VIDEO DEPOSITION ..................... 290
```

```
 1        A P P E A R A N C E S

 2   FOR THE PLAINTIFF:       CALDWELL CASSADY & CURRY, PC
                              2121 N. PEARL ST., SUITE 1200
 3                            DALLAS, TEXAS  75201
                              (214) 888-4848
 4                            BY: MR. JASON CASSADY
                                  MR. BRADLEY CALDWELL
 5                                MR. SETH REICH
                                  MS. ADRIENNE DELLINGER
 6
                              WARD, SMITH & HILL, PLLC
 7                            1507 BILL OWENS PARKWAY
                              LONGVIEW, TEXAS  75604
 8                            (903) 757-6400
                              BY: MS. ANDREA FAIR
 9
     FOR THE DEFENDANTS:      FISH & RICHARDSON PC -
10                            WASHINGTON DC
                              1000 MAINE AVE., SW
11                            SUITE 1000
                              WASHINGTON, DC 20024
12                            (202) 783-5070
                              BY: MR. MICHAEL McKEON
13                                MR. RUFFIN CORDELL
                                  MR. CHRISTIAN CHU
14                                MR. ROBERT SCHWENTKER

15                            FISH & RICHARDSON, P.C. -
                              DALLAS
16                            1717 MAIN STREET, SUITE 5000
                              DALLAS, TEXAS  75201
17                            (214) 292-4084
                              BY: MR. THOMAS REGER, II
18
                              GILLAM & SMITH, LLP
19                            303 SOUTH WASHINGTON AVENUE
                              MARSHALL, TEXAS  75670
20                            (903) 934-8450
                              BY: MS. MELISSA SMITH
21
     OFFICIAL REPORTER:       SHAWN M. McROBERTS, RMR, CRR
22                            100 E. HOUSTON STREET
                              MARSHALL, TEXAS  75670
23                            (903) 923-8546

24

25
```

```
 1            THE COURT:  Be seated, please.

 2        Are the parties prepared to read into the record those

 3   items from the list of pre-admitted exhibits used during

 4   yesterday's portion of the trial?

 5            MS. DELLINGER:  We are, Your Honor.

 6            THE COURT:  All right.  Please proceed to do so.

 7            MS. DELLINGER:  Good morning, Your Honor.  Adrienne

 8   Dellinger.

 9        The following Plaintiff's exhibits were used yesterday

10   during the trial presentation:  PTX 11, 86, 107, 106, 211, and

11   255.  The following Joint Exhibits were used during

12   yesterday's trial presentation:  JTX 7, 10, 13, 14, 15, 16,

13   22, 23, 25, 26, 28, 29, 34, 35, 37, 40, 56, and 69.

14            THE COURT:  All right.  Any objection from

15   Defendants as to that rendition by the Plaintiff?

16            MS. SMITH:  No, Your Honor.

17            THE COURT:  Do Defendants have a similar rendition

18   to offer into the record?

19            MS. SMITH:  We do, Your Honor.  I apologize.  May I

20   have one moment, Your Honor.

21            THE COURT:  You may have a moment, counsel.

22            MS. SMITH:  Thank you.

23            MS. DELLINGER:  Your Honor, may I approach to

24   provide updated exhibit lists?

25            THE COURT:  Hand that to the Courtroom Deputy.
```

MS. SMITH: I apologize, Your Honor.

THE COURT: That's all right. Please proceed.

MS. SMITH: Defendants used DTX 40, DTX 41, DTX 50, DTX 86, DTX 89, DTX 91, DTX 96, DTX 105, DTX 106, DTX 125, DTX 127, DTX 135, DTX 136, DTX 137, DTX 140, and DTX 202.

THE COURT: All right. Any objection to that rendition from the Plaintiff?

MS. DELLINGER: May I confer briefly, Your Honor?

THE COURT: Take a moment.

MS. DELLINGER: Thank you.

THE COURT: Ms. Dellinger, what's Plaintiff's position?

MS. DELLINGER: Your Honor, we believe that there is a bit of a discrepancy between what the parties agreed to last night and what was just read. I'm trying to confirm that and don't want to cause any unnecessary obstruction, but just trying to confirm that.

MS. SMITH: Your Honor, I'm not --

THE COURT: Do you and Ms. Smith need to talk, Ms. Dellinger? Why don't the two of you take a minute and compare notes.

MS. DELLINGER: Thank you, Your Honor.

MS. SMITH: Thank you, Your Honor.

THE COURT: Take as long as you want. Just remember the clock started at 8:30.

5

(Pause in proceedings.)

THE COURT: So where are we?

MS. SMITH: We have an amended list much more brief, Your Honor. I'm withdrawing my proposal previously.

THE COURT: All right. Restate your list of exhibits.

MS. SMITH: Thank you, Your Honor.

Defendants offer DTX 96, DTX 106, and DTX 140.

THE COURT: All right. Does Plaintiff object to that revised and substituted list?

MS. DELLINGER: No, Your Honor. No objection.

THE COURT: All right.

MS. SMITH: I apologize, Your Honor.

THE COURT: Not a problem. Now is the time to get it straight.

All right. Plaintiff, are you prepared to call your next witness?

MR. CURRY: Yes, Your Honor.

THE COURT: Is that going to be Doctor Sullivan?

MR. CURRY: Yes, Your Honor.

THE COURT: All right. Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen. Welcome back. Please have a seat. We'll continue with the

6

Plaintiff's case in chief.

Plaintiff, call your next witness, please.

MR. CURRY: Your Honor, Plaintiff calls Dr. Ryan Sullivan.

THE COURT: All right. Doctor Sullivan, if you'll come forward and be sworn, please.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please come around, sir, have a seat on the witness stand.

All right, counsel. You may proceed with direct examination.

MR. CURRY: Thank you, Your Honor.

RYAN SULLIVAN, Ph.D., SWORN,

testified under oath as follows:

DIRECT EXAMINATION

BY MR. CURRY:

Q. Good morning, sir.

A. Good morning.

Q. Will you please introduce yourself to the jury?

A. Good morning. I am Ryan Sullivan. I live in Wyoming with my family, my wife and two teenage boys. I serve as a managing director of Secretariat, which is a business advisory firm, and I work as an economist. So this means that I use data and information to evaluate revenue, costs, profitability, pricing, and valuation.

7

Q. Have you prepared any slides to show us today?

A. Yes, I have.

Q. And what's on the screen?

A. These are the demonstratives I put together to help communicate my testimony today.

Q. Doctor Sullivan, what's your educational background?

A. I have a Bachelor's degree, a Master's degree, and a Ph.D. They are all in economics and all from the University of California in San Diego.

Q. Why did you choose to go to the University of California San Diego?

A. It provided me with an opportunity to work directly with a couple of professors in the Department of Economics who earned a Nobel prize in economics, and I felt that that would be an amazing place to -- to get my degrees.

Q. And what type of work do you do as a professional economist?

A. Well, I have been serving as a professional economist for over 30 years now. The work that I do really falls into two different categories. On the one hand, I do what's called business analytics or strategic decision-making. This means I work with companies to help them with licensing, valuation, statistical modeling and optimization. And I also work in disputes and litigation such as this one, often involving intellectual property and technology.

8

```
 1      Roughly speaking, my work is split about 50/50 between
 2  the business advisory work and the litigation-related work.
 3  Q.   And have you published any academic papers?
 4  A.   I have.  I've had the good fortune to have my work
 5  published in what is considered top tier, peer-reviewed
 6  journals such as the Journal of Finance and the Journal of
 7  Econometrics.
 8      I've also published in les Nouvelles, which is the
 9  journal for the licensing executive society, and I've also
10  published articles on damages in patent cases, including
11  reasonable royalty damages.
12  Q.   What does that mean for a paper you published to be
13  peer-reviewed?
14  A.   That means that the work that I've done gets reviewed and
15  refereed by other economists to make sure that it's accurate,
16  reliable, and a sufficient advance in the science of economics
17  that would make it worthy of publication in these journals.
18  So my work has been peer-reviewed, and I also serve as a
19  referee for reviewing others' work as well.
20  Q.   And have you won any awards or accolades relating to your
21  work in intellectual property?
22  A.   Yes, I have.  There's a very well-known organization
23  known as Intellectual Asset Management.  And in 2014 they
24  started recognizing top economic experts in the United States,
25  and I have been recognized as one of the top experts in
```
9

```
 1  economics for each year from 2014 onward.
 2  Q.   Can you give us some examples of work that you've done or
 3  projects you've been a part of outside of the courtroom?
 4  A.   Sure.  I -- I really have had, well, as I think of it,
 5  some neat opportunities to do some really fun work.  So here
 6  on the left-hand side, you'll see the NBA, National Basketball
 7  Association.  So I worked with the players' association in the
 8  NBA.  I was the lead economist negotiating the bargaining
 9  agreement between those to two entities so that they could
10  come to an agreement on compensation and, of course, continue
11  playing games.
12      In the middle is reference to work that I did on behalf
13  of the Boston Red Sox.  I developed mathematical algorithms
14  for pricing to help them optimize their prices.  And the goal
15  here, the objective, was to get more people and more fans into
16  the seats at each and every one of their games.  We were able
17  to achieve that.
18      The third one was really a fun one for me because it was
19  working with the real life Joy Mangano.  So you might remember
20  a few years back, there was a movie called Joy with Robert
21  Deniro, Jennifer Lawrence, and Bradley Cooper, and it was the
22  rags-to-riches story of Joy Mangano who started off selling
23  the Miracle Mop on Home Shopping Network, and she became
24  semifamous for the work that she was doing.
25      Well, the movie Joy was profiling her work which really
```
10

```
 1  resonated with me, and I worked with her in Home Shopping
 2  Network around the time of the movie launch to be able to move
 3  the sales they were doing from purely TV over to brick and
 4  mortar.  So working with Target and Bed Bath and Beyond and
 5  developing the whole business plan and the launch strategy
 6  surrounding that.
 7  Q.   If we switch over and start talking about litigation, can
 8  you talk about what companies you have worked with in
 9  litigation?
10  A.   Yes.  So I have worked with all kinds of organizations
11  and companies, big and small, some I would be willing to bet
12  that you have not heard of, and others that you certainly
13  have.  I've worked on behalf of Apple and Adobe and Microsoft
14  and IBM and T-Mobile, as well as TiVo, who helped pioneer DVR
15  technology for our TVs.
16      I have also worked on behalf of large universities,
17  including Harvard and MIT, Columbia, and the University of
18  Pennsylvania.
19  Q.   Have you ever participated in or provided expert services
20  for patent licensing negotiation outside of litigation?
21  A.   Yes.  I have done that many times.  In fact, I have two
22  large negotiations I've been working on this year.
23  Q.   And have you testified on behalf of both plaintiffs and
24  defendants?
25  A.   Yes, I have.  Approximately half of my testimony has been
```
11

```
 1  on behalf of plaintiffs and half on behalf of defendants.
 2  Q.   Doctor Sullivan, what were you asked to do in this case?
 3  A.   I was asked to calculate the damages incurred by
 4  Constellation Designs, LLC., as a result of the infringement
 5  that's been alleged against LG for infringing the four
 6  patents-in-suit here.  And, more precisely, I was asked to use
 7  my expertise to determine what is known as a reasonable
 8  royalty, which is a certain form of damages.
 9  Q.   Why are you calculating a reasonable royalty?
10  A.   Well, it is the form of damages that Constellation
11  Designs is seeking in this case.  It also is considered the
12  minimum or lower bound amount of damages in terms of the
13  measure of damages for a patent infringement.
14  Q.   Now, are you being compensated for your time on this
15  case?
16  A.   The company I work for, Secretariat, bills my time at my
17  standard rate of $2200 per hour.  I myself personally simply
18  receive an annual salary from Secretariat for work that I
19  perform.
20  Q.   And does your company charge the same rate for your
21  advisory work as it does for litigation work?
22  A.   Yes.  It is a very significant billing rate and it is the
23  same across all the work that I do.  I'm very fortunate that I
24  have worked incredibly hard to provide expertise that is in
25  demand in the marketplace.
```
12

Q.   And does your compensation depend on the outcome of the litigation?

A.   No, not in any way.

Q.   What materials did you consider in forming your opinion?

A.   I have considered, reviewed, many different documents and information, certainly the patents and case filings in this matter, but I also perform my own independent research into the marketplace where I obtained documents and data and information on the industry.

     I also had access to all of the documents that were produced by the parties to this case to be able to review and evaluate those.

     Also, I had the opportunity to talk with other experts, including Dr. Mark Jones, I talked to Dr. Chris Jones, and reviewed the report of Dr. Mark Jones.

Q.   And will you please outline all the work that you've performed in this case?

A.   So I performed my analysis, and I set it forth in a report.  The report includes over 200 pages of text wherein there is, you know, roughly 1,000 footnote citations setting forth support and clarification on the various points for my analysis.

     There is also what are called attachments.  There is about 2500 pages of tables, charts, and data that provide some of the underlying analytics for the work that I did.

                                                              13

     And then I sat for deposition, provided testimony at deposition, and the purpose of this is so that I can provide full clarity and transparency to LG, its experts, to the Court, to be able to demonstrate what my work is, what my opinions are, and to provide for full transparency so it can be evaluated.

          MR. CURRY:  Your Honor, Plaintiff offers Doctor Sullivan as an expert in the valuation of intellectual property and the calculation of patent damages.

          THE COURT:  Is there objection?

          MR. McKEON:  No objection, Your Honor.

          THE COURT:  Without objection, the Court will recognize this witness as an expert in those designated fields.

          Please continue, Mr. Curry.

          MR. CURRY:  Thank you.

Q.   (BY MR. CURRY)  Doctor Sullivan, what are the accused products in this case?

A.   The accused products are LG televisions that practice and infringe upon the Constellation Designs patents, so these are televisions that are compatible with the ATSC 3.0 standard.  And often you will see a logo attached to these products.  It says NextGen TV, which is a marketing name that is utilized for ATSC 3.0.

Q.   And can you give us a preview of the royalty rate that

                                                              14

you calculated for these TVs?

A.   My ultimate determination and opinion is that the appropriate royalty here is $6.75 per infringing television.

Q.   And will you be telling us how you reached that conclusion?

A.   I will.

Q.   And what are you showing on this slide here?

A.   These are the topics that we're going to cover today.  I can provide you with a little bit of a nutshell overview of what it is I did.

     So the appropriate framework for determining a reasonable royalty here is known as a hypothetical negotiation.  It's a negotiation that would have occurred between Constellation Designs and LG right at the time when the infringement began back in March 2020, and there are certain assumptions of that negotiation or beliefs on patent validity and infringement where those items are known at this negotiation.

     I determined that there are certain -- there was a licensing program by Zenith in the marketplace for ATSC 1.0, and the patents that were licensed under that agreement are technologically comparable to the patents-in-suit here.  It means that they are sufficiently similar for comparison.  It doesn't mean they're identical; it means that they're very similar.

     And the contribution of the Constellation Designs patents

                                                              15

is a little bit greater than what it was for the Zenith patents.  And this provides comparability in a way that allows me to determine a baseline royalty of $5 per unit, which came out of those Zenith license agreements, but there are some differences relative to those license agreements in this hypothetical negotiation.  So I made economic adjustments.

     And, in particular, what I'll show you is that the value of the dollar has declined over time, and between, say, 2005 to 2020, the value of $5, it now takes $6.75 to purchase the same thing that was $5 back in 2005.  So I make that adjustment.  And then ultimately I apply that to the number of unit sales that have occurred thus far.

Q.   Can we start with your first topic which is framework?

     Will you please explain what a reasonable royalty is?

A.   To provide some context, the legal statute states for patent infringement damages, "Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."

     And as a matter of economics, there's really two take-aways here.  First is that the reasonable royalty is the lower bound or the minimum amount of damages.  The second is that the reasonable royalty should be based upon the use of the invention by the infringer.  So here that's use of the

                                                              16

1 technology and the patents-in-suit by LG.
2 Q.   Have you given expert testimony on what a reasonable
3 royalty should be in other patent infringement cases?
4 A.   Yes, I have, many times.
5 Q.   Now, generally, what's the framework for determining what
6 a reasonable royalty is?
7 A.   As I noted a moment ago, the framework that I use here is
8 known as a hypothetical negotiation.  It is the most typical
9 framework that is used in patent litigation to determine a
10 reasonable royalty, and it's the one that is appropriate here
11 in this case.
12     It's considered a hypothetical negotiation because the
13 negotiation did not actually occur.  If it did, we would not
14 all be sitting here today and there would not be a continuing
15 dispute over the financial value of the Constellation patents.
16     This negotiation would have occurred between
17 Constellation Designs, LLC., the patent holder, the owner of
18 the patents, and LG as the accused infringer or user of those
19 patents.  And this negotiation would have occurred in March
20 2020, and that's because that's when the infringement as being
21 alleged began.  That's when LG first sold an accused
22 television.
23 Q.   Now, are there any rules to the hypothetical negotiation
24 or is it a scenario where all bets are off because it's all
25 hypothetical anyway?
                                                            17

1 A.   No.  The hypothetical negotiation, although it's
2 hypothetical, it is grounded in real-world facts, data, and
3 information.  But it is a bit different than a typical
4 negotiation that you might think of because at this
5 negotiation there is knowledge and belief that the patents are
6 valid and infringed.
7     So even though in this court proceeding LG is disputing
8 whether the patents are valid and, of course, they are taking
9 the position that they do not infringe the patents, what's
10 different at this hypothetical negotiation is those concerns
11 are not there.  There is a belief and agreement among the
12 parties that the patents are valid and that the patents are
13 infringed, that they are going to be used.
14     In addition, there is a requirement that it be between a
15 willing licensor and a willing licensee.  So the licensor here
16 is the patent holder Constellation Designs, and this means
17 that they cannot refuse to grant a license to LG that would
18 allow them to be able to utilize the technology.  And,
19 similarly, the licensee LG cannot simply just walk away,
20 refuse to pay, but yet use the technology.
21 Q.   And what information can be used in the hypothetical
22 negotiation to determine a reasonable royalty?
23 A.   All relevant and available information can be used.  So
24 here again, it's a little bit different than a typical
25 negotiation where parties might hold the cards close to their
                                                            18

1 chest.  This is much more similar to playing a card game with
2 all the cards flat out on the table, face up.
3     This means that LG understands and can see all the
4 technology, and it also means that Constellation Designs can
5 see all of the license agreements that were entered into by
6 Zenith and LG, can see their financial data and information.
7 So it's a -- it's a wholly or fully open book negotiation.
8 Q.   Are you familiar with what's called the *Georgia-Pacific*
9 factors?
10 A.   I am.  There was a court back in 1970 for a case
11 involving the Georgia-Pacific Paper Company set forth a number
12 of factors that can be considered and helpful in evaluating
13 and determining a reasonable royalty.  I'm not going to go
14 through all of these word by word with you, yet I did consider
15 the *Georgia-Pacific* factors in the course of my analysis.
16 Q.   And can we turn to your second topic which is the market
17 approach?  At a high level, what do you mean by market
18 approach?
19 A.   A market approach is one of the fundamental methods of
20 valuation using the value of using a comparable asset to help
21 determine the value of using the asset that is at issue.
22     One of the most typical and common examples or analogies
23 that's used here is renting an apartment.  So if one is
24 looking to determine what's a fair rent and a reasonable rent
25 for a two-bedroom apartment, one might look at other
                                                            19

1 apartments that are similar.
2     Now, those other apartments are not going to be
3 identical; there may be differences.  One might have a balcony
4 versus a porch or one might be overlooking one direction
5 versus another, but those differences can be considered and
6 evaluated to then use the rental amount from the -- you know,
7 the comparable apartment to determine an appropriate value for
8 the other apartment.
9     And the reason why this makes a lot of sense is because
10 the marketplace has determined those prices.  Right?  So
11 people who are renting and the landlords who are renting out,
12 they have collectively in the marketplace determined what
13 reasonable rents are.  And that's one way to be able to make
14 that comparison, and that's why this is often used in
15 valuation.  Not just even in patent litigation or in patent
16 negotiations, but much more broadly than that.
17 Q.   How did you apply the market approach in this case?
18 A.   Well, the notion of the market approach is based upon
19 comparability, and comparable comes from comparable.  It means
20 that two assets are sufficiently similar for comparison.  And
21 so what I did here is I utilized the patents and the license
22 agreements that Zenith had for its VSB technology for ATSC
23 1.0, and I compared that from a technological perspective
24 based upon the work that was performed by Dr. Mark Jones and
25 based from an economics perspective based upon my own work.
                                                            20

1      And, in particular, it is the -- it is a matter of
2 evaluating and considering the contribution of the Zenith
3 patented technology to televisions.  That's the contribution
4 to a television.  Right?  Because the royalty and the value of
5 the patents isn't the standard itself.  It is what does it
6 provide to television manufacturers and consumers, and that's
7 where the value comes.
8      And so I looked at the value contribution of the Zenith
9 patents to TVs that use that technology compared to the
10 contribution of the Constellation patents to the accused
11 products here that are compliant with ATSC 3.0.
12 Q.   And did you also look at material related to ATSC 3.0?
13 A.   Yes, I did.  There is a significant amount of praise that
14 has been set forth for ATSC 3.0.  These are three particular
15 documents that LG submitted to the FCC, the Federal
16 Communications Commission.  It's PTX 29, PTX 30, and PTX 33.
17      And I think these are informative.  In part, LG is
18 communicating to the FCC some of the value contributions of
19 ATSC 3.0, including 4K television, which is a driver of future
20 purchases of television; being able to have HDR, high dynamic
21 range; better reception.  And what LG has communicated here,
22 in part, is that the A/322 protocol that's within the ATSC 3.0
23 standard, that that is the foundational element upon which all
24 of these benefits of ATSC 3.0 are built.
25      And as we heard from Dr. Mark Jones yesterday, it is the

21

1 patented technology that helps contribute to A/322 and to
2 these specific benefits that consumers receive from the
3 technology.
4 Q.   And is the extent of LG's infringement of Constellation's
5 patented technology expected to change in the future?
6 A.   It is.  ATSC 3.0 is still in its relative infancy.  So I
7 have a chart here, and this is from the CTA, the Consumer
8 Technology Association, where in 2021 they projected out sales
9 units for TVs with ATSC 3.0.
10      And you'll see that the number of shipments or sales of
11 these televisions was relatively small.  Year one here is the
12 year 2000 [sic]; the year two is 2021; year three, 2022; year
13 four, 2023; then, 2024; and the last here, year six, is 2025.
14 And so some of this is historical data; some of this is
15 projected out into the future.  We don't have a crystal ball
16 for the future.  Of course, maybe some of us wish we did, but
17 we do not.  But this is what the expectation is, that there's
18 expected growth.
19      But because that is unknown, the way the industry has
20 dealt with that issue is by structuring royalties as a running
21 royalty, a per-unit running royalty.  So this means that if
22 ATSC 3.0 and the patented technology takes off in the future,
23 then LG would pay more to Constellation Designs and
24 Constellation Designs would benefit from the use of their
25 technology.

22

1      Conversely, if ATSC 3.0 doesn't take off or for whatever
2 reason LG decides to just simply drop the patented technology
3 from their products, then they stop paying.  And thus it's, I
4 suppose, just in sense fair from a common sense perspective.
5 But just from a matter of economics, that's how the industry
6 has dealt with this, and that is demonstrated by, you know,
7 many different licensing programs for patented technology in
8 the TV space that are like this.
9 Q.   And is that what you show on your next slide, Doctor
10 Sullivan?
11 A.   It is, as a matter of fact.  I appreciate that.
12      You know, the per-unit running royalty really does tie
13 the royalty and the magnitude, the overall amount, to the
14 extent of use and thus the benefits of the patented
15 technology.  And this is reflected throughout the industry.
16 Q.   If we will turn to the topics that you're going to
17 discuss, what do you mean by comparable agreements?
18 A.   So these are agreements that are sufficiently similar
19 such that they can be compared.  And here is a very
20 informative reference point as a matter of economics.  So what
21 I'm showing here is what is referred to as a royalty stack.
22 These are the royalties that were identified by a third party
23 and reported to the FCC as the royalties payable for
24 televisions implementing ATSC 1.0.  And these can be used for
25 comparison purposes.

23

1      The first row I list as Zenith MPEG LA ATSC 1.0 as $5.
2 And as I'll show, when Zenith started its licensing program,
3 it had bilateral negotiations, just direct negotiations with
4 companies to come to an agreement on a royalty, and that was
5 $5 per unit.  Later on after they had gone through very strong
6 licensing efforts and attained 22 different agreements, they
7 then joined up with others to form this patent pool for MPEG
8 LA ATSC 1.0.  And that rate stayed at $5, and the amount that
9 LG received from that was $3.75.  And I'll talk a bit more
10 about that.
11      But the other technologies that TV manufacturers pay for
12 ATSC 1.0 includes MPEG-2 technology at $2.50, Dolby for some
13 of the audio at $1.30, which LinkedIn provided technology for
14 65 cents.
15      Funai, which is a Japanese TV manufacturer, they are
16 considered oftentimes an OEM manufacturer.  For example, they
17 manufacture TVs for Sharp, and so their royalties were
18 reported to be $5 per unit.
19      Thompson, which is an electronics company, had technology
20 they licensed at a lower bound of $3.50 per unit, actually
21 went up to $5 per unit depending upon the size of the
22 television.
23      And then there are collection of other confidential
24 licensors that license their technology, and it ranged from
25 roughly $6 to over $20 in that two depended upon the size of

24

**Page 25**

1  the TV display. So the highest end there was anything over 47
2  inches in dimension for the display was at the high end of
3  that range. And just by way of note, for all of the accused
4  televisions here, they are all 50 inches or more.
5      And adding this all together, the total royalty stack was
6  reported to be between roughly $24 and $40 per unit.
7  Q.   If we focus on Zenith, can you describe who they were in
8  terms of their characteristics as a licensor?
9  A.   So Zenith was acquired by LG in 1999. They had stopped
10  making televisions and were focused on technology licensing.
11  They were involved in ATSC 1.0 and working with that standards
12  organization to implement it. They had patented certain
13  improvements to VSB. And as I'll explain, that was relative
14  to something called 32 QAM in terms of the VSB technology.
15      They started their licensing program in late 1997. Their
16  first license agreement was entered into in 2004, so it did
17  take time and effort to get to their first license agreement.
18  Then by the time getting into 2007, they had entered into 22
19  different agreements for their patented technology. Each and
20  every one of those was at $5 per unit. And across time,
21  the -- as you heard yesterday in the testimony, Zenith earned
22  a significant sum of $1.3 billion based upon the licensing of
23  their technology.
24  Q.   Were you in court yesterday?
25  A.   Yes, I was.

25

**Page 26**

1  Q.   Were you here for when Doctor Jones established the
2  technical comparability between the Zenith patents and
3  Constellation's patents?
4  A.   Yes, I was.
5  Q.   Okay. Can you remind us what it was that Doctor Jones
6  testified to?
7  A.   Yes. So he went through the Zenith patents, which are
8  listed here on the left-hand side column, and evaluated them
9  relative to different components to establish the technical
10  comparability across these seven items relating to ATSC, both
11  operating at the physical layer, having a receiver,
12  demodulator, demapper, symbols and decoder.
13      And based upon this, along with his evaluation of the
14  8VSB technology that was set forth by Zenith and, you know,
15  they sought to have that put into the standard and there was a
16  competing technology, which was 32 QAM, and as you would have
17  heard in testimony yesterday, there was very close similarity
18  between the 32 QAM, which was an alternative, versus the 8VSB
19  technology.
20      But, ultimately, I rely upon Dr. Mark Jones for his
21  technical comparability analysis. I'm an economist, not an
22  engineer, so I do rely upon his work for that side.
23      MR. CURRY: And, Your Honor, our next topics go into
24  the Zenith agreements, and it's my understanding that LG
25  wishes to seal the courtroom at this time.

26

**Page 27**

1      THE COURT: All right.
2      MR. McKEON: Your Honor, I think we are fine to
3  proceed as we have it.
4      THE COURT: All right. If something changes, let me
5  know. Let's continue.
6      MR. CURRY: Thank you, Your Honor.
7  Q.   (BY MR. CURRY) Doctor Sullivan, what Zenith agreements
8  did you consider in your analysis?
9  A.   There were 22 different agreements that Zenith entered
10  into. I'm listing 19 of them here. All 19 of these have
11  royalties that are payable for consumer televisions. The
12  other three were for commercial equipment suppliers. They,
13  too, happen to be at $5 per unit, but the focus here on the
14  license agreements with specifying royalties on consumer TVs.
15      There are three agreements in particular that I found to
16  be the most relevant and most applicable, and that would be
17  the agreements with LG, Toshiba, and Sharp. Naturally, LG is
18  a party to the hypothetical negotiation. They were a licensee
19  in the Zenith agreement, and they are a licensee here. And
20  they have a very similar, you know, business model, of course
21  because it's the same business model.
22      For Toshiba and Sharp, they are also very similar
23  entities to LG in terms of what it is that they are producing
24  and providing in the marketplace.
25  Q.   Doctor Sullivan, can you tell us more about how you look

27

**Page 28**

1  at the economics of the Zenith/LG agreement?
2  A.   Yes. So this is an excerpt from that agreement that was
3  entered into in 2004. You'll see that section 3.1 of the
4  agreement states that "Licensee shall pay Zenith a five dollar
5  cash royalty for each unit of VSB demodulation equipment sold
6  by licensee and its affiliates within the licensed territories
7  during the term of the essential Zenith receiver patents
8  regardless of whether such unit is capable of VSB decoding
9  more than one channel at a time."
10      So there's a few things here. Just allow me to unpack a
11  couple of items or clarify.
12      So VSB demodulation equipment, that is a defined term in
13  the agreement, so if you take a look at the agreement you'll
14  see that that includes specifically consumer televisions which
15  makes sense because this was an agreement with LG for consumer
16  televisions that they were paying on.
17      It also is for the term of the Zenith receiver patents.
18  So these are the patents that were determined by Dr. Mark
19  Jones to be comparable. And what that also implies is that
20  when those patents expire, there would no longer be
21  royalties payable. So it's just for the term of the patents,
22  and that point's going to become relevant here in just a few
23  moments.
24      Further on in the agreement, and it comes up in the other
25  agreements, too, is that the royalty is specifically not

28

1 payable for semiconductor chips, meaning that there's some
2 notion, you know, that part of the technology is provided in
3 the chips but it's not the chips that are royalty-bearing,
4 it's the television.
5 Q.   And can you take us through the Zenith/Toshiba agreement?
6 A.   So this is very similar.  And if you take a look at the
7 language, it's virtually identical, and -- which is similar
8 across the other agreements as well, Toshiba being a supplier
9 of televisions, very similar to -- you know, LG.
10      One thing that's interesting here is this is a per-unit
11 running royalty.  Later on in time, Toshiba sold their
12 television business to another company called High Sense, and
13 at that time then Toshiba exited the television business.
14 Now, there's still Toshiba TVs sold because they also sold the
15 brand name, but the Toshiba company then can stop paying
16 royalties because they are no longer selling the televisions.
17 And that's part of why the industry structures royalties as a
18 running royalty, a per-unit running royalty.
19 Q.   And I think the third one you mentioned was the
20 Zenith/Sharp agreement.  Can you walk us through that one,
21 please?
22 A.   Yes, this is, again, very similar, Sharp selling
23 televisions and having a similar business model for
24 televisions as LG.  Here, again, the royalty is specified as
25 $5 per TV.

29

1 Q.   Now, did the other Zenith agreements also inform your
2 analysis?
3 A.   Yes, they did.  As I noted, there was a total of 19
4 Zenith agreements for consumer televisions; thus I looked at
5 three, means there's 16 others.  They are all very similar.
6 They all reflect a $5 per-unit royalty.
7      The chief patent counsel of Zenith testified that to the
8 best of his recollection the lowest royalty rate that Zenith
9 had granted any party for past damages was $5 per unit.  And
10 this was further confirmation that what was actually paid was
11 at a lower bound of $5 a unit.
12 Q.   How comparable are the Zenith agreements to the
13 hypothetical negotiation?
14 A.   They are very similar.  They would be considered
15 comparable.  They are not identical.  There are differences.
16 So what I have here and what I'm going to go through, right
17 now it's largely an empty table and you can be guessing that
18 I'm going to fill this in.
19      But I'm looking -- on the blue column are the Zenith
20 agreements, the green column is the hypothetical negotiation.
21 So I'm going to compare those two things to see if I need to
22 make adjustments or account for differences between the Zenith
23 agreements on the one hand and the hypothetical negotiation on
24 the other and determine what the impact might be on the
25 royalty.

30

1      As we know, you can see at the bottom row the royalty
2 rate for the Zenith agreements is $5.  So then the question
3 is, well, what is it for the hypothetical negotiation.  I have
4 a green blank here, but I suppose I already spilled the beans
5 there and it's $6.75.  So I'm just going to go ahead and fill
6 this in and just walk through this line by line here to -- to
7 go through it.
8      The products are the same.  They are televisions.  And
9 the license agreements were all non-exclusive, and here it,
10 too, would be non-exclusive.  That means others would have the
11 rights to be able to license the technology as well, so
12 there's no impact on the royalty from those.  They both
13 specify a per-unit running royalty structure.
14      The technology area is very similar.  The physical layers
15 of ATSC 1.0 on the Zenith agreements side and ATSC 3.0 for the
16 Constellation Designs patents.
17      There was a technology advancement for the Zenith patents
18 that were licensed under the Zenith agreements of the 8VSB
19 technology, but it was explained yesterday in testimony the
20 alternative that was considered, the competing technology of
21 32 QAM, achieved roughly and almost the same benefits as the
22 Zenith 8VSB technology.
23      Whereas here, for the Constellation Designs patents, as
24 explained by Doctor Jones and Doctor Jones, both of them,
25 there was a very significant increase in capacity provided by

31

1 the patented technology.  In fact, when Dr. Chris Jones was
2 testifying and there was a chart trying to show where it is
3 relative to the Shannon limit and, you know, there are --
4 many, many years went by, they got a 2dB improvement.  And
5 then they came along with their technology and got another 1dB
6 plus improvement as a result of their technology.  So
7 something very significant.  And there's not an alternative
8 for that technology to yield those benefits.
9      And that would thus cause the royalty, if anything, to be
10 higher for the Constellation Designs patents at the
11 hypothetical negotiation than for the $5 per unit from the
12 Zenith agreement.
13      At the hypothetical negotiation, as I noted, there is
14 kind of a rule that the patents are believed to be valid and
15 infringed.  And in a real-world negotiation those can be
16 disputed and debated, and that also could cause the royalties
17 to be higher.
18      The timing of those agreements is quite different.  The
19 primary and most relevant agreements that Zenith entered into
20 were in 2004 and 2005 for Toshiba, LG, and Sharp, versus March
21 2020 for the hypothetical negotiation.  So it's a roughly
22 15-year differential.  And I'm going to make an adjustment for
23 that.
24      So another little preview here is I make an adjustment
25 quantitatively for the difference in timing, for the

32

## Page 33

1 difference in the value of the dollar that has occurred over
2 time, and that's the timing row here. I do not make a
3 quantitative adjustment for those other items that would
4 result in an upward, you know, adjustment to the royalty. And
5 in my view, by not doing so, that helps ensure that the
6 per-unit royalty ultimately is reasonable.
7 Q. Doctor Sullivan, if we line up the Zenith agreements with
8 the hypothetical negotiation like you have here, and we were
9 to compare the role that the Constellation Designs patents
10 have with respect to ATSC 3.0 versus the role that the Zenith
11 patents had and the Zenith agreements had with ATSC 1.0, what
12 does that tell you about what a fair and reasonable royalty
13 should be in this case?
14 A. Well, it means that it would be higher than $5 per unit,
15 that the $5 per unit that Zenith implemented in the
16 marketplace really serves as a floor relative to the
17 Constellation Designs patents. And that makes good sense as a
18 matter of economics, given that there's greater contribution
19 of the Constellation Designs patents and it's later in time.
20 Q. Do you make any economic adjustments to account for the
21 differences that you just went through?
22 A. Yes. I accounted for the effect of inflation.
23 Q. Now, what's the basis for making an economic adjustment
24 for timing or inflation?
25 A. Well, I mean, one is just basic economics. I think we

## Page 34

1 all know that there's been inflation, and that the value of
2 the dollar has declined over time, and that's a fundamental
3 economic principle here.
4 In addition, there is documentary evidence that the role
5 of inflation has been considered by Zenith in the licensing
6 market for their technology. On the left-hand side is a
7 document that was put together in late 1997 by a company
8 called PriceWaterhouse. They are a large financial and
9 accounting firm. And they did a study for Zenith to help them
10 figure out how to approach their licensing of their
11 technology. That's where the $5 per unit initially originated
12 from.
13 And in there, there was a recommendation to implement an
14 annual inflation adjustment such that that $5 would increase
15 each and every year throughout the license term based upon the
16 CPI, the consumer price index. And that was what they
17 suggested.
18 Now, as I noted, there weren't license agreements entered
19 into until the 2000s. And over here on the right are the
20 first three agreements that Zenith entered into in the early
21 2000s, and those agreements were with the commercial providers
22 of broadcast equipment. So not consumer TV, so a little bit
23 different, but they were still paying for equipment that is
24 similar to the TVs at $5 per unit.
25 But what's interesting is in those agreements, those

## Page 35

1 three, they provide a provision such that the royalties would
2 go up each year in accordance with the consumer price index.
3 Now, what happened in reality is thereafter the further
4 agreements that were entered into, they removed that and made
5 it just $5 flat. And thus even for these agreements, they did
6 not end up paying that $5 increasing each year. And as a
7 matter of economics, that really makes sense because Zenith
8 had contributed their patents and declared them to the
9 standard. They participated in ATSC 1.0, so they were able to
10 cause their technology to be implemented in the standard.
11 Because of that, there is what is called a RAND commitment to
12 license royalties on reasonable and non-discriminatory terms.
13 That's the acronym RAND, reasonable and non-discriminatory.
14 Well, in order to have that be non-discriminatory, that
15 means the rate has to be the same. And if you have different
16 agreements entered into at different times, there's going to
17 be different payment amounts as they escalate over time that
18 could not be consistent with their commitment, and thus they
19 went to a flat royalty of $5 per unit from that point forward.
20 Q. Now, if we focus on the hypothetical negotiation, what
21 role does inflation play there?
22 A. Well, it's, I suppose, not unlike what we've experienced.
23 Eggs, orange juice, whatever it may be, sliced cheese, it all
24 just keeps going up, up, and up, and that we've experienced.
25 Although we've experienced it even more so lately, it's still

## Page 36

1 something that has occurred consistently over time where just
2 simply the value of the dollar has gone down, there has been
3 inflation that we've experienced.
4 And the market for licensing technology is no different.
5 It, too, has, you know, observed and experienced inflation.
6 Q. But aren't the prices of TVs declining?
7 A. Well, the price of any individual TV declines over time.
8 So when a TV comes out in that model, over time with that
9 technology, it comes down over time. But then a new TV that's
10 bigger, brighter, has more bells and whistles, it comes in at
11 a higher price, that model declines over time. And then
12 there's an even bigger, badder TV and it's got 4K and it's got
13 Alexa and it's got all of these other Smart TV functions and
14 it's priced even higher. And what does it do? It starts to
15 come down over time. And now there's 8K TVs. I mean, it just
16 -- you know, the cycle goes on.
17 And so what I'm trying to illustrate here is that TVs,
18 individual models, certainly do decline in price over time.
19 But the, you know, new TVs require innovation. As they add
20 more features, functionalities, and benefits, the pricing goes
21 up.
22 Q. Now, if we switch from the TV market to the licensing
23 market, what are you -- what have you observed about royalty
24 rates charged in the patent pools relative from ATSC 3.0 to
25 1.0?

**[Page 37]**

1  A.   So this is a really interesting set of information here,
2  and I want to describe it at two levels.  So, first off, on
3  the left-hand side is ATSC 1.0.  And as I noted, Zenith joined
4  the patent pool with others and they kept the royalty at $5
5  per unit.  So the patent pool royalty was $5 per unit.  Okay.
6      Fast forward to this year.  There have been two patent
7  pools formed with royalty rates that were established.  MPEG
8  LA, again, sometimes it's referred to now as Via, but it's
9  MPEG LA, the royalty rate for ATSC 3.0 under MPEG LA is $2.75
10  per unit, $2.75.
11      There's another patent pool that LG is participating in
12  called Avanci.  So Avanci is the -- like MPEG LA, they are an
13  administrator of a patent pool and the royalty rate for that
14  pool is $3 per unit.  So using some simple math here, $2.75
15  plus $3 is $5.75 a unit for the patent pool.  So over time the
16  patent pool went from $5 for 1.0 up to $5.75 for 3.0, which
17  shows the increase in value of technology.  So that's at, I'll
18  call it, a high level or basic level.
19      But there's more to this.  So the -- going back to 1.0
20  and MPEG LA, Zenith for it -- before it joined the patent
21  pool, it undertook some very strong licensing efforts.  Those
22  efforts ultimately over time resulted in 22 license agreements
23  at $5 per unit, 19 of those agreements for consumer TVs.
24      At that point in time, after they had established those
25  royalties through those very significant efforts, they then

**[Page 39]**

1  evaluation.  In fact, there is evidence indicating that
2  Avanci, for example, has not reviewed or evaluated any of the
3  patents yet that were contributed to that patent pool.
4      So what we're comparing here is, you know, something a
5  little bit different, you know.  At the hypothetical
6  negotiation these are patents that are assumed valid and
7  infringed, whereas in the most recent patent pools at $5.75,
8  those have not been evaluated or vetted.
9  Q.   When you're making an adjustment for inflation, do you
10  look at prices for the TV market or do you look at how the
11  rates for the patent pools have gone up or do you use official
12  data?
13  A.   Use official data.  The -- you know, technology that's
14  being licensed is similar in many ways to a carton of eggs.
15  It, too, experiences inflation.  What the documents I showed
16  you earlier from PriceWaterhouse and some of the Zenith
17  agreements, they specify and give us insights into what
18  measure of inflation we should be using, and it's simply the
19  consumer price index.
20      The Bureau of Labor Statistics for the U.S. government
21  puts this out quite frequently.  You probably hear it on the
22  news.  Technically it is the consumer price index for urban
23  consumers.  That's what's specified in those documents, and
24  that's what I'm utilizing here.  That's what you hear about on
25  the news, and it's the basis for many different contracts and

**[Page 38]**

1  formed this patent pool with others.  When they joined the
2  patent pool, their share of royalties, their amount, went from
3  $5 down to $3.75, with a little bit they also got of the
4  $1.25.  But the $3.75, the bulk of that was based upon what
5  are called list 1 patents.  That's how that agreement termed
6  them.  There were two, two Zenith patents that garnered that
7  $3.75.  So when they first started that patent pool, $3.75 of
8  it went to Zenith based upon those two patents alone.
9      The other patents in the $1.25 remaining in that $5 would
10  be considered pooling patents.  And pooling patents are ones
11  that are tossed, placed, assigned to a pool, and typically the
12  payments or the compensation to the patent holders is based
13  upon an allocation based on the number of patents that are put
14  in.  And they're not what would typically be considered vetted
15  patents or evaluated or tested patents.
16      And you can guess and you would be right that not all
17  patents are created equal.  That's why two Zenith patents
18  delivered $3.75 where all the other patents along with other
19  industry players was only $1.25.
20      So now let's look on the right-hand side for ATSC 3.0.
21  These are patent pools that were just established, there has
22  not been to date any information or indication that anybody
23  has paid on these license rates yet, but what's fascinating is
24  that all of these patents have been contributed to those
25  patent pools without the testing and the vetting and the

**[Page 40]**

1  agreements throughout.
2      So if you look at this chart, you'll see that it's going
3  up at a trend over time.  You'll see that there is a dip in
4  2020.  You'll correlate that with COVID and the pandemic.  And
5  then you'll see a nice big upswing thereafter when there was,
6  you know, a lot of financial stimulus that came in and that
7  caused even further inflation and that's why we're seeing an
8  uptick there.
9          THE COURT:  Counsel, approach the bench, please.
10          (The following was had outside the hearing of the
11      jury.)
12          THE COURT:  Mr. Curry, he is effectively lecturing
13  the jury with long narrative answers.  You just asked him
14  about did he or did he not use official data.  He said
15  official data and then there is about 15 lines of explanation.
16  To the best of your ability, break this down into discrete
17  questions going forward.
18          MR. CURRY:  Yes, sir.  Thank you.
19          MR. McKEON:  Thank you, Your Honor.
20          (The following was had in the presence and hearing
21      of the jury.)
22          THE COURT:  Let's continue.
23  Q.   (BY MR. CURRY)  Doctor Sullivan, can you take us through
24  the actual mechanics of how you use inflation data to
25  calculate and adjust for the Zenith $5 per unit royalty in

**[Page 41]**

1  this case?
2  A.   Yes.  So here on the left side of this, you'll see where
3  the $5 for Toshiba, LG, and Sharp were established.  And then
4  over on the right in March 2020, which is right before the
5  large upswing and inflation, the mathematically adjusted to
6  make those equivalent is $6.68 for Sharp, $6.76 for LG, and
7  $6.82 for Toshiba.  And the Toshiba one is -- results in the
8  highest amount because it was the earliest agreement that was
9  entered into.  So there's been more time and thus more
10 inflation.
11 Q.   Sorry.  And what do you do with those rates after you've
12 made the economic adjustments for inflation for those three?
13 A.   So I looked at all three of those.  If you take the
14 average, it's $6.76.  If you look at the midpoint, that's
15 $6.76.  I just rounded it to the nearest whole penny of $6.75.
16     I have not implemented an inflationary adjustment from
17 the hypothetical negotiation forward.  It's establishing it at
18 that point in time and then holding it fixed thereafter, just
19 like in the Zenith agreements.
20 Q.   And with the royalty rate calculated, are you ready to
21 turn to your final topic?
22 A.   Yes.
23 Q.   And how did you calculate a reasonable royalty?
24 A.   From here it is simple arithmetic, taking the $6.75 and
25 multiplying that by the number of accused units for the

**[Page 43]**

1  the royalties you calculated are reasonable?
2  A.   It is.
3  Q.   And will you please explain that, summarizing it, please?
4  A.   Well, first off, by utilizing the Zenith agreements and
5  the comparable technology, that isolates the contributions of
6  the Constellation Designs patents and its value contribution
7  separate and apart from other features, factors, and
8  functionalities of the televisions.
9      Secondly, it is fair to LG as a per-unit running royalty.
10 It's very similar, albeit time adjusted, to what they had for
11 their technology.  It allows them to use that technology as
12 much or as little as they choose to do.
13     It's fair to Constellation Designs as it provides them
14 with a royalty for their patented technology that they
15 developed and the improvements that they generated.  And I
16 think this makes a lot of sense because Constellation Designs
17 is in a very similar position to what Zenith was years ago
18 when they were establishing their licensing program, and they,
19 too, went through significant licensing efforts, obtained
20 those royalties, and that's what's occurring here.  It just
21 shifted in time.
22 Q.   Thank you.
23     MR. CURRY:  Your Honor, I pass the witness.
24     THE COURT:  All right.  Cross examination by the
25 Defendant?

**[Page 42]**

1  damages period for which we have data here, which goes from
2  March 2020 through May 2023.
3  Q.   And what were the accused units during that time frame?
4  A.   249,551 units.
5  Q.   Now, do we now have everything we need to calculate past
6  damages?
7  A.   We do.
8  Q.   Will you take us through the math, sir?
9  A.   Sure.  So $6.75 times 249,551, that math provides a
10 reasonable royalty of $1,684,469.
11 Q.   Should the royalty rate, $6.75, be the same regardless of
12 how many patents LG has found to infringe?
13 A.   Yes, it should.
14 Q.   And will you explain why?
15 A.   Well, for one, there is substantial technological overlap
16 among the four patents.  What they're providing from a
17 contribution perspective is very similar.
18     In addition, the patent agreements that were entered into
19 by Zenith, all of those are, you know, one royalty, whether
20 it's two patents, one patent, four patents, whether it's
21 one -- you know, so long as there's one claim of one patent,
22 then there's still that same royalty.  And that's very common
23 in the industry and thus that's what I apply here.
24 Q.   And, Doctor Sullivan, if you think about the economics of
25 this case and the technology involved, is it your opinion that

**[Page 44]**

1      MR. McKEON:  Yes, Your Honor.
2      And may we hand out some binders, Your Honor.
3      THE COURT:  You may distribute binders.
4      All right.  Mr. McKeon, you may proceed with cross
5  examination.
6      MR. McKEON:  Thank you, Your Honor.
7                    CROSS EXAMINATION
8  BY MR. McKEON:
9  Q.   Good morning, Doctor Sullivan.
10 A.   Good morning.
11 Q.   We have not met.  I am Mike McKeon.  It's nice to see you
12 today.
13 A.   Likewise.
14 Q.   Your educational background is economics.  Correct?
15 A.   Yes, that's right.
16 Q.   And that's your area of expertise.  Right?
17 A.   Economics, finance, statistics.
18 Q.   But you don't have a technical background.  Right?
19 A.   Not in engineering.
20 Q.   Well, you're not here to testify about technical issues
21 today.  Isn't that right?
22 A.   Well, economics is actually referred to as a technical
23 field, so in that sense it's technical, but not technological
24 in terms of engineering.
25 Q.   Yeah.  I'm talking about the TVs and in terms of the

**[Page 45]**

1  details of how they work and all the stuff we've heard the
2  last couple of days in this courtroom.  You're not here to
3  talk about that kind of technology.  Isn't that right?
4  A.  I'm not here to talk about engineering details of
5  televisions and broadcast systems.  I'm here to talk about the
6  economics.
7  Q.  Okay.  I just want to make sure we're clear on this.
8  You're not here to talk about sort of the technical issues
9  relating to operation of the TV, how it works, and all the
10  details we've talked about in the last two days in this
11  courtroom.  Isn't that right?
12  A.  Not quite.
13  Q.  Well, you're not an engineer.  Isn't that right?
14  A.  That's right.
15  Q.  You're a Ph.D.  I saw that in your resume.  But you're an
16  economist.  Right?
17  A.  That is correct.
18  Q.  You're not going explain to the jury about the technical
19  details, what's going on with that TV.  You're not going to do
20  that today.  Isn't that right?
21  A.  No, not as I would think of it.
22  Q.  Well, is it your testimony, sir, that you're prepared to
23  testify to this jury about -- about OFDM and VSB and how the
24  TVs operate internally?  Is that -- is that -- are you
25  prepared to testify about that today?

**[Page 46]**

1  A.  Well, I have testified to some degree on the technical
2  side based upon what it is I understand.  When I say
3  technical, I mean technological.  But I approach it as an
4  economist.  So I'm purely providing my work as an economist
5  based upon my understanding of the technology.
6  Q.  Well, you're not here to talk about infringement.  We
7  know that.  Right?
8  A.  That's right.
9  Q.  And you're relying on -- in terms of the engineering
10  materials you're relying on Dr. Mark Jones.  Correct?
11  A.  Doctor Jones and Doctor Jones.  So Dr. Mark Jones and
12  Dr. Chris Jones.
13  Q.  The two Doctor Jones, you're relying on them for the
14  technical details in this case.  Correct?
15  A.  Yes, that's right.
16  Q.  Now, you're offering an opinion to the jury on what a
17  reasonable royalty is for Constellation Designs' patents if
18  the jury finds infringement and validity.  Right?
19  A.  Yes, that's correct.
20  Q.  And just for to make it easier for today, if I say CD,
21  you understand I'm referring to Constellation Designs, LLC.,
22  the Plaintiff.  Is that right?
23  A.  I'll take that, sure.
24  Q.  Thank you.
25     And what we know is that the job here is to calculate a

**[Page 47]**

1  reasonable royalty.  Isn't that right?
2  A.  Yes.  That's what I did.
3  Q.  Not an unreasonable royalty.  You're not here to present
4  an unreasonable royalty.  Isn't that right?
5  A.  Correct.
6  Q.  And your job is to figure out what CD and LG would have
7  agreed to in a hypothetical negotiation that would have
8  happened when the alleged infringement in this case began.
9  Isn't that right?
10  A.  That's right.  March 2020.
11  Q.  Okay.
12     MR. McKEON:  And if I get the elmo, please.
13  Q.  (BY MR. McKEON)  And I have your slide here.  You recall
14  presenting that to the jury?
15  A.  Yes, I do.
16  Q.  Okay.  And that's a typical slide that's used in these
17  cases about the parties being sort of in a room and they're
18  negotiating at the time when the alleged infringement starts
19  and they've got all the information they need and they're
20  negotiating for a license.  Isn't that right?
21  A.  It's a common depiction.
22  Q.  Okay.  And unlike the real world negotiations, in the
23  hypothetical negotiation, both CD and LG would have come into
24  the room and both would have knowledge of all relevant facts.
25  Right?

**[Page 48]**

1  A.  I agree.
2  Q.  And there's no secrets, like the cards are up on the
3  table.  Isn't that right?
4  A.  That is the intention, yes.
5  Q.  In fact, you had a slide showing sort of two people with
6  the cards up on the table.  Isn't that right?
7  A.  Yes.  Effectively cards up on the table.  It's the two
8  slides later.
9  Q.  Okay.  Well, let me -- if there's any doubt in your mind,
10  let me get the slide and show the jury and we can make sure
11  we're all on the same page there, what you showed the jury.
12     THE COURT:  Let's don't talk about things.  Let's
13  ask questions of the witness.
14     MR. McKEON:  Thank you, Your Honor.  Sorry about
15  that.
16  Q.  (BY MR. McKEON)  And that was the slide that you showed
17  the jury.  Isn't that right, sir?
18  A.  Yes, it is.
19  Q.  And that's cards up on the table.  Isn't that right?
20  A.  That's the intention.
21  Q.  And all information learned in this trial would be shared
22  in the hypothetical negotiation.  Isn't that right?
23  A.  In effect.  All of the information would be available for
24  consideration.
25  Q.  So for starters, both sides would know that no one has

1 ever paid CD to license these patents. Correct?
2 A. That's right.
3 Q. And both parties would know that CD has not earned any
4 revenue at all off the asserted patents. Correct?
5 A. As of March 2020, that's correct.
6 Q. And both parties would also know that CD never sold a
7 product incorporating the technology of the patents. Correct?
8 A. That's right.
9 Q. Both parties would know that LG was a significant
10 contributor to the ATSC 3.0 standard. Correct?
11 A. I think I've seen some debate on that issue, yet some
12 have viewed it that way.
13 Q. Okay. But both parties, including LG, would know what it
14 did in ATSC 3.0. All the meetings, all the contributions, LG
15 would know that and CD would know that. Correct?
16 A. Correct.
17 Q. And both sides would know about the LG's patents that
18 they received on ATSC 3.0 technology. Correct?
19 A. That's right.
20 Q. And we had in the opening we had a stack -- I think it
21 was a hundred patents LG had related to ATSC 3.0. Were you
22 here for opening?
23 A. I was here for openings.
24 Q. You recall that stack on the table?
25 A. I do. I mean, certainly I don't know what it was, but I
49

1 trial as far as we know about that. Isn't that right?
2 A. They would, yes.
3 Q. And sometimes referred to in this area as the book of
4 wisdom where you can see sort of in the future of what's going
5 to happen. Isn't that right?
6 A. There is a book of wisdom that can be used. I would
7 characterize it a bit differently.
8 Q. Okay. And both parties in the room would know that the
9 rate for a license to the patents in the Avanci patent pool is
10 no more than $3 per TV. Right?
11 A. Correct, $3 per unit.
12 Q. And, again, LG would know this and CD would know this.
13 Correct?
14 A. That's right.
15 Q. Okay. And you're telling the jury here, as I understand
16 your testimony, that in that room with all this information,
17 in that room LG would say, yes, $6.75 per TV for these four CD
18 patents, that's what's ultimately agreed to. Correct?
19 A. That is my opinion.
20 Q. And you're saying that LG would agree to that rate, Mr.
21 Marino across the table, LG would agree to that rate even
22 though LG knows that, as part of the Avanci pool, and it pays
23 no more than $3 per TV in that pool. Correct?
24 A. That is incorrect.
25 Q. Well, you know that LG is in the pool. Correct?
51

1 did see it being referenced that way.
2 Q. Okay. And, again, both parties would know this in that
3 room.
4 A. Well, they would know about LG patents.
5 Q. And the contributions to the standard.
6 A. That, too.
7 Q. And both parties in the room would know about the Avanci
8 patent pool. Isn't that right?
9 A. Yes and no. So it's kind of interesting because that
10 didn't occur until much later, but oftentimes we think about
11 at the hypothetical negotiation that that information would
12 still be considered at the hypothetical.
13 Q. You established earlier that all the information we
14 learned in this trial, that would be in the hypothetical
15 negotiation. Isn't that right?
16        THE COURT: Can you slow down, Mr. McKeon?
17        MR. McKEON: Sorry, Your Honor.
18 Q. (BY MR. McKEON) All the information we learned about in
19 the trial would be part of the hypothetical negotiation.
20 Correct?
21 A. That's not how I put it, but it's all the relevant and
22 available information. It's not the information in this
23 trial, per se. It's, you know, within this case, there is a
24 broad set of information.
25 Q. Sure. Even broader outside of what we learned in this
50

1 A. They are in the Avanci pool, not MPEG LA.
2 Q. Did I say MPEG LA? I apologize. Let me say it again.
3 LG would agree to this even though it understood that it was
4 in the Avanci pool, paying no more than $3 per TV. Correct?
5 A. The first part of that is correct. The last part is
6 incorrect.
7 Q. Okay. We'll look at the license in a minute, but we know
8 that LG is in the pool and LG is a licensee to the pool.
9 Correct?
10 A. Right. So under Avanci, they can pay $3 or less, but
11 that doesn't account for MPEG LA and the $2.75 there. So
12 there's two pieces there. I'm just trying to separate those
13 out.
14 Q. I didn't ask you about MPEG LA. We're going to get to
15 that.
16        THE COURT: Counsel, if the witness is
17 non-responsive in your view, raise it with me. Don't tell him
18 you didn't ask him that.
19        MR. McKEON: Okay. Sorry, Your Honor.
20 Q. (BY MR. McKEON) Just focusing Avanci, LG would
21 understand that in the Avanci pool, it is a licensee to the
22 Avanci pool and it has agreed to pay no more than $3 per TV.
23 Correct?
24 A. That's right.
25 Q. And to be clear, sir, no one has ever paid $6.75 per TV
52

**Page 53**

1  for any ATSC 3.0-related patents.  Isn't that right?
2  A.   As of yet, that is correct.
3  Q.   And you haven't shown the jury a single license where
4  someone paid for any patents related to ATSC 3.0 for an amount
5  of $6.75 per TV.  Isn't that right?
6  A.   That's right.
7  Q.   In fact, no one has ever paid even $5 per TV for an ATSC
8  3.0 license.  Correct?
9  A.   Well, the two pools are out there.  Whether license
10  payments have actually been made yet, it's still very early
11  on.  There's not evidence the payments have been made.
12  Q.   Sir, did you have any knowledge that there's members of
13  the MPEG pool that are also members of the Avanci pool?
14  A.   I did not follow.
15  Q.   Well, is it your testimony -- let me ask it this way.
16  Isn't it a fact that there's no members of the MPEG LA ATSC
17  pool that are also members of the Avanci pool?
18  A.   For licensors?
19  Q.   Licensees, sir.
20  A.   I am not aware of overlap on the licensees.  Again, still
21  in its infancy.
22  Q.   Right.  So nobody is paying -- no one's paying $5 per TV
23  for any ATSC 3.0 license.  Correct?
24  A.   Not yet.
25  Q.   And no one's paying $5.75 per TV for an ATSC license.

53

**Page 54**

1  Correct?
2  A.   There's no evidence yet.
3  Q.   Now, you understand the accused products are LG TVs
4  compatible with the A/322 standard that is part of ATSC 3.0.
5  Right?
6  A.   That's right.  I mean, TVs that infringe the CD patents
7  and those are compatible with A/322.
8  Q.   Okay.  Well, I'm just focusing, sir, on the accused
9  products in this case.  You understand that the accused
10  products are LG televisions compatible with the A/322
11  standard.  Correct?
12  A.   Yes, as I just said.
13  Q.   And, of course, you're aware the Avanci pool licenses
14  ATSC 3.0 as essential patents.  Correct?
15  A.   No.  It licenses patents.  Those have not been determined
16  to be essential.
17  Q.   Well, the license agreements with Avanci specifically say
18  they are licensing essential patents.  Correct?
19  A.   Well, that's the intention, but those patents have not
20  been evaluated or vetted to determine whether they are
21  essential or not.
22  Q.   Well, we'll talk about that.  And just so we all
23  understand these pools, the way a pool works is that the
24  patent holders will sort of put their patents into the pool
25  and give the pool administrator the right to sublicense.

54

**Page 55**

1  Isn't that right?
2  A.   In effect, that's right.
3  Q.   Okay.  And the idea here is it's going to be one stop
4  shopping where a lot of patent owners can come in when they
5  have technology related to specific things, put their patents
6  in the pool, and this way if somebody wants to practice this
7  technology, they can go to the pool and get more than just one
8  patent holder but multiple patent holders' licenses to those
9  patents.  Correct?
10  A.   That is the intention.
11  Q.   And you're aware the Avanci pool includes thousands of
12  U.S. patents from different contributors.  Correct?
13  A.   No.
14  Q.   You're not aware of the fact that Avanci, that the actual
15  number of patents in the pool is in the order of thousands?
16  A.   I have seen claims in that regard.  I have not seen
17  documentary evidence.
18  Q.   Okay.  Well, you understand that Avanci is out there
19  saying and making the representation that it has thousands of
20  patents in its pool.  Correct?
21  A.   I have seen your claims in that regard.
22  Q.   Well, sir they're not my claims.  This is what Avanci is
23  saying about its pool.  Correct?
24  A.   Again, I have not seen documentary evidence that would
25  substantiate that point.

55

**Page 56**

1  Q.   Well, companies that contribute to the patent pools
2  include LG, Sharp, Samsung, and Panasonic.  Isn't that right?
3  A.   That's right.
4  Q.   They're contributing all their patents that are related
5  to the ATSC 3.0 standard to the pool.  Correct?
6  A.   That's the intention.
7  Q.   And all these patents that have been contributed by these
8  different companies, those patents have been declared by them
9  as essential to the ATSC 3.0 standard.  Correct?
10  A.   No.  They are declared that they may be essential.
11  Q.   You're saying that the representation to the standard
12  body is they may be and not that they are essential?
13  A.   Correct.
14  Q.   Okay.  Well, we'll talk about that in a minute.
15       Now, let me ask you this question.
16       MR. McKEON:  Let's pull up JTX 71, if we can.
17  Q.   (BY MR. McKEON)  Now, you studied -- this is the
18  agreement between LG and Avanci.  Have you seen this before,
19  sir?
20  A.   I'm having trouble seeing it.
21  Q.   Let's get it blown up.
22  A.   Yes.
23  Q.   Okay.  And this is the agreement where LG has an
24  agreement with the platform sort of operator here which is
25  Avanci, the pool administrator.  Correct?

56

A. That's right.
Q. Okay. And if we go down to the -- well, let me ask this question. In the agreement between Avanci and LG, in this agreement Avanci grants LG a license to the patents in the pool from all of the companies that put the patents in the pool. Correct?
A. That's right. It's a form of cross licensing.
Q. All right. And, of course, this is an agreement that's executed between these two very sophisticated companies. Isn't that right?
A. It is executed among companies, and they are reasonably sophisticated.
Q. Okay. And let's look at the whereas clauses, if we can, so we can get some context.
    MR. McKEON: If we can blow those up.
Q. (BY MR. McKEON) Now, in the whereas clauses, it indicates here that -- it talks about the ATSC standards. Do you see that in the first -- in the first paragraph there?
A. Yes, I do.
Q. Okay. And it talks about a licensor owns one or more patents essential to one or more licensed standards. Do you see that?
A. I do.
Q. And this is -- what it's referring to is the licensors that put their patents into this pool. Right?

to be a whole lot of them that are essential to the standard. Isn't that right?
A. The intention is that there would be some.
Q. And, of course, the amounts of royalties are specified in the agreement as well. Isn't that right?
A. That's right.
Q. And if we go to the ninth page of the document, 5.3.
    MR. McKEON: And just highlight the royalty part up there, Mr. Jackson. There you go.
Q. (BY MR. McKEON) And this is the royalty payments that are required for every sale of television. Correct?
A. That's right.
Q. And depending on when the sale is made, it's $2.10, $2.40 and up to $3. Isn't that right?
A. That's right.
Q. And, in fact, for the years 2022, '23, '24, and '25, which is the years we're in now, it's just $2.10 per TV. Is that right?
A. That's right. I mean, there is some adjustments made based upon when the agreement is entered into.
Q. Okay. And the highest number here we see for all of these patents is $3 per TV. Right?
A. In section 5.3, that's right.
Q. And we also know that as part of the Avanci pool --
    MR. McKEON: We can take that down, Mr. Jackson.

A. It is the patent owners, right. So, yeah, the licensors are the patent owners.
Q. Right. And this would be -- again, it would be not only LG but Samsung, it would be Sharp, it would be Panasonic as well. Correct?
A. That's right.
Q. And what it states here is that they own one or more patents that are essential to the standard. Correct?
A. That's right.
Q. Okay. Let's move on to, if we can, 1.15. And I want to show you the definition of licensed patents.
    MR. McKEON: 1.15. Thank you, Mr. Jackson.
Q. (BY MR. McKEON) And, of course, here's the definition of licensed patents here, and it says here very specifically it means all patent claims that are essential to one or more licensed standards. Isn't that right?
A. It does.
Q. So the people that are in this pool, their expectation is they're going to get a whole lot of essential patents to ATSC 3.0. Right?
A. The licensees would get a license to essential patents. That does not mean that all the patents that are contributed by a licensor are essential.
Q. Okay. Fair enough. But with all of the patents that all of these companies are contributing, there is certainly going

Thank you.
Q. (BY MR. McKEON) -- that the members of the pool or the participants in the pool are not just the licensors, but there's also a licensee at least that's involved that's not a contributor. Isn't that right?
A. There is currently one.
Q. Okay. And that's Sony. Isn't that right?
A. That's right.
Q. And Sony is one of the world's most well-known and high-volume producing TV manufacturer. Isn't that right?
A. Yes.
Q. Very sophisticated company. They know what they're doing. Correct?
A. Sophisticated? Yes. They do not always have full information to work with.
Q. But they -- they -- they joined the Avanci pool and signed one of the license agreements we just saw. Isn't that right?
A. That is my understanding.
Q. And they agree also to the rates that are specified in the license agreement which is up to $3 per television. Correct?
A. Their agreement is a bit different than LGs.
Q. Okay. But the rates, though, is up to $3 per television?
A. There is a specification for payment of a $3 rate.

1  Q.  Okay.
2        MR. McKEON:  And if we can get DDX 701, please.
3  Q.  (BY MR. McKEON)  And you're familiar with this document?
4  You've seen it before.  Isn't that right?
5  A.  Probably.
6  Q.  It's cited in your expert report.
7  A.  It looks familiar.
8  Q.  Do you recall citing it in your expert report?
9  A.  Like I say, I think it looks familiar.  We'd have to dig
10  into it to make sure.
11  Q.  Well, Footnote 100 you cited, if you want to take a look
12  at it, but I'll represent to you it's cited.
13  A.  I'll take your word for it.
14  Q.  And what the article says here is that -- on the left
15  here, it says, new platform includes more than 70 percent of
16  ATSC 3.0 essential patents for families and licensees
17  responsible for vast majority of ATSC 3.0 televisions sold to
18  date.  Do you see that?
19  A.  I do.
20  Q.  So the claim is 70 percent of the essential patents for
21  ATSC 3.0 are part of the Avanci pool.  Isn't that right?
22  A.  That is the claim.
23  Q.  Okay.  And it also says here the initial licensees
24  include LG, Samsung, Sharp, and specifically refers to Sony.
25  Isn't that right?

61

1  A.  In addition to the others, yes.
2  Q.  Now, as we mentioned, your task here was to determine
3  what a reasonable royalty is for the patents.  Isn't that
4  right?
5  A.  Correct.
6  Q.  And you decided, sir, that the Avanci ATSC 3.0 patent
7  pool that we just discussed is not informative for determining
8  a reasonable royalty in this case.  Correct?
9  A.  That's right.
10  Q.  And you decided that -- in this case that patent pools do
11  not provide any quantitative input to determining a reasonable
12  royalty.  Correct?
13  A.  In my view, it would not be proper to use them as a
14  quantitative input.
15  Q.  And one thing we know, though, you believe the market
16  approach is a good way to value patents in the context of a
17  hypothetical negotiation.  Isn't that right?
18  A.  In some cases it is, and here it definitely is.
19  Q.  Okay.  And you gave an analogy in your direct about
20  renting an apartment, and if I want to rent an apartment and
21  you have an apartment next to where I want to rent, whatever
22  you're paying is a good data point for what I should pay.
23  Isn't that right?
24  A.  It's the general idea.
25  Q.  Okay.  And you believe that a patent pool is the epitome

62

1  of the free marketplace.  Correct?
2  A.  It can be, yes.
3  Q.  And you believe that a patent pool rate provides a real
4  solid grounding in the marketplace to tell us what the right
5  amount is.  Isn't that right, sir?
6  A.  In some instances it can be for the -- for the particular
7  technologies in pools that have been tested.
8  Q.  Okay.  Well, let me get you to look at the deposition in
9  another case you had, DDX 707.  Could you go to that in your
10  binder?
11  A.  Oh, I remember that case.
12        THE COURT:  He didn't ask you if you remembered it
13  or not.  Wait until he asks you a question, please.
14        THE WITNESS:  Understood.
15  Q.  (BY MR. McKEON)  You have in front of you -- go to page
16  130, 1 to 15, and please read that?
17  A.  Did you say 130?
18  Q.  130, 1 to 15.
19  A.  I see that.
20  Q.  Okay.  And you believe that patent pool is the epitome of
21  the free marketplace.  Is that right, sir?
22  A.  They can be.
23        MR. McKEON:  Your Honor, may I publish the
24  deposition testimony?  Nothing in the reference to 'can be'.
25        THE COURT:  That's really not inconsistent with his

63

1  prior testimony.
2  Q.  (BY MR. McKEON)  So you believe certainly in cases that
3  you can -- patent pools form a great market reference for the
4  value of a patent.  Isn't that right?
5  A.  Some patent pools can, yes.
6  Q.  But in this case you decided it's not informative.  Is
7  that right?
8  A.  Not the ATSC 3.0 patent pools.  And I can explain if
9  you'd like.
10  Q.  We'll move on, sir.
11    Now, one thing you did in this case, you increased the
12  $5 rate in the Zenith licenses to $6.75 because of inflation.
13  Isn't that right?
14  A.  For a variety of reasons, yes.  I explained why that's
15  appropriate.
16  Q.  So you had the $5 rate in the agreement and you kind of
17  put a little kicker in there to get to $6.75.  Is that right?
18  A.  I would not characterize it that way.
19  Q.  Well, it's for inflation adjustment is what you called
20  it.  Is that right?
21  A.  It's an economic adjustment to account for inflation.
22  Q.  We do agree this case is about TVs for ATSC 3.0.  Isn't
23  that right?
24  A.  Yes.
25  Q.  And that's over the broadcast television.  Right?

64

**Page 65**

1  A.   ATSC 3.0 is broadcast.
2  Q.   And, of course, broadcast TV does not have monthly prices
3  associated with it.  Isn't that right?
4  A.   That's right.
5  Q.   Now, if we can get your slide 39.
6       You showed this slide earlier in your testimony.  Do you
7  recall that?
8  A.   Yes, I do.
9  Q.   And this is sort of the general consumer price index.  Is
10 that right?
11 A.   Correct.
12 Q.   And you pulled this from the Bureau of Labor Statistics.
13 Is that right?
14 A.   That's right.
15 Q.   Okay.  And you agree that the CPI is a measure of the
16 average change over time in prices paid by urban consumers for
17 market basket of consumer goods and services.  Right?
18 A.   Yes.  That is correct.
19 Q.   That's the definition that the Bureau of Labor Statistics
20 uses.  Isn't that right?
21 A.   It sounds right.
22      MR. McKEON:  Okay.  Let's pull up DDX 704, if we
23 can.
24 Q.   (BY MR. McKEON)  And this is from the -- you recognize
25 this, sir, from the Bureau of Labor Statistics?  It's on the

**Page 67**

1  Q.   And does not reflect the spending of the military.
2  Correct?
3  A.   That's right.
4  Q.   And it reflects really the purchase of a variety of goods
5  and services.  Is that right?
6  A.   Yes.
7  Q.   And if we go to 10, section 10, and we see here some
8  examples of that, it talks about food and beverages, housing,
9  apparel, transportation, medical care, recreation.  Do you see
10 that list there?
11 A.   Yes, I do.
12 Q.   Okay.  And it includes food.  Right?
13 A.   It does.
14 Q.   And if we go to section 3, there's an example here of a
15 package of cheese.  Do you see that?
16 A.   Yes, I do.
17 Q.   So this CPI reflects sort of goods and things like
18 cheese.  Is that right?
19 A.   Well, it's a large basket of goods and services, and it's
20 the typical index that is utilized throughout industry.
21 Q.   And I think we all agree in this courtroom, as you said
22 in your direct, things have become more expensive over the
23 years.  Is that right?
24 A.   Yes, in terms of the value of the dollar has declined.
25 Q.   Okay.  Well, things have become more expensive over the

**Page 66**

1  screen, but it's also in your binder if you'd like to look at
2  it--DDX 704.
3  A.   Yes, I do.
4  Q.   Okay.  And the definition we just established here is
5  actually defined in the -- on the website of the Bureau of
6  Labor Statistics.  Isn't that right?  Do you see that?
7  A.   I do.  And I think that's exactly what you said.
8  Q.   Okay.  I just want to make sure we're on the same page.
9       And, generally speaking, though, the consumer price index
10 is based on things that families actually purchase.  Is that
11 right?
12 A.   Families, individuals.  It is consumers.  It's intended
13 to be a representative basket of goods.
14      MR. McKEON:  Okay.  And if we go down to section 6
15 and highlight that.
16 Q.   (BY MR. McKEON)  Here it says here that it really only
17 applies -- or the definition only applies to urban areas.  Do
18 you see that?
19 A.   I do.
20 Q.   It does not reflect the spending patterns of people
21 living in a rural non-metropolitan area.  Correct?
22 A.   I do understand that.
23 Q.   And it does not reflect the spending of the farm
24 households.  Correct?
25 A.   That's right.

**Page 68**

1  years.  Is that because of inflation?  Correct?
2  A.   In effect, as a result.
3  Q.   But one thing that hasn't become more expensive--the TVs.
4  Is that right?
5  A.   I disagree.
6  Q.   TV prices have been going down, sir.  Do you understand
7  that?
8  A.   For individual models.
9  Q.   Well, people -- folks remember TV prices way back when
10 for these big flat televisions, big flat televisions way back
11 when, and people remember the prices for those, and those
12 prices -- now you can get the same thing for a lot less.  You
13 agree with that.  Right?
14 A.   Yes.  If one's looking at an individual model, those
15 decline over time.
16 Q.   Okay.  In fact, you had a slide showing the graph down.
17 Isn't that right?
18 A.   That was what I was intending to convey.
19 Q.   Okay.  And, of course, you know the Bureau of Labor
20 Statistics collects information about TV prices.  Do you know
21 that?
22 A.   Yes, I do.
23 Q.   And you didn't show the jury anything from the Bureau of
24 Labor Statistics, their data on the prices of TV prices over
25 time, did you?

1 A. No, I did not.
2 Q. Well, let's look at that.
3 MR. McKEON: Go to DDX 705. And if you go down to
4 the CPI area here.
5 Q. (BY MR. McKEON) Do you see that? This is data from the
6 same data source that you relied on, and what you showed the
7 jury earlier. This data source, however, relates to
8 televisions. Do you see that?
9 A. So this is like a sub-component of the broader CPI, so
10 this is specific to TVs, and the BLS puts together many of
11 these indices for lots of goods and services, and then when
12 they compile them together, it becomes the CPI for urban
13 consumers.
14 Q. For televisions.
15 A. This one's for televisions.
16 Q. And we're focusing here in this case on televisions, sir.
17 Isn't that right?
18 A. We are focusing on patented technology that is used in
19 televisions.
20 Q. Okay. Fine. But the case is about televisions. Isn't
21 that right, sir?
22 A. I prefer the way I put it.
23 Q. Okay. And we know that the data from the Bureau of Labor
24 Statistics, you relied on one set for the entire economy,
25 including cheese, but they also have data for televisions

69

1 talking about prices over time. Isn't that right?
2 A. They do have an index, as reported here, reflected here
3 on televisions.
4 Q. And what we see in the graph above, do you see that graph
5 in the same document, sir?
6 A. Yes, I do.
7 Q. And if we look at the prices of televisions since 2002 to
8 now--we see that curve--it goes way down. Isn't that right,
9 sir?
10 A. It does decline especially during that kind of 2002 to
11 2010 period.
12 Q. A big decline over many years for televisions if you look
13 at the CPI data. Isn't that right?
14 A. Yes; during that Zenith licensing period in particular.
15 THE COURT: Counsel, let me interrupt at this point.
16 This is probably as good as any place to break for a short
17 recess. I know that there's additional cross examination and
18 I suspect redirect of this witness.
19 So, ladies and gentlemen, we're going to take a short
20 recess at this time. If you'll simply close your notebooks,
21 leave them in your chairs, don't discuss the case with each
22 other, and follow all my other instructions, we'll be back
23 shortly to continue with the Defendants' cross examination of
24 Doctor Sullivan.
25 The jury's excused for recess.

70

1 (Whereupon, the jury left the courtroom.)
2 THE COURT: The Court stands in recess.
3 (Brief recess.)
4 THE COURT: Be seated, please.
5 Mr. McKeon, are you prepared to continue with your cross
6 examination of the witness?
7 MR. McKEON: Yes, I am, Your Honor. Thank you.
8 THE COURT: All right. Let's bring in the jury.
9 (Whereupon, the jury entered the courtroom.)
10 THE COURT: Please be seated. We will continue with
11 cross examination of the witness by the Defendants.
12 Mr. McKeon, you may continue.
13 MR. McKEON: Thank you, Your Honor.
14 Q. (BY MR. McKEON) Now, Doctor Sullivan, you relied on from
15 the Zenith agreement, there was three primary agreements that
16 you relied on. Is that right?
17 A. That's right.
18 Q. LG, Sharp, and Toshiba?
19 A. Correct.
20 Q. And they all have the $5 rate. Correct?
21 A. Yes.
22 Q. And none of those agreements, there was a clause about
23 increasing the rate based on inflation. Correct?
24 A. That's right.
25 MR. McKEON: And if I can get the elmo.

71

1 Q. (BY MR. McKEON) In fact, you studied all 22 of the
2 Zenith agreements that are available. Isn't that right?
3 A. There are 22 agreements.
4 Q. Okay.
5 A. And these are 19 of them.
6 Q. These are 19. And these are the -- of the 22, these are
7 the agreements you've identified on slide 27. These are the
8 agreements that relate to consumer televisions. Correct?
9 A. That's right.
10 Q. Okay. And in every one of these agreements that you have
11 here on slide 27, of the 19, not a single one of them has a
12 clause in there about increasing for inflation. Correct?
13 A. That's right.
14 Q. For that clause, you relied on three other Zenith
15 agreements. Isn't that right?
16 A. In part.
17 Q. Okay. Well, let's look at your slide 35. These are the
18 three other agreements that you relied on for your inflation
19 adjustment. Correct?
20 A. That's right.
21 Q. And these agreements are between Zenith and a company
22 called KTech, another called Techtronic, and another company
23 called D Technology. Correct?
24 A. That's right.
25 Q. And, of course, KTech does not make or sell TVs.

72

**[Page 73]**

1  Correct?
2  A.   That's right.
3  Q.   And Techtronic does not make or sell TVs.  Correct?
4  A.   That, too, is correct.
5  Q.   D Technologies does not make or sell TVs.  Correct?
6  A.   Correct again.
7  Q.   These are all commercial equipment companies.  Correct?
8  A.   Yes.
9  Q.   And they have what's called professional VSB license
10  agreements.  Correct?
11  A.   Yes.
12       MR. McKEON:  If we can get as an example, DDX 702.
13  Q.   (BY MR. McKEON)  And this is an example of one of those
14  three agreements with KTech.  Correct?
15  A.   Yes, that's right.
16  Q.   And this one says professional VSB license agreement.
17  Isn't that right?
18  A.   Yes.
19  Q.   Whereas the other ones, the 19 that you referred to
20  earlier, that's the VSB license agreement.  Correct?
21  A.   That's right.
22  Q.   And those other ones are the ones that relate to
23  televisions.  Correct?
24  A.   That's right.  This is commercial broadcast equipment.
25       MR. McKEON:  You can take that down.  Thank you.
73

**[Page 75]**

1  Q.   And the CPI, the consumer price index you are using for
2  this graph from the Bureau of Labor Statistics, this is the
3  one that relates to the general CPI.  Isn't that right?
4  A.   That's right.
5  Q.   This is like for -- for the cheese.  Isn't that right?
6  A.   Amongst other things, yes.
7  Q.   It's not the one that we looked at earlier that's
8  available on the Bureau of Labor Statistics websites for
9  televisions that shows the prices dropping over time.
10  Correct?
11  A.   That's right.  The TVs are a component of this, but
12  it -- in the scheme of things, it's a relatively small piece.
13  Q.   Okay.  But my question is you didn't choose to use
14  that -- the -- the consumer price index as reported by the
15  Bureau of Labor Statistics for televisions, you didn't choose
16  to use that for this particular graph.  Correct?
17  A.   It would be inappropriate to do so.  That's right.
18  Q.   And even though that's for TVs.  Correct?
19  A.   That's right.
20  Q.   Okay.  And what you've done here, sir, you -- as I
21  understand it, you've put on the left-hand side of the screen
22  here, you've got the -- the license agreement amounts, $5 for
23  each of Toshiba, LG, and Sharp, and the time that they were
24  actually entered into.  Isn't that right?
25  A.   That's right.
75

**[Page 74]**

1  Q.   (BY MR. McKEON)  And with respect to these three
2  agreements here, the ones with the KTech, Techtronic, and D
3  Technology, you did not include them as part of your analysis
4  under the market approach.  Correct?
5  A.   I considered them for the economic adjustments.  I did
6  not incorporate them into the market approach in terms the 19
7  consumer TVs for the $5.
8  Q.   Okay.  So let's go to your expert report at paragraph
9  359.  It's page 174.  And do you see the sentence, "I do not
10  include Zenith's agreements with KTech, Techtronic, and D
11  Technologies under my analysis under the market approach."  Do
12  you see that?
13  A.   Yes, I do.
14  Q.   Okay.  But you rely on these three agreements for your
15  inflation adjustment.  Right?
16  A.   I do utilize them amongst other information for that.
17  Q.   Let's go to your slide 40.  And you presented this slide
18  to the jury.  Do you recall that?
19  A.   I do.
20  Q.   And what you've got here is you've got the data from the
21  Bureau of Labor Statistics that you presented earlier in the
22  presentation, and you put on top of it these references to
23  Toshiba, LG, and Sharp licenses.  Is that right?
24  A.   That's right based on the timing of those agreements back
25  in 2004-2005.
74

**[Page 76]**

1  Q.   And then over the years I think, as I understand your
2  testimony, you're saying that over the years if you look at
3  the general consumer price index, over the years this would
4  rise, and when you hit to the 2020 hypothetical negotiation,
5  the royalty rate would be $6.68 for Sharp, $6.76 for LG, and
6  $6.82 for Toshiba.  Isn't that right?
7  A.   Close, but that's not quite right.
8  Q.   Okay.  Well, you used the consumer price index to
9  calculate that.  Is that right?
10  A.   To calculate those three values.  That's right.
11  Q.   Okay.  And now, you're aware, of course, sir, that
12  Zenith -- the ATSC 1.0 licenses were transferred to MPEG LA.
13  Isn't that right?
14  A.   Most of the licensees, most of the 22 licensees, then
15  converted over to an MPEG LA license under ATSC 1.0.
16  Q.   Okay.  And including these three.  Correct?
17  A.   Yes.
18  Q.   And you're familiar with the rates for MPEG LA.  Correct?
19  A.   I am.
20  Q.   And if we can -- well, let me ask you this question.  The
21  rate, of course, for MPEG LA was $5, and this is now the ATSC
22  1.0 licenses, including the ones we just saw --
23       MR. McKEON:  And you can keep that on the screen,
24  sir.  Thank you, Mr. Jackson.
25  Q.   (BY MR. McKEON)  -- it was $5 per ATSC receiver for
76

**Page 77**

```
 1  product sold between January of 1998 to December of 2016.
 2  Isn't that right?
 3  A.   That's right.
 4  Q.   And it was $1.50 -- the license agreements we're looking
 5  at here are $1.50 for a TV sold from January of 2017 to
 6  December of 2020.  Isn't that right?
 7  A.   Yes.  And that makes good sense.
 8  Q.   And it was $1 for receiver or TVs sold after January
 9  2021.  Correct?
10  A.   That's right.
11  Q.   So now any royalties being paid under these three
12  agreements, it's a dollar.  Correct?
13  A.   That's right.
14  Q.   And you're aware, of course, that all the Zenith
15  patents -- all the Zenith patents have expired.  Correct?
16  A.   Yes.
17  Q.   All right.  And that's why it's a dollar now.  Right?
18  A.   Yes.  The -- the decline coincided with the expiration of
19  Zenith patents.
20  Q.   Okay.  But -- so in reality, in reality, the Toshiba, LG,
21  Sharp agreements, as of 2020--right?--as of 2020, they were
22  paying $1.50 per television.  Correct?
23  A.   For the patents that remained, yes.
24  Q.   A dollar 50.  Correct?
25  A.   Yes.
                                                            77
```

**Page 78**

```
 1  Q.   And today, it's a dollar.
 2  A.   Yes.
 3  Q.   And here you're indicating to the jury that somehow
 4  Sharp, the licenses would be $6.68.  Right?
 5  A.   That's the equivalent dollar amount.  I'm not saying the
 6  agreements are -- I'm not saying that they're paying that
 7  amount based on the agreements; rather, it's a reset of that
 8  base rate.
 9  Q.   I'm talking about the real world.  I'm talking about the
10  real world we live in.  Right now in the real world, Sharp is
11  paying today a dollar, LG would be paying a dollar, Toshiba
12  would be paying a dollar.  Correct?
13  A.   That's right.  Under -- under those agreements.
14  Q.   And they wouldn't be -- Toshiba would not be paying $6.82
15  today.  Is that right?
16  A.   Not under the old agreement where the patents have
17  expired.  That's right.
18  Q.   And yet you're relying on this data, this data was very
19  important and critical to your analysis when you wanted to add
20  $3.75 to the base rate.  Correct?  Or add -- let me ask that
21  again.
22       When you wanted to make the inflation adjustment from $5
23  to $6.75, these agreements and the analysis you presented here
24  to the jury was very important for that.  Isn't that right?
25  A.   I do think it is informative.
                                                            78
```

**Page 79**

```
 1  Q.   Okay.
 2       MR. McKEON:  We can pull that down.
 3  Q.   (BY MR. McKEON)  And, of course, you mentioned in your
 4  testimony MPEG LA is another 3.0 license pool.  Correct?
 5  A.   MPEG LA has a number of pools, including ATSC 3.0.
 6  Q.   Okay.  And they include Dolby Labs and Panasonic.
 7  Correct?
 8  A.   There are various licensors to the current 3.0 pool under
 9  MPEG LA.
10  Q.   Okay.  Let's go to -- to refresh your recollection, sir,
11  of your report, go to page 85.  Well, page 123, footnote 585.
12  Are you there?
13  A.   Yes.
14  Q.   Okay.  So just, for example, Dolby is a licensor.  Isn't
15  that right?
16  A.   That's right.
17  Q.   Philips is a licensor.  Correct?
18  A.   Yes.
19  Q.   NEC and Nippon and Panasonic are all licensors in that
20  pool.  Isn't that right?
21  A.   Yes.
22  Q.   And Sinclair Television Group is a licensor.  Correct?
23  A.   Correct.
24  Q.   And for all the contributions of these licensors for that
25  MPEG LA pool, the rate is $2.75 per TV.  Correct?
                                                            79
```

**Page 80**

```
 1  A.   I wouldn't characterize it quite that way.
 2  Q.   Well --
 3  A.   But the rate is 2.75.
 4  Q.   The rate is $2.75, and what you get is the licenses that
 5  have been put into the pool by all the licensors, including
 6  the ones we just identified.  Correct?
 7  A.   It's the patents, not the licenses.
 8  Q.   I'm sorry.  I misspoke.  Thank you for correcting me.  So
 9  let's get a clearer question on that.
10       You agree with me that the $2.75 rate, what you get for
11  that is a license to all the patents that were contributed by
12  the companies we just referenced, including Dolby and
13  Panasonic.  Isn't that right?
14  A.   The patents that those entities have put into this
15  particular pool.  Some of them have put patents into Avanci as
16  well.
17  Q.   Okay.  But the ones with respect to MPEG LA, if you want
18  a license to the patents -- for all the licensors, you want to
19  license to their patents, you go there and you get $2.75 per
20  television.  Correct?
21  A.   For the patents that those licensors put into that pool
22  versus patents they may have put into Avanci.
23  Q.   Okay.  And you're not aware of anybody today that has
24  become a licensee to that pool.  Is that right?  Just a
25  licensee without being a licensor.
                                                            80
```

81

A.   Oh, I think they have three licensees, if memory serves
me right.
Q.   Okay.  That are not licensors as well.  Is that right?
A.   I think there's one.
Q.   Okay.  All right.  Now, in terms of the primary
agreements you relied on, those agreements were executed down
2004 and 2005.  Isn't that right?
A.   I'm sorry.  I didn't hear you.
Q.   The three primary agreements, the LG agreement that you
referenced, the Sharp and Toshiba agreements with Zenith, do
you have that in mind?
A.   Yes.  So those were 2004-2005.
Q.   And that was 16 years before the hypothetical
negotiation.  Isn't that right?
A.   Closer to 15, but --
Q.   Okay.  Fifteen.  I'm working on my math.  So 2004 is a
long time ago.
A.   It was a while ago.
Q.   And back then Blockbuster Video was booming back then.
Isn't that right?
A.   I think they were starting on their decline at that
point.  I don't know that they were booming, but --
Q.   But still around.  Still around.  You can go rent a video
from Blockbuster way back in 2004.  Isn't that right?
A.   Yes.

Q.   The world is a very different place in 2004 than it is
now.  You agree with that.
A.   I do.
Q.   Now, I understand from your testimony in this case that
you don't watch TV.  Is that right, sir?
A.   That's right.  I work far too much.
Q.   Okay.  But there's no dispute then that since 2004, a lot
of improvements have happened to television.  Isn't that
right?
A.   Yes.
Q.   Gotten thinner, for example?
A.   Yes.
Q.   Gotten -- screens have gotten bigger.  Is that right?
A.   Yes.
Q.   Now you've got super-duper high resolution.  Isn't that
right?
A.   That does not exactly strike me as a technical term, but
I would generally agree.
Q.   Okay.  But you understand the point there.  The
resolution is unbelievable now.  It feels like you are in the
image now versus 2004 when it wasn't so good.  Isn't that
right?
A.   Yes, especially with 4K and then 8K.
Q.   Okay.  And TVs have gotten lighter, of course.  Isn't
that right?

A.   Some have.
Q.   Okay.  And over time they've gotten cheaper as we already
discussed.  Isn't that right?
A.   Individual models, yes.
Q.   Now, when we talk about the ATSC 3.0 standard, as we've
already established that's over-the-air broadcast.  Isn't that
right?
A.   At a high level, yes.
Q.   And the receiver that's capable of receiving that signal,
if you want to receive that, you have that receiver and can
watch TV over the air.  Isn't that right?
A.   Generally speaking.
Q.   And accused TVs in this case are all Smart TVs.  Isn't
that right?
A.   Yes, they are.  They are the higher end of the LG TVs.
Q.   And you didn't have Smart TVs in 2004.  Isn't that right?
A.   No, not the way they are today.
Q.   And you can connect a Smart TV to the internet.  Isn't
that right?
A.   That's the intention.
Q.   And you get all sorts of content over the internet.  TV
shows, movies, and news.  Isn't that right?
A.   Yes.  There is a great deal of content.
Q.   Of course, that's very different than broadcast
television.  Isn't that right?

A.   No.  There are differences for sure in terms of what's
available, but there's also overlap.
Q.   Well in terms of the technology, sir, you agree that
broadcast television is very different than streaming over the
internet.  Isn't that right?
A.   There are differences.
Q.   Well, for example, you can't get Netflix through
broadcast television.  Isn't that right?
A.   That's right.
Q.   All right.  You got to -- if you want to watch Netflix,
you've got to have an internet connection and stream over the
internet.  Isn't that right?
A.   And subscribe to it.
Q.   And subscribe.  But you also can go to YouTube.  Isn't
that right?
A.   Yes, that on many Smart TVs is available.
Q.   And you don't have to pay for that content, do you?
A.   Some folks do, but it's not required.
Q.   Right.  So you can watch movies and clips and all sorts
of things you like to watch over the internet, streamed
through to your television, and don't pay a dime.  Isn't that
right?
A.   Not anything additional to YouTube unless one wants to
get rid of certain advertisements.  I mean, there's the
internet connection and such, and so there's payment there,

1 but not for the content unless one wants to remove the
2 advertising.
3 Q.   You got to pay for the internet and people want to get
4 paid for that -- for that service.  But in terms of the actual
5 contents apply, you can go to YouTube and download and stream
6 things, I should say, and you don't pay a dime for that.
7 Right?
8 A.   You can stream and some -- some viewers, some consumers,
9 do pay; many do not.
10 Q.   Okay.  And let's go to if we can pull up JTX 41.  And
11 this is an example of a TV in this case.  Isn't that right?
12 A.   Yes, it is.
13 Q.   Okay.  It's a 50-inch television that LG sells.  Right?
14 A.   Yes.
15 Q.   And if we can go down to the next image, and here we see
16 some images of some of the image quality that you pay for when
17 you buy an LG television.  Isn't that right?
18 A.   I'm having trouble seeing it.
19 Q.   Okay.
20 A.   I mean, they do have nice image quality, especially the
21 QNEDs.  Yes, some of this is referenced here.
22 Q.   Okay.  And CD, of course, isn't claiming it invented
23 anything about the physical display.  Isn't that right?
24 A.   No, but it's about improving image quality for that which
25 is sent over the air.
85

1 Q.   Well, the technology that goes into this screen, sir,
2 CD's patents don't relate to that.  Right?
3 A.   Not for the display itself.
4 Q.   And if you go to page 6 of the document, you see here
5 binge-worthy streaming.  Do you see that?
6 A.   Yes, I do.
7 Q.   Okay.  And this is what we're talking about earlier.  You
8 can stream all sorts of things over the internet into your TV
9 and you can watch all that without using broadcast television.
10 Isn't that right?
11 A.   That's right.
12 Q.   And, in fact, it talks about 300 -- over 300 free LG
13 channels you can stream from.  Do you see that?
14 A.   Yes, subject to change.
15 Q.   A lot of content that you can get for streaming.  And
16 some you have to pay for, but there's a whole lot you don't
17 have to pay for.  Is that right?
18 A.   Yes.  Consumers can access content from many different
19 sources.
20 Q.   Okay.  Now, you've cited a report --
21      MR. McKEON:  You can take that down, Mr. Jackson.
22 Thank you.
23 Q.   (BY MR. McKEON)  You cited a report that the share of
24 Americans that watch TV through cable and satellite has fallen
25 76 percent in 2015 to 56 percent in 2020.  Do you recall that?
86

1 2021.  Do you recall that?
2 A.   Something like that.  I don't recall the exact numbers,
3 but that sounds about right.
4 Q.   And that's because people are, you know, watching now
5 stuff over the internet.  Is that right?
6 A.   It's two factors.  There's more OTT and more OTA.  That
7 means over the top is the internet, OTA is over the air.  So
8 both of those have increased over the years while the others
9 have declined.
10 Q.   Well, 20 percent jump you see in the ATSC 3.0 over the
11 air is very recent.  Isn't that right?
12 A.   The ATSC 3.0, the NextGen TV is recent, but there's been
13 an increase also of OTA from 1.0 as well.
14 Q.   Got it.  Okay.
15      But you're not suggesting that this 20 percent decline
16 represents a move from satellite and cable to 3.0.  Isn't that
17 right?
18 A.   If I recall the numbers, it's about five or six percent
19 of that.  20 percent is OTA, and the remainder is OTT --
20 Q.   Okay.
21 A.   -- meaning over-the-top internet for the remainder, five
22 or six percent of that 20 percent for over the air.
23 Q.   Okay.  Thank you, sir.
24      And you also cited a report of eight percent of TVs sold
25 in the U.S. in 2022 have the ATSC 3.0 capability.  Do you
87

1 recall that?
2 A.   Sounds about right.
3      THE COURT:  Mr. McKeon, please try to slow down.
4      MR. McKEON:  Sorry, Your Honor.
5      THE COURT:  You just get faster and faster.
6      MR. McKEON:  Too much coffee this morning.  I
7 apologize, Your Honor.
8 Q.   (BY MR. McKEON)  And you know that just 15.3 percent of
9 households in the U.S. watch over-the-air TV broadcasts.
10 Correct?
11 A.   No, that's the exclusive, meaning they only watch over
12 the air.  There's more that watch OTA, plus other forms of
13 content such as cable or over the internet.
14 Q.   Well, let's look at that.
15      MR. McKEON:  DDX 703.  Let's pull that up.
16 Q.   (BY MR. McKEON)  This is an article you cited in your
17 report.  Do you recall that, sir?
18 A.   Yes.
19 Q.   Okay.  And if we can flip through the article and go to
20 the paragraph -- this paragraph here.  Do you recall reading
21 this paragraph, sir?
22 A.   I don't know.  Where is that?
23 Q.   Okay.  If you wanted to pick the document out, it's in
24 your exhibits.
25 A.   Oh, I found it.
88

**Column 1 (page 89):**

1 Q. You got it? Okay. And I can direct you to the page of
2 the document. It's the document page ending the .4, and
3 there's a paragraph there that we're focusing on here.
4 A. Yes, I see it.
5 Q. Okay. And what it indicates here is that, although in
6 2022 Nielsen estimated a slight uptick in households that view
7 free, over-the-air TV to 19 million homes, that represents
8 just 15.3 percent of all households and is equally
9 unimpressive. Do you see that?
10 A. I do.
11 Q. So at least this article thinks that the progress of ATSC
12 3.0 is unimpressive. Correct?
13 A. That's how they characterize it.
14 Q. And you agree that in general when we talk about
15 over-the-air broadcasts, even today 1.0 -- to the extent
16 anyone is doing it, it's likely they are doing 1.0. Isn't
17 that right?
18 A. There are more viewers under 1.0 than 3.0 today.
19 Q. Okay. And that's consistent with the data you've seen in
20 this case where LG's televisions that have 3.0 are only two
21 percent of their televisions. Correct?
22 A. That's right. The accused products are only 2 percent of
23 the LG TVs that they sell.
24 Q. Thank you, sir.
25     MR. McKEON: You can pull that down.

**Column 2 (page 91):**

1 A. That is my understanding, yes.
2 Q. And you agree that there are technological differences
3 between 1.0 and 3.0. Correct?
4 A. I do.
5 Q. For example, 1.0 used VSB while 3.0 uses OFDM. Correct?
6 A. That's right. The VSB was displaced in 3.0.
7 Q. And 1.0 uses a different compressing technology than 3.0.
8 Correct?
9 A. That is my understanding.
10 Q. And we also know that 3.0 is not backward compatible with
11 1.0. Correct?
12 A. That's right. I understand that to be the difference
13 between VSB and OFDM.
14 Q. And another thing you looked at was the identity of the
15 licensor. Isn't that right?
16 A. I did.
17 Q. And, of course, for the Zenith licenses, Zenith was the
18 licensor. Right?
19 A. Correct.
20 Q. And that is different than the hypothetical negotiation
21 where Zenith is not the licensor. Isn't that right?
22 A. That's right.
23 Q. That's Constellation Designs, LLC. Correct?
24 A. That's correct.
25 Q. And also you looked at and considered the relationship

**Column 3 (page 90):**

1 Q. (BY MR. McKEON) Now, in terms of the hypothetical
2 negotiation when -- one requirement is that, in order to rely
3 on a license as part of the hypothetical negotiation, it must
4 be a comparable license to the situation of the hypothetical
5 negotiation. Isn't that right?
6 A. To serve as the -- the basis, I would agree.
7 Q. And one of the requirements is the technical
8 compatibility -- or comparability, I should say.
9 A. That's right, technical and economic comparability.
10 Q. And economic comparability means that the license that
11 you rely on must also be comparable from an economic point of
12 view to the license that CD and LG would be negotiating in
13 that hypothetical negotiation room. Correct?
14 A. Sufficiently similar for comparison such that adjustments
15 can be made, that's correct.
16 Q. In reviewing the Zenith licenses, you considered the
17 differences between the Zenith licenses and the situation in
18 the hypothetical negotiation. Right?
19 A. Yes. That's right.
20 Q. And you addressed some of them in your -- in your direct
21 testimony. Isn't that right?
22 A. Correct.
23 Q. So, for example, you understand there are differences
24 between the Zenith ATSC 1.0-related patents and the asserted
25 patents. Correct?

**Column 4 (page 92):**

1 between the parties. The relationship between the parties was
2 very different in the Zenith licenses than they would be in
3 that room in the hypothetical negotiation. Isn't that right?
4 A. No.
5 Q. Well, let me ask you this question. The parties to
6 the -- well, let me -- let me just say this. You agree that
7 Zenith and Sharp had a competitive relationship.
8 A. There were some competitive aspects given their role with
9 LG, but Zenith itself was not a direct competitor as Zenith
10 was not selling TVs.
11 Q. Well, let's go to your report, and I want you to focus on
12 paragraph 399 and 190-91. Do you see that?
13     Now, unlike the hypothetical negotiation, there may have
14 been a competitive relationship between Zenith and Sharp at
15 the time of the agreement. Correct?
16 A. That's right.
17 Q. And there's no competitive relationship between CD and
18 LG. Correct?
19 A. There is from a licensing perspective in the licensing
20 marketplace, not in the TV marketplace like for the sales of
21 TVs.
22 Q. Well, right, sir. We're talking about the sales of
23 televisions here and the royalty here is going to apply --
24 what you're saying is the royalty applies to sales of
25 televisions. Correct?

**Page 93**

1  A.   I agree with the latter point, not the former.
2  Q.   Well, you agree with the statement that the royalty at
3  issue in this case that you're telling the jury to apply
4  applies to the sales of televisions.  Correct?
5  A.   That's right.
6  Q.   So when we're talking about competition between parties,
7  we're talking about the sales of televisions.  Isn't that
8  right?
9  A.   That is one dimension of competition, but there is also
10  competition in terms of the licensing of technology.
11  Q.   Well, you believe that Zenith and Toshiba had a
12  competitive relationship.  Isn't that right?
13  A.   There were some aspects that could have been considered
14  competitive.
15  Q.   Unlike the hypothetical negotiation, there may have been
16  a competitive relationship between Zenith and Toshiba at the
17  time of the agreement.  Correct?
18  A.   I wouldn't put it quite that way.  The latter part I
19  agree with.  The former part, there is competitive aspects.  I
20  did not include those competitive aspects within the
21  quantification of the royalty, but there are aspects of that.
22  Q.   Would you be surprised, sir, that you put it exactly that
23  way in your expert report?
24  A.   The way I said it, yes.
25  Q.   Go to paragraph 400, 191 to 92.

**Page 94**

1  A.   I'm there, yes.
2  Q.   Let me ask the question again.  Unlike the hypothetical
3  negotiation, there may have been a competitive relationship
4  between Zenith and Toshiba at the time of the agreement.
5  Correct?
6  A.   And it continues, yes.
7  Q.   Now, the licensed technologies, of course, are different.
8  Correct?
9  A.   Correct.  There are differences.
10  Q.   The ATSC 1.0 agreements from Zenith involved essential
11  Zenith receiver patents.  Isn't that right?
12  A.   Yes.
13  Q.   Whereas the hypothetical negotiation would only involve
14  the patents in the lawsuit.  Correct?
15  A.   That's right.
16  Q.   And another fact that you looked at in terms of the
17  similarities was licensed products.  Isn't that right?
18  A.   Yes.
19  Q.   There are differences there, too.  Correct?
20  A.   Yes.
21  Q.   You agree that the products licensed by Zenith are very
22  different from the LG TVs that would be addressed in the
23  hypothetical negotiation.  Correct?
24  A.   Well, they're both consumer televisions.  But, of course,
25  televisions have evolved over the years, and they're different

**Page 95**

1  models and different televisions.
2  Q.   Well, there are differences.  For example, we have VSB
3  demodulation equipment at issue in the Zenith licenses.
4  Correct?
5  A.   Televisions.
6  Q.   Correct.  But defined as VSB demodulation of equipment.
7  Isn't that right?
8  A.   It's actually just the opposite.  They refer to VSB
9  demodulation equipment, and they define that to include
10  consumer TVs.
11  Q.   Well, go to your report again, sir, 382, 184.
12  A.   Paragraph 382?
13  Q.   184.  Yes.  Paragraph 382, and it's at page 184.
14       There are several differences between the licensed VSB
15  demodulation equipment and the accused products.  Correct?
16  A.   Yes.  And then it goes through a lot of content on it.
17  Q.   Sir, if you --
18       MR. McKEON:  Your Honor, can I just get an
19  instruction to focus on my question?
20       THE COURT:  Doctor Sullivan, you do need to limit
21  your answers to the questions asked.  Mr. Curry's going to get
22  a chance to ask you follow-up questions on redirect, so try to
23  limit your answers to the questions asked.  All right?
24       THE WITNESS:  Thank you, Your Honor.  I'll do my
25  best.

**Page 96**

1       THE COURT:  Let's continue.
2       MR. McKEON:  Thank you, Your Honor.
3  Q.   (BY MR. McKEON)  Zenith licenses cover computers, for
4  example.  Right?
5  A.   They could.
6  Q.   Well, they are part of the scope of the license.  Isn't
7  that right?
8  A.   Yes.
9  Q.   They include cable boxes and computer add-on cards, video
10  recorders, camcorders, converter boxes, TV set-top boxes, and
11  satellite boxes.  Isn't that right?
12  A.   Some of the agreements do include those as licensed
13  products.
14  Q.   Well, let's go to page 383, paragraph 383, 184 to -85 in
15  your report.  Are you there?
16  A.   I am.
17  Q.   In addition to TVs, the VSB demodulation equipment
18  includes cable boxes, personal computers, computer add-on
19  cards, video recorders, camcorders, converter boxes, TV
20  set-top boxes, and satellite boxes.  Correct?
21  A.   Yes.  That's right.
22  Q.   And another thing you looked at is geographic scope.
23  Isn't that right?
24  A.   I did.
25  Q.   And the differences there as well.  Right?

1    A.    That's right.
2    Q.    Zenith agreements covered multiple countries, whereas the
3    hypothetical negotiation would only cover the United States.
4    Correct?
5    A.    It's not quite right.  The effect is the same in terms of
6    infringement within the United States impacting North America.
7    Q.    Well, let's go to your report, sir.  Paragraph 401 and
8    192.  You agree with me that the geographic scope of the
9    Zenith agreements extends to the U.S. Canada and Mexico.
10   Correct?
11   A.    That's right.
12   Q.    And the hypothetical negotiation would result in
13   royalties on sales of the accused products that have a U.S.
14   nexus.  Correct?
15   A.    Exactly.
16   Q.    And the timing, of course, we've already talked about the
17   timing of the two agreements.  Strike that.
18         The timing of the actual Zenith agreement and the
19   hypothetical negotiation is very different.  Right?
20   A.    There is a difference.  That's right.
21   Q.    Now, I think, Doctor Sullivan, you have an opinion that
22   in the hypothetical negotiation, LG would agree to pay $6.75
23   regardless of how many patents are licensed.  Correct?
24   A.    Correct.
25   Q.    But you agree that each asserted patent is different in

97

1    A.    Correct.
2    Q.    Now, in your direct testimony -- well, let's get a slide
3    you used.
4         MR. McKEON:  24, please.
5    Q.    (BY MR. McKEON)  And you recall this slide, sir, in your
6    direct testimony?
7    A.    I do.
8    Q.    And you reference here a number of different licenses for
9    ATSC 1.0 technology.  Isn't that right?
10   A.    Yes.
11   Q.    But you haven't actually studied the licenses in this
12   list other than the Zenith licenses.  Isn't that right?
13   A.    No.
14   Q.    Well, let's talk about that.  You reference Funai, for
15   example.  Isn't that right?
16   A.    I do.
17   Q.    It's $5.  Do you see that?
18   A.    I do.
19   Q.    You actually have not seen any Funai license in reference
20   to this case.  Correct?
21   A.    I have not reviewed those license agreements within the
22   context of this case.
23   Q.    You do not know what patents were licensed by Funai.
24   Right?
25   A.    Not by number.

99

1    this case?
2    A.    Yes.
3    Q.    And you agree -- you believe, as I understand it, LG
4    wouldn't care if they were licensing one patent or four
5    patents.  Correct?
6    A.    I disagree.
7    Q.    Well, you're not offering an opinion in this case about
8    each individual patent and how much they're worth.  Correct?
9    A.    I have a -- I have determined a reasonable royalty that
10   applies to the set of four patents or a subset of those in the
11   event that infringement is only found for a subset of those
12   patents.
13   Q.    And your rate doesn't change.  It's $6.57, no matter
14   what.  Correct?
15   A.    Well, as I just described it.
16   Q.    And it will be $6.75 if it was more than four patents.
17   Isn't that right?
18   A.    I have only evaluated these four patents for this trial.
19   Q.    Now, the Zenith license agreements that you've examined,
20   you agree that the royalty in the Zenith licenses,
21   particularly the ones you focused on, does not depend on the
22   number of patents used by the licensee.  Correct?
23   A.    Correct.
24   Q.    So it's $5 regardless of how many patents are used.
25   Correct?

98

1    Q.    You do not know who paid Funai $5 to license its patents,
2    do you?
3    A.    I do not have that information produced in this case.
4    Q.    And you also have an indication here of -- of $6.15 to
5    $20.65.  Do you see that?
6    A.    I do.
7    Q.    You identified it as confidential licensors.  Do you see
8    that?
9    A.    Yes.
10   Q.    And, by the way, you got this chart from a document that
11   somebody filed in a government agency.  Isn't that right?
12   A.    That is one place.  There is multiple sources for the
13   information here.
14   Q.    You haven't seen any of these so-called confidential
15   licenses.  Isn't that right.
16   A.    No.  They are confidential.
17   Q.    And you don't know any company that actually agreed to
18   these rates.  Correct?
19   A.    I do not have documents on the payments.
20   Q.    Okay.  Now, you were here for the testimony of Mr.
21   Marino.  Isn't that right?
22   A.    Yes.
23   Q.    Okay.  And do you recall his testimony, sir, where he
24   testified that the rate for the ATSC Zenith portfolio at $3.75
25   would have been -- let me get the exact language -- would have

100

been a reasonable royalty. Do you recall that testimony?
A. I think he viewed that as successful for Zenith.
Q. Okay. All right. I want to talk about a slide that you had in your case, if I can, in your direct testimony, rather. Do you see that side? Do you recall presenting that to the jury?
A. I do.
Q. Did you make this slide, sir?
A. Yes.
Q. And you presented it to the members of the jury in your direct testimony. Is that correct?
A. Yes.
Q. Now, did you modify any of the content of the slide in terms of the images of the LG TVs before you presented them to the jury?
A. This just has the NextGen TV logo placed there to help convey the notion of ATSC 3.0 and the marketing name.
Q. So you went to the LG website and you grabbed a picture of a TV and you put the NextGen logo on -- through a snippet, if you will, photo shop, you put it right on the television. Isn't that right?
A. Not photo shop. But, yes, that's added.
Q. Did you tell the jury in your direct testimony that you added that NextGen logo on the television?
A. No, but I'd be happy to do so.

101

Q. Let's get the images, if we can, from the actual website.
        MR. McKEON: Mr. Jackson, can you pull up the images please?
Q. (BY MR. McKEON) You see on the left, this is what you presented to the members of the jury. Correct?
A. Correct.
Q. And on the right, you have the actual images from the website. Do you see that?
A. I do.
Q. So you took those two images on the right and you added the NextGen image you have there in your slide. Isn't that right?
A. Correct.
Q. But LG doesn't have that image on the front of its televisions. Isn't that right?
A. Not on those images.
Q. Were you trying to impress on the jury that somehow LG was elevating the importance of -- of nextGen TV over all its many, many, many other features it has in its televisions, sir?
A. No, I was not. I was just simply trying to convey that these are TVs that are accused, they are compliant with ATSC 3.0, which is -- has the marketing name of NextGen TV.
Q. Now, on your direct you also talked about shipments of -- of televisions over time. Do you recall that? Let me get the

102

slide and then we'll talk about the same thing.
        MR. McKEON: Let me get slide 21.
Q. (BY MR. McKEON) Do you recall that slide, sir, you presented?
A. Yes, I do.
Q. And just to be clear, this slide is data for the entire TV industry. Isn't that right?
A. Correct.
Q. And what you're saying here is that the number of units shipped for 3.0 TVs has gone up from 2021 and the projections are that 31 million in 2025. Isn't that right?
A. That is the projection.
Q. And in 2022 here, you indicate 4 million. Isn't that right?
A. That is right.
Q. And 2023, you have 11 million. Isn't that right?
A. Correct.
Q. You know that only -- as we established earlier, only eight percent of TVs sold in the U.S. support ATSC 3.0. Right?
A. That is my understanding.
Q. And I think you described this earlier as that the sales of the -- strike that.
    You described earlier the projections saw a drastic increase in the number of shipments. Isn't that right?

103

A. I'm sorry. Try that again?
Q. All right. Let me ask it this way. You agree or you stated in the past that the sales of NextGen TVs are expected to grow drastically in the coming years. Isn't that right?
A. Significantly.
Q. Okay. In your report, you said drastically. Do you recall that?
A. Drastically, significantly, substantially. It is projected to take off. Now, like I said, we don't know yet whether it will, but it is projected that way.
Q. Okay. And then that's what you're trying to show here to the members of the jury. Isn't that right?
A. Well, this was kind of a two-fold indicating that there is a projection of it increasing but this is also why a per-unit running royalty structure is appropriate because that is unknown.
Q. And I believe you said in your direct this data here comes from the Consumer Technology Association. Isn't that right?
A. That's right.
Q. Okay.
        MR. McKEON: If we can pull up PTX 152.
Q. (BY MR. McKEON) Do you recall this document, sir?
A. Yes.
Q. Okay. And this is the source, this particular document,

104

1 the page of the document is the source of the information you
2 presented to the members of the jury.  Isn't that right?
3 A.   It's a broader document, and this is one page where I got
4 the data.
5 Q.   And if you look at the date here, the data for this
6 document is July 2021.  Isn't that right?
7 A.   Correct.
8 Q.   Okay.  But you looked at more recent publications that
9 have more recent data.  Isn't that right?
10 A.   There are data points -- other data points that one can
11 look at, for sure.
12      MR. McKEON:  Let's go to the DDX 703 documentation.
13 Q.   (BY MR. McKEON)  This is a document we looked at earlier.
14 Do you recall that?
15 A.   Yes.
16 Q.   And this article, as we see here, is dated February of
17 2023.  Isn't that right?
18 A.   Yes.
19 Q.   And you agree with me that the data relating to
20 projections for the year 2023 is probably more accurate if it
21 is generated in 2023 than prior years like 2021.  Isn't that
22 right?
23 A.   It's further from the date of the hypothetical
24 negotiation.  So it would be more accurate as of present day
25 for historical and probably going forward.  It depends upon

105

1 methods.
2 Q.   Well, but people in that room, they know all the data.
3 We established that earlier.  They've got their hands on
4 everything.  They know what the data is and they -- they
5 access the data, including everything we're talking about in
6 this courtroom.  Isn't that right?
7 A.   They have available all the information.
8 Q.   Including this document.  Isn't that right?
9 A.   Yes.
10 Q.   And if you look at this document, which is dated February
11 2023, it states that the Consumer Technology Association now
12 expects only 5 million, not 11 million, 5 million, 3.0 TVs to
13 be shipped in 2023.  Do you recall that?
14 A.   Yes.
15 Q.   Okay.  It's 5 million.  If we go back to your slide, sir,
16 you told the jury that in 2023 --
17      MR. McKEON:  And if we can go back to the
18 demonstrative slide, Mr. Jackson, 5.21.  And we can pull down
19 the -- yeah.
20 Q.   (BY MR. McKEON)  You told the members of the jury that 11
21 million TVs were the estimation for 2023.  Isn't that right?
22 A.   That was the projection at that point in time.
23 Q.   But in 2021 -- we have the 2023 data, which is the same
24 data you relied on you looked at that article in this case,
25 and that data shows and that's from 2023, that data says 5

106

1 million.  Isn't that right?
2 A.   That's right.
3 Q.   More than half reduction.  Isn't that right?
4 A.   Yes.
5 Q.   And then, therefore, the reliance of the data for 2024
6 and the reliance on the data for 2025 that you show here, not
7 very reliable.  Isn't that right?
8 A.   I disagree if you go back and look at what was written in
9 that prior document.
10 Q.   Okay.  Well, all we know here is for 2023, which is the
11 year we're in right now, it was a big miss.  Right?  11
12 million is very different than the projections we have now
13 which is 5 million.  Isn't that right?
14 A.   It has been a slow adoption.
15      MR. McKEON:  If I can get a slide that you have from
16 your opening.
17 Q.   (BY MR. McKEON)  Were you here for opening, sir?
18 A.   Yes, I was.
19 Q.   And you recall this slide that was presented to the jury?
20 A.   I do.
21 Q.   And the one thing that we know in the room that you
22 testified about with CD and LG in 2020 is they would be aware
23 of their competitors and what they've been doing.  Isn't that
24 right?
25 A.   There is some information.

107

1 Q.   Well, they would know whether their competitors had
2 televisions with 3.0.  Isn't that right?
3 A.   They would have some information on that.
4 Q.   Well, I mean, it's very hot competition in this business,
5 as you know, sir.  Right?  They would know what their
6 competitors are doing and what they're selling.  Isn't that
7 right?
8 A.   They would have some information on that.
9 Q.   Well, they would know whether they are selling 3.0 TVs or
10 not.  Correct?
11 A.   Generally that information is known.
12 Q.   And, for example, both sides would know that Sony sells
13 ATSC 3.0-enabled televisions.  Correct?
14 A.   Yes.
15 Q.   Both sides would know that Samsung sells ATSC 3.0
16 televisions.  Correct?
17 A.   Yes.
18 Q.   And both sides would know that Sony actually plans to
19 have all of its U.S. models to be 3.0 compatible.  Correct?
20 A.   I have seen that.
21 Q.   And both sides would also know that Sony is not licensed
22 to any of CD's patents.  Correct?
23 A.   That's right.
24 Q.   Sony hasn't paid a dime.  Right?
25 A.   No.

108

**Page 109**

1  Q.  And both sides would also know in that room Sony was
2  willing to pay a license for $2.10 for all the patents in the
3  Avanci pool.  Correct?
4  A.  There is an agreement in that regard.
5  Q.  And both sides would know that in the hypothetical
6  negotiation.  Correct?
7  A.  Yes.
8  Q.  So we understand the situation:  LG is in the room,
9  competes in a very, very competitive business.
10      Mr. Marino is across the table.  Mr. Marino says, Give me
11  $6.75 a TV, LG.
12      LG in their mind goes, Wait a minute.  So I'm in an
13  Avanci pool where the rate is $2.10, and one of my biggest
14  competitors is in the Avanci pool and they're paying $2.10,
15  but am I supposed to pay Mr. Marino $6.75 based on that?
16      You're saying LG would agree to that?
17  A.  For all of the reasons I have described, correct.
18  Q.  And the parties in the room would also know that Samsung
19  sells 3.0 televisions.  Correct?
20  A.  Yes.
21  Q.  Both sides would know that Samsung does not have a
22  license.  Correct?
23  A.  Yes.
24  Q.  Samsung has not paid a dime.  Correct?
25  A.  Not yet.

**Page 110**

1  Q.  Samsung is also in the Avanci pool.  Isn't that right?
2  A.  Yes.
3      MR. McKEON:  Now, we can pull that down, Mr.
4  Jackson.  Thank you.
5  Q.  (BY MR. McKEON)  There's no dispute here that there would
6  be no payment by LG to CD if the jury determines there is no
7  infringement of the patents or that the patents are invalid.
8  Correct?
9  A.  That's right.
10  Q.  I mean, it's a requirement [sic], of course, to pay a
11  royalty to a patent if it's not infringed.  You agree with
12  that.  Right?
13  A.  In terms of the court trial here, I would agree.
14  Q.  Okay.  And if the court trial here, if the jury
15  determines they are invalid, there would be -- then no -- no
16  requirement to pay any money.  Correct?
17  A.  That's right.
18  Q.  Now, Doctor Sullivan, I understand you're the president
19  of Intensity, LLC.  Is that right?
20  A.  I have been.  I am currently a managing director of
21  Secretariat.
22  Q.  Okay.
23      MR. McKEON:  Your Honor, may I get my --
24      THE COURT:  You may.
25      MR. McKEON:  If I can get the elmo here.

**Page 111**

1  Q.  (BY MR. McKEON)  This is your expert report we received
2  in this case, and you see the front of it, it says, Intensity.
3  Do you see that?
4  A.  I do.
5  Q.  Okay.  So Intensity is a -- is a -- a company that you're
6  affiliated with.  Isn't that right?
7  A.  It is a company that I have been employed by and that was
8  acquired by Secretariat.
9  Q.  Okay.  And does that company still exist?
10  A.  I'm not certain about the legal structures.
11  Q.  Well, let me ask you this question.  You are the
12  president of Intensity, LLC.  Isn't that right?
13  A.  I have been.
14  Q.  Well, you were the president as of the date of your
15  expert report which is a few months ago.  Isn't that right?
16  A.  Yes.
17  Q.  Okay.  And, in fact, you founded Intensity.  Isn't that
18  right?
19  A.  I did.
20  Q.  And you are an owner of Intensity.  Isn't that right?
21  A.  No.  I was.  I was a partial owner.
22  Q.  You were a partial owner.  And I believe that Intensity
23  and the company you work for now -- remind me of the name of
24  that?
25  A.  Secretariat.

**Page 112**

1  Q.  So Intensity is a Secretariat company.  Isn't that right?
2  A.  Yes.
3  Q.  That's how it's promoted.  Intensity, a Secretariat
4  company.  Correct?
5  A.  That's how it has been framed.
6  Q.  And on your direct testimony, I want to be sure I heard
7  this correctly, your hourly rate for your time in this case is
8  $2,200 per hour.  Isn't that right?
9  A.  Yes.
10  Q.  And you've been here all week, sir?  Is that right?
11  A.  Yes, I have.
12  Q.  How many days have you been here?
13  A.  I think maybe four or five.
14  Q.  So four or five days.  That would be eight hours a day.
15  That's $88,000 for your time in this case.  Correct?
16  A.  Yes.
17  Q.  And you've been on the stand about two hours.  That's
18  $4,400.  Isn't that right?
19  A.  Actually, I think it's been longer than that now.
20  Q.  Oh, you know, I lost track of time.  So the point is your
21  compensation in this case is pretty substantial.  You agree
22  with that?
23  A.  The firm Secretariat receives very substantial
24  compensation for my work.
25  Q.  And the time of your deposition you indicated that at

1  that point, which was months ago, it was likely that your firm
2  has been paid over $500,000 in the case. Isn't that right?
3  A.   Yes.
4  Q.   And since then, you've gotten more billings to your firm.
5  Isn't that right?
6  A.   Yes.
7  Q.   And the total award in this case is $1.6 million you're
8  asking the jury to award. Is that right?
9  A.   $1.864 million.
10  Q.   And at least a third of that is -- that's your amount,
11  that your company earns a third of that. Isn't that right?
12  At least?
13  A.   Thereabouts.
14       MR. McKEON:  No further questions. Thank you, Your
15  Honor.  I pass the witness.
16       THE COURT:  All right. Is there redirect?
17       MR. CURRY:  Yes, Your Honor.
18       THE COURT:  Okay. Let's proceed with redirect.
19  Proceed when you're ready, Mr. Curry.
20       MR. CURRY:  Thank you, Your Honor.
21            REDIRECT EXAMINATION
22  BY MR. CURRY:
23  Q.   I want to pick up where Mr. McKeon left off about your
24  rate. And, sir, I know you're someone who values your
25  privacy, but can I ask you a personal question?

1  A.   Sure.
2  Q.   Can you describe all of the hard work that you put in to
3  get to where you are today?
4  A.   Wow.  Well, yeah.  I started work when I was 15. I was
5  effectively on my own when I was 16. My dad was out of the
6  picture, and I had to help support my mom who could not
7  support us.  I went to college and --
8  Q.   Sir, how did you go to college if you're on your own?
9  A.   I worked.  I -- I have worked more than full time
10  consistently since I was 16, all throughout school, all
11  throughout graduate school.  It's something I was told that I
12  could never achieve, that that doesn't happen. And somehow
13  when I was told that, that lit a fire in me.
14       And I have always worked harder than anybody else I've
15  known.  And now I'm in a position where my talents, my
16  expertise, my analytics are highly valued in the marketplace,
17  and --
18  Q.   And in the marketplace, do other companies outside of
19  litigation pay your rates?
20  A.   Yes.  All of the work that I do is at my standard rate.
21       MR. CURRY:  Can I get the document camera, please?
22  Q.   (BY MR. CURRY)  When you showed the jury this slide, were
23  you trying to suggest that in 2020 these companies paid these
24  rates?
25  A.   No, I was not.

1  Q.   What were you describing on this slide?
2  A.   This is intended to convey a reset of the baseline rate
3  of $5, what that amount would be if that rate was established
4  in March 2020.  The actual rates they were paying under the
5  Zenith agreements had declined at the start of 2017, and that
6  coincided with the expiration of those two LG patents that
7  were responsible for $3.75 of the $5 MPEG LA royalty.
8  Q.   And did the MPEG LA ATSC 1.0 rate go down over time
9  because the market wouldn't support it?
10  A.   No.  It went down because of the expiration of the
11  patents.
12  Q.   And with respect to this graph that Mr. McKeon showed the
13  jury, is this data using unmodified data or does it account
14  for things like quality?
15  A.   The government uses certain techniques to do what's
16  referred to as quality adjustment, but it has inherent biases
17  in it, which is what results in the decline because it's not
18  looking at individual TV models and the innovation that occurs
19  over time.
20       I think one things that's really interesting here is the
21  large decline here is occurring precisely during the time of
22  the Zenith licensing program that kept the technology price
23  fixed at $5.  So if this was relevant to the participants in
24  the marketplace, then the royalty would have been declining
25  across time, but it's not.  The royalty was held flat in the

1  face of this.
2  Q.   Doctor Sullivan, is old technology getting cheaper?
3  A.   Older technology in the sense of like a television, the
4  older ones, the CRTs, the tubes, those go down over time. And
5  then the LCDs come in, those go down. LEDs are there and
6  OLEDs.  And it keeps going up and then each one comes down.
7  Q.   Is new technology getting cheaper?
8  A.   No, not at all.  The prices keep going up.
9  Q.   And what's the basis for adjusting for inflation, Doctor
10  Sullivan?
11  A.   Well, multiple.  Economics, basic economic principles,
12  the value of the dollar has declined, but it's also reflected
13  in the Zenith licensing program that was established by
14  PriceWaterhouse, some of the license agreements that were
15  entered into, and it's just part of the reflection of what we
16  see fundamentally in the marketplace.
17  Q.   And with respect to the official CPI data that you used
18  in your calculation, can you give us some sense of how many
19  businesses rely on that data for their business decisions?
20  A.   So many.  I mean, that CPI for urban consumers is the
21  CPI index that is used and referenced by businesses, it is in
22  contract after contract after contract, it is utilized
23  universally by the Federal Reserve to be able to determine how
24  they want to handle interest rates for inflation. So it's
25  very broadly used, recognized, and relied upon.

Q.   And can we talk about the per-unit aspect of your damages model?

A.   Sure.

Q.   What's the basis for saying that the royalty rate should be a fixed per-unit amount?

A.   A couple of things.  One, there was discussion over the projection for ATSC 3.0 televisions and whether we're meeting projections/not meeting projections.  The per-unit royalty structure allows us to be agnostic to that.  So we don't have that crystal ball.  It's still projected to get up to 31 million units by 2025, but the uptick has been slower.  We don't know.  And the per-unit royalty structure accounts for that.

And by holding that flat, the per-unit, at $6.75, the uptick inflation that we've had over the last couple of years is not accounted for.  You know, this is not increasing over time; it's held flat, just the way the industry did it with Zenith.

Q.   Now, you acknowledge that different TVs have different features and different sizes and they get different prices.  Right?

A.   They do.  And that's one of the benefits of having a per-unit royalty.  So if it was a percentage, for example, then the royalty would be capturing value.  Once you start putting in Alexa or Smart TV components or bigger fancier

display, if it's a percentage royalty, it captures that.

Having it being a per-unit, that's fixed, it cabins off the value of the ATSC 3.0 patented technology provided by Constellation Designs.  So it's separate and apart and it's isolated.

Q.   And I know that we're at the beginning of seeing the adoption rate for ATSC 3.0, but how does the adoption rate of ATSC 3.0 affect per-unit royalties given the per-unit structure?

A.   Whatever the adoption rate turns out to be will be reflected in royalties payable and, thus, if it takes off, there will be more royalties, and if it doesn't, well, there won't be.  And if LG decides not to use the technology from Constellation Designs, they would stop paying.

Q.   And you looked at in your analysis projections from 2021.  Is that right?

A.   Correct--July 2021.

Q.   And there are some other projections in 2023 that you were shown on cross examination.  Do you remember that?

A.   I do.

Q.   Which is closer to the date of the hypothetical negotiation?

A.   The July 2021 projections.  Certainly there is a view of increasing sales regardless of which one you look at, and it's going to be the actual sales that determine the royalties that are payable.

Q.   Do large corporations get to test the market and see how lucrative their infringement will be before taking a license?

A.   That is not how it ought to be.  The intention in the licensing marketplace is that entities who want to use technology pay royalties for the rights to use that technology, and if it's something they want to use a lot of, they pay more, and if it's something they decide not to use, then it doesn't take off, they stop using it, and they stop paying for it.

Q.   Now, under your damages model with a per-unit royalty, would LG have to pay a royalty on a TV if it takes out Constellation Designs' patented technology?

A.   No.

Q.   Now, if LG doesn't think that anyone's interested in watching ATSC 3, or broadcast television, does that warrant a lower per-unit rate for Constellation Designs?

A.   No.

Q.   Why?

A.   It's an effect on the royalty base, it's reflective in the sales units, and if they take it out, they no longer pay for the technology.

Q.   Is the same true for the geographical limitations?

A.   Yes.

Q.   Can you explain that a little bit?

A.   Sure.  So there are sales that are -- or TVs that are

made outside the United States, in Mexico.  Those TVs are shipped into the United States, sold in the United States, and those have what is referred to as a U.S. nexus.  And that's why there actually is geographic consistency between the royalty base that I utilize and is agreed upon and that which was in the Zenith agreements.

Q.   Now, can government mandates affect the extent to which technology is adopted or not?

A.   Yes.  In ATSC 1.0 there was a government mandate that increased the number of units--in other words, that royalty base or that sales base--but it doesn't affect the royalty rate; just the base.

Q.   Well, hold on now.  Couldn't Zenith have used that government mandate to demand a higher rate for its patents?

A.   No.

Q.   Why not?

A.   Well, they have a commitment to license their patents under reasonable and non-discriminatory terms.  That's their commitment.  You know, when you are part of the standard-setting organization and you put your technology into the standard, one has to capture in licensing the value of the technology only, not the value of the standard.  So it could not reflect the value of a government mandate in terms of the royalty rate.  That can affect the royalty base and the sales, but not the per-unit rate.

Q.   And we've heard a lot about patent pools.  Can I show you the Avanci patent pool agreement that LG's lawyer cross-examined you on?

A.   Sure.

Q.   Now, sir, did you see a particular 'whereas' clause that caught my eye?  And I'll highlight it for you.  Did you see that in the Avanci license?

A.   Yes, I did.

Q.   For all of the talk that we have heard in this case about how many patents LG has and how high the stack is when they're sitting there on counsel table, what was the strongest thing that LG was able to commit in writing about its patents in the ATSC 3 standard when it did this deal with Avanci?

A.   One; one or more patents.  The patents simply have not been reviewed, evaluated, and vetted.  Avanci as a licensing administrator has not undertaken a review of the patents that have been contributed by LG in terms of determining whether they are relevant to the standard or not, whether they are essential or not.

     Right now LG is simply satisfied its obligations as a participant in a standard-setting organization to contribute and identify all patents that might or may be essential and may be relevant.

Q.   You've already told us that you in your analysis have compared Constellation's current condition with ATSC 3.0 to

121

the position that Zenith used to be in for ATSC 1.0, but how do you know that Zenith or LG isn't in the same position that they used to be for ATSC 1.0?

A.   They have demonstrated they are in a different position now.  LG has chosen the path of just putting their patents in a pool where they are not vetted and tested in a licensing effort that's being undertaken.

     In contrast, Zenith, much like Constellation Designs, went -- Zenith went through very strong licensing efforts to get their patents tested in the marketplace and evaluated, and it was through that process and that licensing process that they established a royalty of $5 per unit.

     Here with 3.0, the fact that they have simply put their patents into a pool without that testing and vetting process demonstrates a view in terms of the value contribution that they would think of for their patented technology for 3.0.

Q.   And can we talk about patent pools a little bit, sir?

A.   Sure.

Q.   I want to return to this slide which you showed the jury.  First, will you tell us what a pooling patent is?

A.   So pooling patents are patents that are not evaluated and tested but, rather, placed into a pool where the compensation, the royalties for those patents, is based upon simple formulas.  It's typically based upon the number of patents.  Thus, the more patents that a patent holder can put into a

122

pool, the greater their share of the royalties.

Q.   And I think you said earlier that you were here for the testimony of both Doctor Jones and Doctor Jones?

A.   Yes.

     MR. CURRY:  Mr. Diaz, can I have PDX 2.66 please?

Q.   (BY MR. CURRY)  Do you remember seeing this from Doctor Jones, the inventor's, testimony?

A.   Yes, I do.

Q.   Do you see how it took us as a society about 42 years to achieve a 2dB gain and then Doctor Jones sitting right here with one invention brought us a full dB?

A.   Yes.

Q.   Do you think it's fair to evaluate his inventions like they're just some pooling patents?

A.   I do not.  As a matter of economics, this demonstrates that there is substantial technological value and that converts into substantial economic value.  All patents aren't created equal.  There are some patented technology that is pioneering and valuable, and that is what we're seeing here, and there are other technologies that are minor improvements, and those are reflected in pooling patents.

     And if we were on that prior slide, I mean, I think it's demonstrated because when LG--excuse me--when Zenith joined the MPEG LA patent pool for 1.0, they had two patents that garnered the full $3.75, so that $5 got split and only two

123

patents for $3.75.

     MR. CURRY:  Could I have the document camera, please?  Thank you.

     THE WITNESS:  Yeah.  So the one on the left is --

Q.   (BY MR. CURRY)  Let me ask a question, sir.

     For ATSC 1.0, how many pools were there for the standard?

A.   One.

Q.   And what portion of that $5 was allocated to pooling patents?

A.   $1.25.

Q.   So about 25 percent?

A.   Yes.

Q.   And who got the other 75 percent of that $5?

A.   Zenith with their two patents that are referred to as list 1 patents.

Q.   What technology area were those patents in?

A.   Those were in the physical layer of ATSC 1.0.  They were the so-called 8VSB technology.

Q.   And did Zenith license its patents with resolve?

A.   Yes.  It undertook very strong licensing efforts.

Q.   Now, if we go to ATSC 3.0, what happened to that pooling group?

A.   Well, in effect, those pooling patents have been put into the new MPEG LA patent pool and the Avanci patent pool, and the rates that are effectively there are $5.75 in total.

124

Q.   Okay.  So these over here are $5.75, and what was it --
what were the pooling patent rates for ATSC 1.0?

A.   $1.25.

Q.   Now, has the rate for the pooling patents grown?

A.   Yes, it's grown significantly from $1.25 up to $5.75.  So
this is the point I was trying to make earlier is that on the
surface you see it going from $5.00 to $5.75, but when you
start to look at the different types of patents and you dig
underneath it, the pooling patents going from $1.25, what we
have in the new patent pools are pooling patents because they
have not gone through the licensing resolve process, and those
are now at $5.75; so a relatively significant increase over
time.

Q.   Why do you say that the rate in this case is an inflation
adjusted $5.00 instead of the $3.75 amount?

A.   Because the $5 is what Zenith had in its bilateral
negotiations with individual companies.  It wasn't until
they -- and when they did that, they obtained a total of 22
agreements, 19 of which were for consumer TVs.  By going into
the patent pool, that gave them access ultimately to 90
licensees, so it expanded that royalty base significantly for
them and was put in with these commitments of reasonable and
non-discriminatory.

Q.   Now, as you look at the rates of the pooling patents
going from $1.25 to $5.75, what does that tell you about your

**125**

---

adjustment from $5.00 to $6.75 for Constellation's patents?

A.   In my view, it demonstrates that making the adjustment
utilizing the CPI index is imminently reasonable; that it
simply reflects the value of the dollar.  It's not reflecting
how the marketplace is currently viewing the increase in the
price of the technology itself.

     MR. CURRY:  Plaintiff marks as a Sullivan
Demonstrative and moves it into evidence as a trial
demonstrative.

     MR. McKEON:  Well, Your Honor, we object to moving
anything into evidence that's a demonstrative.

     THE COURT:  We can note this as a demonstrative
created during examination, but that doesn't make it anything
more than a demonstrative.

     MR. CURRY:  Understood.  Thank you, Your Honor.

     THE COURT:  All right.

     MR. CURRY:  And could I get my slide 33, please?

Q.   (BY MR. CURRY)  Now, you were asked a lot of questions
about the differences between ATSC 1.0 and 3.0 and the
differences between the parties.

     Let me start by asking, is ATSC 1.0 different from ATSC
3.0?

A.   It is different, yes.

Q.   Do things have to be identical to be comparable?

A.   No.  They have to be sufficiently similar for purposes of

**126**

---

comparison.

Q.   And how would you compare Constellation Designs in its
position with its patents and ATSC 3.0 with where Zenith used
to be with respect to ATSC 1.0?

A.   They are in a very similar position.  When Zenith
embarked upon their licensing program with their technology of
8VSB for 1.0, they had to go into the marketplace and
undertake very significant licensing efforts to demonstrate
the value and viability of their patented technology.  They
were not producing televisions at that point in time but,
rather, were a technology company for licensing.

     And it's very similar to Constellation Designs now where
at the hypothetical negotiation they, too, are seeking to
demonstrate their licensed technology, and at that
hypothetical negotiation the parties agree that the patents
are valid and that they're infringed.

     And based upon that, it is reasonable to conclude a
per-unit royalty of $6.75 per unit that LG can use; or, again,
if they choose not to use the technology, then they would not
be paying.

Q.   But how do we know that Zenith's $5 licensing rate was
fair?

A.   Well, multiple reasons.  One, they put forward that rate
under a commitment of being reasonable and non-discriminatory,
and that rate was agreed to in many bilateral negotiations, as

**127**

---

reflected in the license agreements.

Q.   Doctor Sullivan, would it be any less fair for
Constellation Designs to insist on getting the rate that
Zenith used to get when it was in Constellation's position?

A.   No.  I think the $6.75 is fair and reasonable.

     MR. CURRY:  Pass the witness.

     THE COURT:  Any further cross examination?

     MR. McKEON:  Yes, Your Honor, just a few things.
Thank you.

     THE COURT:  All right.  Proceed with additional
cross.

     MR. McKEON:  Thank you, Your Honor.

     Can I get slide 38, Doctor Sullivan's slide 38?

                    RECROSS EXAMINATION

BY MR. McKEON:

Q.   Now, you were -- just had a conversation with counsel on
this slide.  Do you recall that?

A.   I do.

Q.   Okay.  And you mentioned something that I never heard
before--patent pooling.  Well, this is two separate patent
pools.  Isn't that right?

A.   Three, actually.  So there's the two on the 3.0 side, one
on the 1.0 side.

Q.   Thank you for that clarification.  3.0 patent pools I'm
referring to.  There's two separate -- entirely separate

**128**

**Page 129**

1  patent pools. Isn't that right?
2  A.  Correct.
3  Q.  And we have separate licensors in the MPEG LA than we do
4  in Avanci. Is that right?
5  A.  There is some overlap.
6  Q.  There is some overlap, but the vast majority are not in
7  both. Isn't that right?
8  A.  Majority.
9  Q.  The majority -- there's not an overlap of the majority.
10  Fair enough?
11  A.  Agreed.
12  Q.  So you're going to have a whole collection of patents in
13  one that are not in the other. Isn't that right?
14  A.  That's right.
15  Q.  Okay. And the way these patent pools work is that folks
16  that are -- if you're part of a standard body, you agree to
17  contribute your patents under fair, reasonable, and
18  non-discriminatory conditions. Is that right?
19  A.  Not quite. They agree to license under reasonable and
20  non-discriminatory terms, but it is not a commitment to
21  contribute patents to a pool.
22  Q.  Fair enough. Let's make sure we're clear on that. When
23  you're in the standard body--right?--you make this agreement,
24  if you're part of it, that you will agree to license all the
25  patents coming out of the work of a standard body the patents

**Page 130**

1  that you develop, you agree to license them under fair and
2  reasonable and non-discriminatory terms. Correct?
3  A.  Correct.
4  Q.  Okay. And in this case we have an MPEG LA pool where we
5  have members of the ATSC 3.0, and they had their work and they
6  contributed their patents in terms of the development, and
7  they agreed within MPEG LA to license them under fair and
8  reasonable and non-discriminatory terms. Correct?
9  A.  That confuses a couple of items.
10  Q.  Well, they made a commitment when they put their patents
11  into the pool. Right? They made a commitment to license
12  those patents. Isn't that right?
13  A.  They made a commitment -- a RAND commitment when they
14  participate in the standard-setting organization. They did
15  not make a commitment to put their patents in a pool. That's
16  a separate choice. And when they put them in the pool, then
17  there's a royalty associated with that.
18  Q.  And that royalty needs to be fair, reasonable, and
19  non-discriminatory, in accordance with the commitment they
20  previously made to the entire industry within 3.0. Correct?
21  A.  Correct. It's independent of the pool, the commitment.
22  Q.  But that commitment, if they're out there trying to
23  license on discriminatory terms and unreasonable conditions,
24  that would violate the agreement with the standard body.
25  Correct?

**Page 131**

1  A.  That's right.
2  Q.  So at least from their perspective, the folks that are
3  in these pools, they believe they're all complying with their
4  obligation to license under fair, reasonable, and
5  non-discriminatory terms. Correct?
6  A.  I would imagine that's the case.
7  Q.  And each one of these folks that have contributed to the
8  standard body, they believe -- maybe not every patent, but
9  they believe a whole lot of their patents are essential to the
10  standard. Isn't that right, sir?
11  A.  Not necessarily.
12  Q.  Well, you think they have no belief when they commit to
13  licensing their patents under fair and reasonable conditions,
14  they don't have -- they think they're just not essential to
15  the pool?
16  A.  No. I think most of them think they do have some
17  essential patents. History demonstrates that there's a
18  smaller handful that turn out to be essential. But they
19  declare a much broader group.
20  Q.  And you understand that Avanci pool has over 10,000
21  patents that have been put into the pool. You understand
22  that?
23  A.  I have seen your claims in that regard.
24  Q.  Well, if it's 10,000, it's -- a whole lot of those
25  patents are going to be standard essential. You agree with

**Page 132**

1  that?
2  A.  They have not been reviewed and evaluated.
3  Q.  Well, sir, you understand as a matter of statistics that
4  of all of these people in the industry who are involved in 3.0
5  who were there showing up to the meetings and had contributed,
6  and then they take their patents and go to the Avanci pool and
7  put them in there, there are going to be a whole lot of
8  patents that are standard essential that are required to
9  practice the standard. Isn't that right?
10  A.  There may be some, there may be few, there may be more.
11  At this point that analysis has not been done and it simply is
12  not known, so that would be speculative.
13  Q.  Well, one thing we do know that's not speculative is
14  Constellation Designs, they didn't put their patents into the
15  standard. Isn't that right?
16  A.  They did not put them in the pool.
17  Q.  Now, let's go back to the room, the room in 2020 where LG
18  and Constellation Designs, they're in this room. Mr. Marino
19  and a representative from LG are in there and they're
20  negotiating. Do you recall that testimony -- that discussion
21  we had?
22  A.  I do.
23  Q.  And I just want to make sure we're clear on something.
24  In fact, the parties in that room would have the knowledge and
25  awareness of all the things we talked about, including the

**[Page 133]**

1  MPEG LA pool, the Avanci, all the sales that LG would make in
2  the future, and they would have the knowledge of the adoption
3  rates that would happen with respect to 3.0.  Correct?
4  A.   Not quite.
5  Q.   Well, they would know all the facts that we learned here
6  in this courtroom.  Isn't that right?
7  A.   That they would know.
8  Q.   And they would know about the adoption rates for 3.0.
9  Isn't that right?
10  A.   Historical ones.  From today forward, we don't know and
11  they don't know.
12  Q.   Fair enough.  But I'm talking about there in 2020.  Now
13  we are near 2023, and we have data in 2023.
14  A.   We have some.
15  Q.   And we saw an article earlier where there was an
16  estimation of 5 million TVs in the United States that have 3.0
17  in it.  Isn't that right?
18  A.   There was an estimate earlier this year in February that
19  this entire year going forward would yield 5 million units.
20  Q.   And we're in 2023 and that estimate was created in 2023.
21  Isn't that right?
22  A.   Correct.
23  Q.   And you had an estimate that you showed the jury or that
24  you presented to the jury where there was 11 million in 2023.
25  Do you recall that?
                                                              133

**[Page 134]**

1  A.   Yes, from a couple of years prior.
2  Q.   And that was 2021.  Isn't that right?
3  A.   Correct.
4  Q.   But the folks in that room would know that 2023 data
5  which says 5 million, and they would know that the adoption
6  is real, real slow.  Isn't that right?
7  A.   They would know that it's slow.  It has been a slow
8  uptick.  The projections themselves are not -- you know, they
9  do not determine the royalty; that's the sales base, the
10  actual sales.
11  Q.   Thank you, Doctor Sullivan.
12       MR. McKEON:  Your Honor, I pass the witness.
13       THE COURT:  All right.  Any further direct?
14       MR. CURRY:  No, Your Honor.
15       THE COURT:  You may step down, Doctor Sullivan.
16       THE WITNESS:  Thank you.
17       THE COURT:  You are welcome.
18       Ladies and gentlemen, it's five minutes until noon.  We
19  are going to break for lunch.  If you will take your notebooks
20  with you to the jury room, follow my instructions, including
21  not to discuss the case with each other.  Hopefully my guess
22  as to how long will be -- will not be as far off as it was
23  yesterday.  We will try to be back somewhere close to 1:00.
24       With that, the jury's excused for lunch.
25       (Whereupon, the jury left the courtroom.)
                                                              134

**[Page 135]**

1       THE COURT:  Counsel, has there been any resolution
2  on the matter we talked about in chambers this morning, or are
3  you still in the process of communicating, or have all efforts
4  broken down?  Give me an update.
5       MR. CASSADY:  We resolved, Your Honor.  Do you want
6  me to go to the podium and give you more detail?
7       THE COURT:  Please do.
8       Have a seat, everyone.
9       You can step down, Doctor Sullivan.
10       MR. CASSADY:  Your Honor, the agreement we've made
11  is that they can mention $███  they can mention the number of
12  patents that they believe is part of the offer, but that the
13  witness Mr. Lewis will not go into the explanation as to FRAND
14  basis for it or as to how it's calculated.
15       And, in fact,  Mr. Caldwell can ask him questions like,
16  You're not going to tell this jury how to calculate this,
17  you're not going to tell this jury how it is FRAND, and
18  basically we're not going to ask him how it was done.  We'll
19  just say, You're not going to tell this jury how it was done.
20  And that's the agreement regarding that.
21       I've got one other thing it would be nice to tell you
22  once we confirm the agreement.
23       THE COURT:  Let's get confirmation first.
24       Is that correct, from the Defendant's viewpoint?
25       MR. REGER:  Almost, Your Honor.  The question --
                                                              135

**[Page 136]**

1  Your Honor, we had decided that what Mr. Lewis would talk
2  about is the ███, the number of patents, and there would be
3  no more, no less.
4       What I did indicate, of course, is that his answers would
5  be based upon their cross examination of questions.  If they
6  open the door by saying, You're not going to tell the jury
7  something, then he's entitled to talk about that, Your Honor.
8  If they want to say that now, they're flipping privilege on
9  us.
10       THE COURT:  Let me make this clear.
11       MR. REGER:  Yes, Your Honor.
12       THE COURT:  If anybody thinks the door's been
13  opened, they're going to have to confirm with me whether I
14  believe the door's been opened before they attempt to walk
15  through it.
16       MR. REGER:  Understood, Your Honor.
17       THE COURT:  And if in the course of the direct
18  examination of Mr. Lewis as an adverse witness the Plaintiff
19  goes down a path you believe opens the door to something
20  beyond what Mr. Cassady has recited in the record, then you
21  need to approach and I'll take that up on an *ad hoc* basis.
22       MR. REGER:  Thank you, Your Honor.
23       THE COURT:  Other than that, I assume you are in
24  agreement with what's been recited.
25       MR. REGER:  Yes, Your Honor.
                                                              136

THE COURT: Okay. And I assume further, counsel, this relates solely to Mr. Lewis' testimony and doesn't relate to Doctor Napper's testimony later in the Defendants' case, which will be governed by the four corners of his report.

MR. REGER: That's right, Your Honor.

MR. CASSADY: That's the same thing, Your Honor, yes. Mr. Napper doesn't talk about it. Thank you.

THE COURT: All right. Now --

MR. CASSADY: He doesn't talk --

THE COURT: Wait a minute. Whatever is in Mr. Napper's report is in Mr. Napper's report; whatever is outside of his report is out of bounds. Correct?

MR. CASSADY: Agreed.

THE COURT: Okay. Thank you.

Now, you said there was something else, Mr. Cassady.

MR. CASSADY: Yes. I just wanted to state on the record, given some of the testimony and some of the other comments during this last day or two of trial, I was concerned that we were about to be surprised by a witness saying that Avanci has actually now looked at some of these patents.

I asked counsel on the break, You guys aren't trying to surprise me with the fact that Avanci maybe in the last couple of days approved some particular patent as being essential to the portfolio in the Avanci pool. They assured me that they're not going to do that, that that hasn't happened, and

that no witness is going to say that.

And I just Your Honor, rather than approaching the bench in the middle of testimony where they're trying to get to it, I wanted to make this record in it because that's what I've been informed of by counsel--that they are not going to try to surprise us with some disclosure of Avanci in the middle of this trial, Your Honor.

THE COURT: With regard to that recital from Mr. Cassady, do Defendants have any differing opinion? Or can you confirm that's his version of what he heard you say is what you said?

MR. McKEON: Yeah. I wasn't part of the discussions, Your Honor, but that's our understanding. We are not going to come in with some witnesses and talk about all the essentiality analysis that's been done.

THE COURT: Is there anything else we need to cover before we break for lunch?

MR. CASSADY: No, Your Honor.

THE COURT: All right. We'll try to reconvene close to or just before 1:00.

Court stands in recess.

(Lunch recess.)

THE COURT: Be seated, please.

Do I understand there's a request for Doctor Sullivan to be excused?

MR. CASSADY: Yes, Your Honor.

THE COURT: All right. Any objection?

MR. McKEON: No objection, Your Honor.

THE COURT: Doctor Sullivan is excused.

MR. CASSADY: Thank you, Your Honor.

THE COURT: All right. Plaintiff, you're going forward with several deposition witnesses at this point. Is that correct?

MS. DELLINGER: Yes, Your Honor.

THE COURT: All right. Before you do that, let me give you an update on trial time. As of right now, Plaintiff has used 7 hours, 27 minutes, and 48 seconds, and Defendant has used 5 hours, 8 minutes, and 1 second.

We have a little over 11 -- between 11 and 11-and-a-half hours of combined trial time remaining. I am confident with what we can do this afternoon and with a full day Monday, we can finish all the evidence by or before the end of the day Monday. And it would be my hope to deal with 50(a) practice and the charge conference such that we can charge the jury first thing Tuesday morning.

That's at least at this point what the schedule looks like. But we'll fine-tune that as we go forward.

All right. Anything further before I bring in the jury?

MR. CASSADY: Nothing from Plaintiff.

MR. McKEON: Nothing from LG, Your Honor. Thank

you.

THE COURT: Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT: Welcome back from lunch, ladies and gentlemen. Please have a seat.

We'll continue with the Plaintiff's evidence. And it's my understanding the Plaintiff has a series of witnesses to present by deposition.

Plaintiff, call your next witness.

MS. DELLINGER: Thank you, Your Honor. Adrienne Dellinger on behalf of the Plaintiff.

The Plaintiff calls by deposition Mr. Tae Hee Ahn. Mr. Ahn is a professional in the IP center at LG. Plaintiff's run time is 9 minutes and 5 seconds, and Defendants' run time is 4 minutes and 23 seconds.

THE COURT: Please proceed with this witness by deposition.

TAE HEE AHN
BY VIDEO DEPOSITION

Q. Will you state your name for the record?

A. It is TaeHee Ahn.

Q. Who do you currently work for, Mr. Ahn?

A. I work at LG Electronics.

Q. And in what jurisdictions are you a lawyer, Mr. Ahn?

A. U.S., Washington, D.C.

Q.   And you're currently a professional in the IP center at LG.  Right?
A.   Yes.
Q.   But you've worked in the IP center at LG related to patents.  Right?
A.   Yes.
Q.   LG has a choice about whether it's going to use someone else's patent.  Right?
A.   I don't know in which case you're speaking about that LG has to make a choice.
Q.   Are you sitting here today saying that LG has never used another company or person's patents?
A.   I did not say that.
Q.   When LG chooses to use other people's patents, one of the options it has is to take a license.  Right?
A.   The decision can be different depending on the negotiation.
Q.   Right.  But one of the options is for LG to take a license to use someone else's patent.
A.   That can be decided based on the negotiation.
Q.   That's one of the results that can come from the negotiation.  Right?
A.   That can be decided depending on the negotiation.
Q.   Is it one of the results that can come from the negotiation or not?

---

A.   Yes.  It is one of the results.
Q.   Mr. Ahn, I'm asking you whether or not you have to have a negotiation with the patent holder for LG to decide whether it's going to use a patent or not.
A.   LG respects patent rights.  Thus, when a patent holder asks for negotiation, we respond to that request by negotiating with the patent holder and make determinations according to the negotiation results.
Q.   And you've known about this case at least since 2022.  Right?
A.   Correct.
Q.   Do you know how many patents Constellation Designs, the Plaintiff in this case, accuses LG of infringing when it sells its ATSC 3.0 televisions?
A.   I don't know.
Q.   Do you know what the patent numbers are of Constellation Designs patents that are in this case?
A.   I don't know.
Q.   Have you reviewed any of Constellation Designs' patents?
A.   No.
Q.   You've been working in the IP center since 2000.  I just want to make sure I got that right.
A.   When I joined the company, the name was Patent Center, but it is the same organization.
Q.   Do patent pools just license people that were involved in

---

the standard?
A.   In a patent pool, anyone in that patent pool can participate.
     CHECK INTERPRETER:  Anyone who has patents in a patent pool can participate in that patent pool.
     LEAD INTERPRETER:  I agree.
Q.   So have you ever been involved in valuing a patent?
A.   No.
Q.   Have you ever compared the value of one patent to another?
A.   No.
Q.   I mean, would you agree with me that all patents have the same value?
A.   It is difficult to say.
Q.   Why is it difficult to say?
A.   Value is decided through negotiation.
Q.   What agreements has LG entered into with Avanci?
A.   ATSC 3.0.  I worked on it.
Q.   In the agreement with Avanci that LG entered into, did LG agree to sublicense its patents to the Avanci pool?
A.   By patents, are you referring to the ATSC 3.0 patents?
Q.   I'm referring to whatever patents were included in the deal.
A.   For ATSC 3.0 patents, we have joined the pool.
Q.   Okay.  I put in front of you what's been marked Exhibit 1

---

to your deposition which starts with the Bates range LGCD_00200317.  Do you have that in front of you now, sir?
A.   Yes.
Q.   Okay.  Have you ever seen this document before?
A.   Yes.
Q.   And this relates to ATSC 3.0?
A.   Yes.
Q.   Okay.  And the little hand-initialed signature at the bottom left of the first page, is that yours?
A.   Yes.
Q.   What is Exhibit 1?
A.   It is an agreement entered into when joining the ATSC 3.0 patent pool entered into by Avanci and LG.
Q.   Who was the primary negotiator on this deal with Avanci that LG did?
A.   I was the negotiator on the working level.
Q.   What financial benefits did Avanci promise LGE to deal with that particular issue?
A.   The portion that we just read.
Q.   ████████████████████████████████████████
     ███████████████████████████████████████
     ██████████
     █████ ████
     ████████████████████████████████████████
     ████████████████████████████████████████



13  Q.   And there are other companies that have put their patents
14  in this pool besides LG.  Right?
15  A.   Yes.
16  Q.   When entering into this agreement with Avanci, did LG and
17  Avanci discuss valuations of particular patents?
18  A.   No.
19  Q.   Did Avanci and LG discuss any particular patents in
20  detail?
21  A.   No.
22  Q.   Are you aware of Avanci or LG doing any analysis related
23  to a particular patent that's included in this agreement?
24  A.   No.
25  Q.   Did Avanci and LG, in entering this deal, discuss patents

145

---

1  A.   It did not.
2  Q.   Did MPEG LA ask LG to be a licensor in the MPEG LA patent
3  pool?
4  A.   LG participated in the patent pool discussion.
5  Q.   Well, when did LG tell MPEG LA it was joining Avanci?
6  A.   It did not tell MPEG LA.  They did not reach out to
7  us -- to us to be a member of the pool.  They asked us to
8  participate in the patent pool discussion.
9  Q.   Are you saying that MPEG LA never offered LG to be a
10  member and a licensor of the MPEG LA ATSC 3.0?
11  A.   Companies participating in the pool discussion decide for
12  themselves whether or not to become a member.
13        LEAD INTERPRETER:  If it wanted to, it could have
14  participated in the patent pool launch, but it did not
15  participate as a member.
16  Q.   And the first time MPEG LA found out that LG would not
17  become a licensor member of the ATSC 3.0 patent pool was when
18  Avanci made a public release yesterday that LG would be a
19  licensor of the Avanci patent pool.  Right?
20  A.   I don't know about that.  Avanci announced that LG would
21  participate in the Avanci patent pool yesterday.
22  Q.   Is that the way LG informs its longstanding partners that
23  have helped it make over a billion dollars that it's not going
24  to go forward with those partners by letting somebody else put
25  out a press release?

147

---

1  that were not part of the pool?
2  A.   No.
3  Q.   During the negotiation of this agreement, did LG and
4  Avanci ever discuss this lawsuit?
5  A.   No.
6  Q.   Was Avanci made aware of this lawsuit when LG entered
7  into this agreement?
8  A.   No.
9  Q.   Did you discuss any invalidity analysis related to LG
10  patents when negotiating this agreement with Avanci?
11  A.   No.
12  Q.   Did LG let Avanci know that one of its engineers had
13  written an IEEE paper citing to the inventors in this case?
14  A.   No.
15  Q.   Did LG let Avanci know that Constellation Designs'
16  priority date was before any LG patent committed to the
17  standard ATSC 3.0?
18  A.   No.
19  Q.   When negotiating this agreement with Avanci, did LG tell
20  Avanci how many patents it had that it thought applied to the
21  ATSC 3.0 standard?
22  A.   No.
23  Q.   And during the negotiations with Avanci related to any of
24  the agreements that was entered into with Avanci, did LG tell
25  Avanci about Constellation Designs' patents?

146

---

1  A.   I did not say LG informs in this way.  I just said that
2  Avanci simply made a press release that LG is joining Avanci's
3  patent pool.
4  Q.   How many agreements did LG and Avanci execute that
5  evidenced the full agreement regarding the ATSC 3.0 pool?
6  A.   LG signed three agreements.
7  Q.   What are those three agreements?
8  A.   One is Exhibit 1, and the other is a participation
9  agreement stating that it will participate in the platform
10  agreement, and the third is a licensee agreement.
11        CHECK INTERPRETER:  There is another agreement,
12  which states it would join as a licensee.
13  Q.   Do you know how Avanci determined these would be the
14  royalty rates in this agreement?
15  A.   I don't know.
16  Q.   Do you know if Avanci did any analysis of the patents
17  that exist that are necessary to practice the ATSC 3.0
18  standard?
19  A.   I don't know.
20  Q.   Do you know how Avanci would deal with the situation
21  where a very critical patent portfolio was discovered after
22  setting these rates?
23  A.   That is a matter for Avanci to determine.
24  Q.   Do you see that LG signed this agreement in November of
25  2022?

148

A.   Yes.
Q.   Do you know why Avanci didn't sign it until February 27th of 2023?
A.   After LG signed, LG made a request to Avanci.
Q.   What was the request?
A.   We set a condition stating that until ONE Media, Samsung, Sony, and ETRI joined, that Avanci should not countersign the agreement.
Q.   How did LG determine that ONE Media, Samsung, ETRI, and Sony were the main patent holders?
A.   Patent application team, when they participated in the standing setting, said that those were the main entities that participated in the standard setting.
     CHECK INTERPRETER:  When the patent prosecution team worked on ATSC 3.0 standards, they told us that these are the major participating parties.
     THE COURT:  Does that complete this witness by deposition?
     MS. DELLINGER:  Yes, Your Honor.
     THE COURT:  And, ladies and gentlemen of the jury, just a quick reminder, this is what I mentioned yesterday where we cut out the question and answer or the parties at my direction cut out the question and answer in the non-English portion, and you heard the witness and you saw the written transcription of it.  You might not have seen his mouth move

149

very much, but that's to save time.
     All right.  Call your next witness, Plaintiff.
     MS. DELLINGER:  Thank you, Your Honor.
     The Plaintiffs call by deposition Dr. Nagaraj Nandhakumar.  Doctor Nandhakumar is the senior vice president of strategic technology projects for Zenith and a representative of the CTO.
     Plaintiff's run time is 2 minutes and 34 seconds, and Defendants' run time is 1 minute and 9 seconds.
     THE COURT:  All right.  Proceed with this witness by deposition.

NAGARAJ NANDHAKUMAR, Ph.D.
BY VIDEO DEPOSITION,

Q.   Good morning, sir.
A.   Good morning.
Q.   Can you please state your name and address for the record?
A.   My name is Nagaraj Nandhakumar.  I live at 10129 Winecrest Road, San Diego, 92127.
Q.   What company do you work for?
A.   Zenith Electronics, LLC.
Q.   You're currently employed by Zenith Electronics, LLC.?
A.   That's right.
Q.   And what's your title at Zenith Electronics, LLC.?
A.   Senior vice president.

150

Q.   Are you the senior vice president of any specific discipline?
A.   I'm in the office of the CTO, and my team is called the strategic technology projects team.
Q.   How are you familiar with David Bailey?
A.   Well, based on an exhibit that I was shown related to this -- related to this proceeding, I had -- recall my memory of having communicated with him on LinkedIn.
Q.   Have you ever read or reviewed any of Constellation Designs' patents?
A.   No.
Q.   Have you ever tried to access Constellation Designs' patents?
A.   No.
Q.   Have you ever accessed a patent using the United States Patent and Trademark Office website?
A.   Yes, I have.
Q.   What about other people's patents?  How do you know whether LG's lawyers had the right information to know which patents from others that they needed to license related to ATSC?
A.   That is not part of my role or responsibility at LG.  We have an IP team in Korea who handles those analysis and the decision-making.
Q.   And what's been marked as Exhibit 4 is a LinkedIn

151

conversation between Doctor Nandhakumar and David Bailey dated December 27th, 2017.  Do you see that?
A.   Yes.
Q.   And you agree that Mr. Bailey indicated and stated that his client, Constellation Designs, pioneered the physical layer digital communications technology underlying ATSC 3.0.  Right?
A.   Many companies claim that they pioneer all kinds of technologies.  I don't know if it's a request for an R&D collaboration, if they want our help in doing something with their technology.  I have no idea what he wanted to do with this so-called pioneering technology.
Q.   Because you never followed up.
A.   I never followed up.  Probably.  I don't know if I followed up or not.
Q.   Do you regret never responding to Mr. Bailey's final request for a brief conversation regarding Constellation Designs' ATSC 3.0 technology?
A.   No.
Q.   What would Constellation Designs have to do to get you or someone else at Zenith or LG to seriously engage with them in pre-suit negotiations?
A.   I have no idea.
     THE COURT:  Does that complete this witness by deposition?

152

1    MS. DELLINGER:  Yes, Your Honor.
2    THE COURT:  Call your next witness, please.
3    MS. DELLINGER:  The Plaintiffs call by deposition
4  Ms. Hyo Yeong Kim.  Ms. Kim is the chief research engineer at
5  LG Electronics who worked with Realtek.
6    The Plaintiff's run time is 1 minute, 18 seconds, and the
7  Defendants' run time is 1 minute, 52 seconds.
8    THE COURT:  All right.  Proceed with this witness by
9  deposition, please.
10          HYO YEONG KIM,
11          BY VIDEO DEPOSITION
12  Q.  Would you please state your name for the record?
13  A.  My name is Kim Hyo Yeong.
14  Q.  What SoC companies do you work with?
15  A.  Realtek.
16  Q.  And why do you communicate with Realtek?
17  A.  In order to draw circuit diagrams, information on how the
18  SoC circuits are made up is necessary.  That's why.
19  Q.  What do you mean by 'made up'?
20  A.  In order to make the surrounding circuits, one needs to
21  know the power that SoC requires.
22          INTERPRETER:  Swap power with voltage, please.
23  Q.  Have you asked for any other technical documents from
24  Realtek?
25  A.  I do not recall.

1  Q.  Have you ever asked for chip layouts from Realtek?
2  A.  I have not asked for a chip layout.
3  Q.  Do you think Mr. Lee would give you chip layouts if you
4  asked for it?
5  A.  That I don't know.  I don't know whether it would be
6  provided or not.
7  Q.  Have you ever had a bug with the code in a Realtek chip?
8  A.  I don't know about code bugs.
9  Q.  Have you ever made a request for information from Realtek
10  that Realtek refused to provide for?
11  A.  Not that I can recall.
12  Q.  Were you involved in the development of the K8HP chip?
13  A.  Yes.
14  Q.  Did you work with Realtek?
15  A.  Yes.
16  Q.  Did you provide any design requirements for the K8HP chip
17  to Realtek?
18  A.  I have not provided a design requirement for SoC to
19  Realtek.
20  Q.  Do you know if the K8HP chip is able to receive ATSC 3.0
21  signals?
22  A.  I understand that K8HP does receive the signal.
23  Q.  We've been using the term ATSC 3.0 signal.  Are you aware
24  that the ATSC is a standards organization?
25  A.  I don't know that it's a standards organization.

1  Q.  Do you know that ATSC 3.0 is a standard?
2  A.  I do not.
3  Q.  So what is your understanding of an ATSC 3.0 signal?
4  A.  I only know that it is the version after the ATSC 1.0.
5  Q.  Did you know what ATSC 3.0 signals were when you ran
6  those tests?
7  A.  I don't have knowledge of the 3.0 signal.
8  Q.  Are you aware that this is a patent infringement case?
9  A.  Yes.
10  Q.  Have you reviewed any of the patents in this case?
11  A.  No.
12  Q.  Once you learned about this lawsuit, did you change
13  anything you were doing?
14  A.  No.
15  Q.  Did you have any conversations with Realtek about the
16  lawsuit?
17  A.  No, none.
18  Q.  You ran the ATSC 3.0 verification and validation test on
19  the K8HP chip.  Right?
20  A.  Yes, I did.
21          THE COURT:  Does that complete this witness by
22  deposition?
23          MS. DELLINGER:  Yes, Your Honor.
24          THE COURT:  Call your next witness, please.
25          MS. DELLINGER:  Thank you, Your Honor.

1    These next if you depositions are quite short.  Do you
2  mind if I remain near the podium?
3          THE COURT:  That's fine.
4          MS. DELLINGER:  Thank you, Your Honor.
5    Plaintiffs call by deposition Mr. Lee Daenam.  Mr. Daenam
6  is a senior manager at LG in the home entertainment division.
7    Plaintiff's run time is 44 seconds.  Defendants' run time
8  is 27 seconds.
9          THE COURT:  Let's proceed.
10          LEE DAENAM
11          BY VIDEO DEPOSITION
12  Q.  Would you please state your name for the record?
13  A.  My name is Lee Daenam.
14  Q.  What year did you begin working at LG?
15  A.  I joined the company in 1998.
16  Q.  What companies do you purchase semiconductors from?
17  A.  As far as companies go, Realtek and mediaTek are the two
18  main companies that I purchase from.
19  Q.  How often do you communicate with Realtek?
20  A.  I communicate whenever necessary.
21  Q.  When was the last time you communicated with Realtek?
22  A.  Last week, Friday.
23  Q.  And why did you communicate with Realtek?
24  A.  It wasn't work-related.  My recollection is that they
25  contacted me -- called me just to say hello.

**Page 157**

1  Q.  Once you learned about this lawsuit, did you change
2  anything you were doing?
3  A.  No.
4  Q.  Have you reviewed any of the patents in this case?
5  A.  No.
6  Q.  Do you know what a patent is?
7  A.  I do not.
8  Q.  No one's ever talked to you about patents at LG?
9  A.  No.
10 Q.  Do you know what intellectual property is?
11 A.  Well, I've heard of it, but I don't know.
12     THE COURT:  Proceed with your next deposition,
13 please.
14     MS. DELLINGER:  Thank you, Your Honor.
15     The Plaintiffs call by deposition Dr. Woo Suk Ko.  Doctor
16 Ko is a researcher at the Standardization Research Center at
17 LG who worked on the standardization of ATSC.
18     Plaintiff's run time is 1 minute, 18 seconds, and the
19 Defendants' run time is 23 seconds.
20     THE COURT:  Please proceed.
21         WOO SUK KO, Ph.D.
22        BY VIDEO DEPOSITION
23 Q.  Good morning.  Can you please state your name for the
24 record?
25 A.  My name is Ko Woo Suk.

**Page 159**

1  this case?
2  A.  Yes.  Like I said, that's what I was told.
3  Q.  Do you know what patents are involved in this case?
4  A.  I do not.
5  Q.  Have you ever seen the patents involved in this case?
6  A.  I have not.
7     THE COURT:  Please proceed with your next
8  deposition, counsel.
9     MS. DELLINGER:  Thank you, Your Honor.
10    Plaintiffs call by deposition Mr. Byeongkook Kang.  Mr.
11 Kang is a chief research engineer in the TV Research Center at
12 LG.
13    Plaintiff's run time is 48 seconds, and Defendants'
14 time is 1 minute and 12 seconds.
15     THE COURT:  Please proceed.
16         BYEONGKOOK KANG
17        BY VIDEO DEPOSITION
18 Q.  Can you please state your name for the record?
19 A.  Yes.  My name is Byeongkook Kang.
20 Q.  And at what company do you work?
21 A.  At LG electronics.
22 Q.  What division do you work in at LG?
23 A.  The name of the team is ATSC product development project.
24 Q.  Is your ATSC product development project responsible for
25 TVs that support ATSC 3.0 broadcasts?

**Page 158**

1  Q.  Are you an employee of LG?
2  A.  Yes.
3  Q.  Is what division of LG do you currently work for?
4  A.  Standardization Research Center is where I work.
5  Q.  So you've worked on standardization for ATSC 3.0.  Is
6  that correct?
7  A.  Yes.
8  Q.  About how many people in the Digital TV Research Center
9  worked on ATSC 3.0 standardization?
10 A.  About five.
11 Q.  Do you recall any of their names?
12 A.  Kim Jinwoo, chief research engineer.
13     THE INTERPRETER:  Kim, K-I-M, Jinwoo, J-I-N-W-O-O,
14 and Jeong Byeongkook, last name Jeong Byeongkook, chief
15 research engineer.
16 Q.  Did you work on technology development for ATSC 3.0?
17 A.  No, I did not develop personally.
18 Q.  You did not personally develop any technology related to
19 non-uniform constellations.  Correct?
20 A.  Correct.
21 Q.  Do you understand my client, Constellation Designs, LLC.,
22 owns patents?
23 A.  I've never heard of that company's name, and I don't know
24 which patents you're talking about.
25 Q.  Are you aware that LG is accused of violating patents in

**Page 160**

1  A.  Yes.
2  Q.  Have you ever read or reviewed any of Constellation
3  Designs' patents?
4  A.  I don't recall reviewing it.
5  Q.  Why would the patent team have sent you a copy of
6  Constellation Designs' patents?
7  A.  By asking me why the patent team sent me the patent, that
8  assumes that I received it.  But I do not have recollection of
9  receiving it, and I don't know why the patent team would send
10 me the patent.
11 Q.  Do you understand that Constellation Designs' patents are
12 available online to be accessed by the public?
13 A.  This is the first time I am hearing this.
14 Q.  Did you know that patents were publicly available?
15 A.  I don't work on patents.  I did not know.  I don't know
16 the details of such things.
17 Q.  If someone were to reach out to you and tell you about a
18 patent that they believed LG was infringing, what would you
19 do?
20 A.  Regarding this question, I don't work on patents, so I
21 don't think anyone will reach out to me about patents.
22 Furthermore, there were no cases like that in which people
23 reached out to me, so I don't know what actions I will take.
24 Q.  Have you done anything personally to make sure that LG
25 doesn't infringe Constellation's patents?

1  A.  No.  Not to my understanding.

2        THE COURT:  Does that complete this witness?

3        MS. DELLINGER:  Yes, Your Honor.

4        THE COURT:  Call your next witness, please.

5        MR. CALDWELL:  Your Honor, the Plaintiff calls

6  adverse Mr. Richard Lewis, the corporate representative from

7  LG.

8        THE COURT:  All right.  Mr. Lewis, if you'll come

9  forward and be sworn, please.

10       (Whereupon, the oath was administered by the Clerk.)

11       THE COURT:  Please come around, sir, have a seat on

12 the witness stand.

13       MR. CALDWELL:  May we pass out the binders, Your

14 Honor?

15       THE COURT:  Please do.

16     Pull the microphone down just a little bit, Mr. Lewis,

17 please.  Thank you.

18     Mr. Caldwell, you may proceed with direct examination

19 when you're ready.

20       MR. CALDWELL:  Thank you, Your Honor.

21              RICHARD LEWIS, SWORN,

22 testified under oath as follows:

23              DIRECT EXAMINATION

24 BY MR. CALDWELL:

25  Q.  Mr. Lewis, this is a slightly unusual situation because

161

1  we've called you adverse.  You understand I'm Brad Caldwell,

2  and I represent the Plaintiff, Constellation Designs?

3  A.  I do.

4  Q.  Okay.  And we haven't really met other than just sort of

5  saying hi here in the courtroom or things like that.  Correct?

6  A.  That's right.

7  Q.  All right.  I don't want to be unfair to you.  Will you

8  do me a favor and will you introduce yourself to the jury and

9  maybe kind of a little brief intro into what your role is?

10 A.  Sure.  So I'm Richard Lewis.  I'm a senior vice president

11 at Zenith Electronics.  I do technology and licensing.  You

12 sort of heard my name throughout the day.  I work on business

13 development, putting deals together, technology licensing, and

14 technology leadership.

15 Q.  Thank you.  And you understand that this is an adverse

16 examination.  Correct?

17 A.  I do.

18 Q.  Okay.  And you understand I mean no disrespect if I ask

19 you questions kind of in that form like your lawyers ask

20 questions of Constellation Designs' witnesses.  Correct?

21 A.  Correct.

22 Q.  Okay.  Thank you.

23     And adverse doesn't mean we have to fight about it.  I

24 just want to make sure you understand the sequence or the

25 flow.  Thank you.

162

1        How long have you been at Zenith or LG?

2  A.  I started in 1997 so about 26 years.

3  Q.  And to be clear, you're not an employee of LG or

4  Defendant in this case.  Correct?

5  A.  I'm sorry.  Say again?

6  Q.  You're not an employee of LG.  Correct?

7  A.  Well, Zenith is a wholly-owned subsidiary of LG so in

8  that sense I am.

9  Q.  But you're a Zenith employee.  Correct?

10 A.  That's correct.

11 Q.  And you also -- they give you a title when it's handy

12 that you can use as an LG employee.  Correct?

13 A.  Well, no, not really.

14 Q.  Would you agree that LG acquired Zenith so they could use

15 that brand in North America?

16 A.  Yes.

17 Q.  And, in fact, LG often attended ATSC meetings under the

18 Zenith name and wearing Zenith name tags.  Correct?

19 A.  No, I don't think so.

20 Q.  Well, did you go to any of the ATSC 3.0 meetings?

21 A.  I've seen pictures of the people in meetings.  I didn't

22 attend all the meetings, no.  Sorry if I -- so, you didn't

23 specify a time frame, and I know that LG employees attended

24 later ATSC meetings with LG name tags.

25 Q.  Okay.  Mr. Lewis, you have an electrical engineering

163

1  degree.  Correct?

2  A.  I do.

3  Q.  So I'm sure that you understand technology to some depth,

4  but just for place, you're not here to -- you're not here

5  offering technical opinions.  Correct?

6  A.  I'm definitely not.

7  Q.  Who is it that will be offering technical opinions for LG

8  in this case?

9  A.  It will be the technical expert.

10 Q.  And which one is that?

11 A.  I don't recall his name exactly.  I don't want to use his

12 first name only.

13 Q.  Okay.  Have you guys met?

14 A.  We have not.

15 Q.  Okay.  And who is it that's going to offer the damages

16 opinions for LG in this case?

17 A.  Again, I am not very good with last names.  I tend to

18 meet people and think of them in their first name so I don't

19 know his last name and I don't wish to use just his first

20 name.

21 Q.  But have you guys met, you and the damages --

22 A.  Oh, we've met many -- yes, several times.

23 Q.  But you've met several times, but you didn't talk before

24 his expert report was served.  Correct?

25 A.  Not to my recollection, no.  Oh, sorry.  Excuse me.

164

**[Page 165]**

1    We're talking about the damages expert.  Is that correct?
2    Q.   Yes, sir.
3    A.   Okay.  Yes, I had phone calls and discussions with him, I
4    don't know, two or three times.
5    Q.   Were you willing to provide him whatever information or
6    support he needed for his opinions?
7    A.   Yes.
8    Q.   Does the name Brian Napper ring a bell?
9    A.   The Brian I knew, the Napper part I -- now that you said
10   it, I remember it.  But as I said, I'm not great on names,
11   last names.
12   Q.   Understood.  I just want to make sure we're unambiguously
13   talking about the same person.  Thank you.
14        Were you the CTO of Zenith right before it was acquired
15   by LG?
16   A.   I was.
17   Q.   Okay.  And you've negotiated patent licenses before.
18   Correct?
19   A.   I have.
20   Q.   Am I correct that you negotiated approximately 30 ATSC
21   1.0 licenses for Zenith?
22   A.   Yes.
23   Q.   Do you remember that slide that Doctor Sullivan showed in
24   his direct that had just a long list of licenses with $5 per
25   device royalty rates?

**[Page 167]**

1    A.   Licensing, absolutely.
2    Q.   All right.  Am I correct that ATSC 1.0 was adopted by the
3    FCC in 1996?
4    A.   That's correct.
5    Q.   It took a little while, though, for the technology in a
6    commercial sense to kind of get off the ground.  Right?
7    A.   I would say more than a little while, yeah.
8    Q.   Well, about how long?
9    A.   Well, we signed -- you know, the standard's adopted in
10   '96-ish, and we signed our first television manufacturer I
11   think in like 2004.  So that's a fairly substantial time.
12   Q.   But is that also -- 2004 -- just strike that and I'll
13   start over.
14        That's about eight years after the -- the standard was
15   finalized as to ATSC 1.0.  Correct.
16   A.   That's correct.  It's tough to get people to take
17   licenses.  You have to have a thick skin.
18   Q.   I understand.
19        What I was curious about, though, the question I had
20   actually asked you was if it took a long time for ATSC 1.0 to
21   take off.  And I want to make sure that we're talking about
22   the same thing because you told me when you signed the first
23   license, but I'm also talking about technical adoption.
24        So with that background, did it take a while for ATSC 1.0
25   to take off commercially?

**[Page 166]**

1    A.   I do.
2    Q.   Did a bunch of those licenses sound familiar to you?
3    A.   They did.
4    Q.   And why is that?
5    A.   Because I personally negotiated all of those licenses.
6    Q.   Every single one of those $5 licenses that he was talking
7    about?
8    A.   Yes.
9    Q.   Have you ever negotiated any ATSC 3.0 licenses?
10   A.   No.
11   Q.   And that's on behalf of Zenith or LG.  Correct?
12   A.   That's correct.
13   Q.   So you're here actually to talk about ATSC 3.0 or a
14   little bit more -- I mean, are you more comfortable talking
15   about your background in ATSC 1.0?
16   A.   Well, it depends on the subject matter.  As I said, I'm
17   not a technical guy, I'm the licensing guy.  I did some
18   mentoring of the LGE people on the ATSC 3.0 license.  So
19   depending on the topic, I'm comfortable talking about either
20   one of them.
21   Q.   And, Mr. Lewis -- actually, it's Mr. Lewis.  Correct?
22   It's not Doctor Lewis.  I'm not being disrespectful or --
23   A.   I'm a licensing guy so you're not offending me.
24   Q.   All right.  You were there pretty much through most of
25   the sort of heyday of the Zenith ATSC 1.0 licensing.  Correct?

**[Page 168]**

1    A.   I think that's fair to say.
2    Q.   And is that also in the seven or eight years time frame
3    probably?
4    A.   No, I -- I wouldn't say that.
5    Q.   Okay.  And when is it that you think ATSC 1.0 took off?
6    A.   Well, it's a question of what does take off mean.  I
7    think there was significant television -- ATSC 1.0 televisions
8    in the marketplace probably in that 2002-to-2003 range.
9    Q.   Okay.  So maybe six or seven years after adoption of the
10   standard?
11   A.   Yeah.  If we want to say take off, that's -- that's
12   probably right.
13   Q.   And -- and if you were to kind of fast forward, that's
14   exactly where we are today with regard to the adoption of the
15   ATSC 3.0 standard in terms of time.  Correct?
16   A.   We're definitely six-ish years, yeah.
17   Q.   Do you remember in opening that -- well, let me back up.
18   I'm sorry.
19        Are you kind of familiar with the basic process of the
20   way standards bodies work and then licensing of -- of -- of
21   patents that maybe relate to standards?
22   A.   Probably more than kind of.  I wouldn't say I'm an
23   expert, but I'm very familiar.
24   Q.   And your counsel made a big theme in opening about
25   playing by the rules and playing by the rules of the standards

**Page 169 (left column, top)**

1  body and kind of being fair and -- do you remember that?
2  A.  I do.
3  Q.  Is there some suggestion on the part of LG that
4  Constellation Designs has not played by any rules of a
5  standards body?
6  A.  No.
7  Q.  Okay.  And I'll ask you, as the representative for LG, is
8  it your position that Constellation Designs has failed to play
9  by any rule of any standards body?
10  A.  You're not required to join a standards body.  It's
11  not -- it's not something you have to do.  Most companies want
12  to do that, they want to be involved, but you don't have to.
13  Q.  And you listened to Dr. Christopher Jones testify that he
14  would have been happy to participate in the standards body.
15  Correct?
16  A.  I think that's right.
17  Q.  So just if there is any uncertainty, you're not
18  suggesting that Constellation Designs has done anything wrong
19  if it was unaware of the ATSC 3.0 standard or did not
20  participate in the ATSC 3.0 standard.  Correct?
21  A.  That's correct.
22  Q.  Are you contending that Constellation Designs has done
23  anything at all that is unfair to LG?
24  A.  Well, being a licensing person, I think the filing of a
25  lawsuit prior to the business presentation, the sequence there

**Page 171 (right column, top)**

1  Q.  Five days, roughly?
2  A.  Uh-huh.
3  Q.  When is it you knew you were going to make a trip to
4  Marshall, Texas, to testify in this trial?
5  A.  A few weeks ago, month ago, something like that.
6  Q.  All right.  Kind of moving on a little bit, do you
7  understand that the parties' credibility is at issue in this
8  case?
9  A.  Yes.
10  Q.  Do you think it's important for LG to act consistently
11  with the things it says to the jury and to the Court here in
12  Marshall?
13  A.  Yes.
14  Q.  Do you remember in your deposition you told us that LG is
15  always very respectful of everyone's intellectual property?
16  A.  Yes.
17  Q.  Okay.  And that that means you take time and effort to
18  analyze, negotiate, and understand the position of a company
19  offering a license?
20  A.  Yes.
21  Q.  And would you agree that that's because that's the
22  appropriate standard of conduct for a company in this
23  industry?
24  A.  Yes.
25  Q.  And is it exactly how you would expect to be treated if

**Page 170 (left column, bottom)**

1  seems a little unfair to LG.
2  Q.  How many years should somebody wait after they try to
3  contact LG before they go ahead and file a lawsuit when
4  they're not getting anywhere?
5  A.  Well, it kind of depends on that nature of that contact.
6  Q.  Okay.  Well, let me ask you this.  Is there anything
7  unfair about Dr. Chris Jones believing in his invention?
8  A.  Oh, no.
9  Q.  Is there anything unfair about Constellation Designs
10  filing a lawsuit in a United States District Court when it
11  feels that it's just not getting anywhere on a licensing
12  effort?
13  A.  There's nothing in the law against it.  I believe the
14  question asked me was, did I feel it was unfair or was there
15  anything unfair.  And that was, you know, it's my feeling, so
16  that's what I was answering.
17  Q.  And does LG have any right whatsoever to tell Dr. Chris
18  Jones or Constellation Designs how it should value its
19  patents?
20  A.  Absolutely not.
21  Q.  Okay.  So when did you get around to reading the patents
22  in the lawsuit?
23  A.  If you mean read them cover to cover, I've not done that.
24  Q.  How long have you been in Marshall, Texas?
25  A.  I've been in Marshall, Texas, since Sunday.

**Page 172 (right column, bottom)**

1  you're the guy for Zenith reaching out to someone else and
2  saying, I'd like you to take a license?
3  A.  Yes.
4  Q.  So is there ever a scenario in your mind where you
5  believe LG would be justified in not taking an intellectual
6  property claim seriously?
7  A.  I am sorry.  Can you repeat the question just one time
8  for me?
9  Q.  I will do my best, and I apologize if it's not verbatim.
10  Is there ever a scenario where you believe LG would be
11  justified in not taking an intellectual property claim
12  seriously?
13  A.  Yes.  Would you like me to explain?
14  Q.  Go ahead.
15  A.  So you said an intellectual property claim.  A claim can
16  be, I have patents, you should take a license without any
17  detail, or it could be -- you know, it could be something as,
18  what we did was an analysis, here's your products, here's how
19  they infringe.  In that case it would be inappropriate.
20  You know, LG gets -- we're a big company.  We get people
21  writing to us with intellectual property, you know, claims or
22  offers all the time.  So it kind of depends on what we're
23  talking about.
24  Q.  Well, if I'm reading your answer right in my mind, what
25  I'm seeing is, you're saying if you reach out to us with the

**Column 1 (p. 173)**

1  words that Constellation Designs' people did, we don't have to
2  take it seriously.  Did I interpret that more or less
3  correctly?
4  A.   I think the way I would think about it is if you reached
5  out the way that you reached out to us, you -- you might not
6  get the response that you need.  We certainly -- I can only
7  relate it back to my own licensing experience.
8       So when we reached out to people, we had not only a
9  business presentation, but some specific intellectual property
10  claims against their products so they could see the whole --
11  whole situation, and then it was clear.
12       In your situation before the lawsuit, it was offers, new
13  opportunities, partnership.  That's not the same as asserting,
14  hey, here is the specific technology that I have that you need
15  to take a license for.
16  Q.   And you mentioned something about you would -- you would
17  tell us what it is that's the infringement or something along
18  those lines.  I don't remember exactly the words.  But will
19  you go ahead and list for us all the model numbers or products
20  we were supposed to put in our 2017 outreach to you three
21  years before you released an ATSC 3.0 television?
22  A.   Yeah.  I think we both know that there weren't products
23  being made at that time, but it's a situation where -- and it
24  goes back to the IP center where they said, it's too early.
25  You know, when you were writing to us regarding licensing

173

**Column 2 (p. 174)**

1  these things, it was early in the process.  And, typically, as
2  it works in the TV industry as I've done it over the last 25
3  years, you know, people are cautious.  It's hard to convince
4  your boss to sign up to spend money if it's very early and
5  other people aren't doing it.
6  Q.   I mean, it's really, really hard if you never even open
7  the patent and can say what the subject matter is.  Right?
8  A.   Well, which patent would we open?  You know, there
9  weren't -- again, there are specific references in our
10  licensing program.  We put together specific references to
11  patents.  You know, some companies came to us, unsolicited,
12  knowing and wanting to know which patents were applicable.
13  Q.   Would you agree with me it would be really hard to
14  recommend it to your boss if you never looked at a patent?
15  A.   Sure.
16  Q.   You negotiated over -- start over.  Sorry.
17       You negotiated a large number of ATSC 1.0 licenses that
18  resulted in over a billion dollars in licensing for Zenith.
19  Correct?
20  A.   I did.
21  Q.   You will agree with me LG was aware that Constellation
22  Designs had patents that covered specific constellations
23  utilized within the ATSC 3.0 standard in approximately
24  2017-2018.  Correct?
25  A.   I can't agree with that, no.

174

**Column 3 (p. 175)**

1  Q.   You do have a cross examination binder, and I'd just like
2  to direct you to your testimony.  And I think it should be
3  right there at the first tab.  It's your deposition.
4  A.   Yep.
5  Q.   And I would, if you would, please flip to page 56,
6  starting at line 3.
7       THE COURT:  Mr. Caldwell, do you have a copy of that
8  material for the Court?
9       MR. CALDWELL:  Yes, sir.  And I'm sorry if it wasn't
10  passed up.  My apologies.
11       May we approach?
12       THE COURT:  You may.
13       MR. CALDWELL:  And, Your Honor, it was tab 1, and I
14  was citing to page 56.
15  Q.   (BY MR. CALDWELL)  So did you find that, sir?
16  A.   Just so I'm clear, page 56?
17  Q.   Line 3.
18  A.   Line 3.
19  Q.   Yes.  Would you agree with me that LG first became aware
20  that Constellation Designs' patents covered specific
21  constellations utilized within the ATSC 3.0 standard when
22  there were some earlier correspondence in 2017-2018 that
23  alluded to patents in ATSC 3.0?
24  A.   Well, again, my response at the deposition was that they
25  alluded to patents.  There weren't any specific patents

175

**Column 4 (p. 176)**

1  listed, so it's kind of hard to say if the patents that
2  weren't listed read on the standard.
3  Q.   Sir, I'm just tracking -- I tracked literally what the
4  question was.
5  A.   I'm sorry?
6  Q.   I tracked literally what the question was in your
7  deposition, didn't I, sir?
8  A.   Okay.
9  Q.   And the question was, When did LG first become aware that
10  Constellation Designs' patents covered specific constellations
11  utilized within the ATSC 3.0 standard?  Did I read that
12  correctly?
13  A.   You did.
14  Q.   And, sir, was your answer, There were some earlier
15  correspondences in 2017-2018 that alluded to patents in ATSC
16  3.0 is my recollection?
17  A.   Correct.  That's what I said.
18  Q.   And at that point in time, LG had no televisions we could
19  have listed.  Correct?
20  A.   That's correct.
21  Q.   Were there any LG chips that we would have been able to
22  analyze or any code that Constellation Designs should have
23  cited for any LG chips at that point in time?
24  A.   No.
25  Q.   We don't have to go back through it, but you've been here

176

1 in court and you've seen the correspondence between the
2 attorney, Mr. David Bailey, and your colleague, Mr. -- former
3 colleague, anyway, Mr. Wayne Luplow?
4 A.   Yes.
5 Q.   And you understand that after Mr. Bailey followed up, Mr.
6 Luplow's response was there's zero/no interest.  Correct?
7 A.   Correct.
8 Q.   But will you agree with me that what he meant was zero/no
9 interest in talking to you about your patents?  He did not
10 mean zero/no interest in moving forward with ATSC 3.0, did he?
11 A.   I can't agree to that, no.
12 Q.   Well, Mr. Luplow throughout that same time period was
13 heavily involved in lobbying the FCC to adopt the A/322
14 standard, wasn't he?
15 A.   Yes.
16 Q.   He was also well aware of IEEE broadcast publications,
17 wasn't he?
18 A.   Yes.
19 Q.   In fact, he was actually even up on the administrative
20 committee for the IEEE Broadcast Technology Society in 2016,
21 wasn't he?
22 A.   Yes.
23 Q.   And on the magazine, the IEEE public magazine, he's
24 listed on the inside cover because of his role on the
25 administrative committee.  Correct?
                                                          177

1 A.   That's correct.
2 Q.   And as to his interest in advancing ATSC 3.0, are you
3 aware that essentially in days or weeks from when he was
4 telling Mr. Bailey, Zero/no interest, that he was actually
5 conducting field tests on ATSC 3.0 receivers?
6 A.   I'm not aware of that timing.  I know he was involved in
7 field testing, I can say that.
8 Q.   Okay.  You're aware of the correspondence we've seen as
9 LinkedIn where Mr. Bailey also reaches out to Mr. Nandhakumar
10 and says, hey, let's talk, and ultimately requested a call and
11 then the communications dropped off.  Correct?
12 A.   I am.
13 Q.   Now, my understanding was from your deposition that you
14 thought those first two efforts by Mr. Bailey, so the Wayne
15 Luplow emails and the Nandhakumar emails or LinkedIn, those
16 basically petered out and didn't work because he wasn't
17 reaching out to the IP center.  Right?
18 A.   Yeah.  Wayne Luplow was not involved in licensing.  And
19 so the other thing was, you know, Wayne -- I don't know if
20 you've seen the movie *Grumpy Old Men*, but you could tell from
21 the video he is a little prickly.  And so it doesn't surprise
22 me that because it wasn't in his job responsibility, that he
23 had no interest.
24    I actually think, and if you look at the sequence of
25 the -- the correspondence, the one that he responded to was
                                                          178

1 Mr. Bailey reaching out to have a call.  So, you know, it's
2 open to interpretation.  Knowing Wayne for 20-plus years and
3 having him work for me for five or six years, I believe he was
4 saying, I have zero interest in having a call with you.  And
5 the thing that's not clear is that he then -- he was thinking
6 about retiring because he -- he literally retired very shortly
7 after that.
8    So I know that's going to sound like, you know, it's a
9 different interpretation to what you have, but that's how I
10 knowing Wayne and how prickly he is, that's how I read that
11 exchange.
12    THE COURT:  Let me ask you, Mr. Lewis, not to refer
13 to him as simply Wayne.  I know you knew him intimately, but
14 it's important for the record that we avoid using first names
15 only, and in that answer you called him Wayne three different
16 times.  I assume it's Mr. Luplow.  But I'm not insisting on
17 this just because I'm some kind of formal person that doesn't
18 like first names.
19    This is a record that may be reviewed on appeal, and it's
20 important that it be clear.  And so to avoid confusion, I
21 require everybody, Plaintiff's counsel, Defendants' counsel,
22 and all the witnesses, not to refer to individuals by first
23 name only.
24    I have a reason for it, and I'm going to insist that
25 everybody do it, and that includes you.  So don't refer to any
                                                          179

1 other individual in your testimony by first name only.  All
2 right?
3    THE WITNESS:  Yes.  I apologize, and I'll -- I will
4 not do it.
5    THE COURT:  Just fix it going forward, please, sir.
6    THE WITNESS:  Yes, sir.
7    THE COURT:  All right.  Counsel, please continue.
8    MR. CALDWELL:  Your Honor, I appreciate that.  I did
9 not want to interrupt obviously, but I also object to the
10 answer.  I mean, I was asking if he was citing that the
11 problem was we didn't reach out to the IP, and I think that
12 might have gotten answered in a millisecond before it kind of
13 ran off.
14    So I object to the non-responsiveness of the large
15 majority of that answer.
16    THE COURT:  Well, that's a valid objection which
17 I'll sustain.
18    Mr. Lewis, I know this is an examination of you for the
19 first time in an adverse manner because your company and Mr.
20 Caldwell's company are adverse to each other.  So he can ask
21 you leading questions, he can treat you as if you were on
22 cross examination, and that's what the rules require.
23    But the rules also require that your answers correspond
24 to the question asked and that you not volunteer information
25 or answers that the question doesn't call for.  And counsel
                                                          180

181

1  for LG's going to get the chance to follow Mr. Caldwell, and
2  anything that they think needs to be cleaned up or clarified,
3  they can ask you about.
4       So please limit your answers to the questions asked.  All
5  right?
6            THE WITNESS:  Yes, sir, Your Honor.
7            THE COURT:  That's the way this system is supposed
8  to work.
9       Let's continue, counsel.
10           MR. CALDWELL:  Yes, sir.  Thank you.
11  Q.   (BY MR. CALDWELL)  So, Mr. Lewis, focusing back on the
12  nub of my question is, my understanding from your deposition
13  is you thought part of why things didn't work out when Mr.
14  Bailey reached out in the 2017-2018 time frame is because he
15  had not reached out to LG's IP center.  Correct?
16  A.   Correct.
17  Q.   But you understand that when Constellation Designs did
18  reach out to the IP center, that didn't get them anywhere, did
19  it?
20  A.   No.
21  Q.   And there was a response at some point from the IP center
22  that basically said, you know what, we'd like to wait and see.
23  Do you remember that response?
24  A.   Yes.
25  Q.   Do you remember what year that was?

181

1  A.   I don't have a clear recollection of that, no.
2  Q.   I think it was about October of 2021.  Does that sound
3  approximately right?
4  A.   I would believe it if -- if that's what you're saying.
5  Q.   Let me ask you this.  If LG had been selling products
6  that Dr. Chris Jones and his colleagues, Constellation
7  Designs, feel they have to infringing their intellectual property, how
8  long do they have to wait while LG imports those televisions
9  into the U.S. and sells them before they can actually talk
10  substance on a license?
11  A.   Well, that's a question that is difficult to answer.  It
12  depends on the growth in the marketplace.  If, you know,
13  during that time period there was 10 TVs sold or a million TVs
14  sold, it would have a different answer.  So I -- I don't think
15  that's an answerable question.
16  Q.   How many ATSC 3.0 televisions did LG sell in the first
17  year-and-a-half?
18  A.   I don't have that number off the top of my head.
19  Q.   Well, do you think it's closer to 10 or closer to a
20  million, to use your own terminology?
21  A.   Well, it's certainly closer to a million than to 10.
22  Q.   Will you agree with me that it was when Constellation
23  Designs filed a lawsuit that folks at LG finally read the
24  patents?
25  A.   Yes.

182

1  Q.   Does it frustrate you or annoy you that Constellation
2  Designs had to file a lawsuit or that they did?
3  A.   No.
4  Q.   Can you understand how they would have been frustrated in
5  late 2021?
6  A.   Yes.
7  Q.   I alluded earlier to the concept of kind of like acting
8  consistently in court or out of court.  Do you remember that?
9  A.   Yes.
10  Q.   Have you heard the suggestion in this trial that maybe
11  ATSC 3.0 isn't that significant in terms of progress or it's
12  not really being adopted or just isn't terribly important?
13  A.   I'm sorry.  Could you just repeat that question?
14  Q.   Yes, sir.  Have you heard the suggestion primarily from
15  LG's counsel that ATSC 3.0 hasn't been successful or maybe
16  really isn't all that important?
17  A.   I don't think I heard that, no.
18  Q.   Do you think ATSC 3.0 has been successful?
19  A.   I think it's been marginally successful.  It's early.  As
20  we discussed earlier, it's early in the curve.
21  Q.   Early in the curve.  And what does that mean to someone
22  like you?
23  A.   To me, the jury's still out.
24  Q.   Okay.  But what does that mean in terms of commercial --
25  like to be early in the curve or the jury's still out on this

183

1  standard?
2  A.   It means it might be successful in the future, it might
3  not.
4  Q.   Is it possible to get any fairer than a licensing offer
5  to LG that you would pay zero dollars if it's not successful
6  and take it out of your televisions?
7  A.   I don't think that's the issue.  The royalty rate would
8  be the issue.
9  Q.   So if it is successful and LG feels like it needs to put
10  it in their televisions, your concern is that they don't want
11  to have to pay much for that.  Is that right?
12  A.   I don't think that's a fair characterization, no.
13  Q.   Okay.  Well, have you taken the position in context of
14  this case, and I mean you, Mr. Lewis, that ATSC 3.0 is, at
15  best, evolutionary, not revolutionary?
16  A.   We're talking ATSC 3.0?
17  Q.   Yes, sir.
18  A.   I would say it is in some aspects revolutionary.  It adds
19  a back channel.  That two AM activity is a very important
20  part.  It adds -- it switches from an MPEG 2 transport stream
21  container.  And I know that's a lot of words, but just how the
22  signal package is being delivered has changed.  I think those
23  things are revolutionary.
24  Q.   I want to ask if you agree with this statement.  Excuse
25  me.  Do you agree with this statement:  The transition from

184

**Page 185**

1  ATSC 1.0 to ATSC 3.0 represents an incremental or
2  evolutionary, not revolutionary, change?
3  A.    The question, again it's a long question so if you don't
4  mind, the very first -- repeat it for me.
5  Q.    Do you agree with the following statement:  The
6  transition from ATSC 1.0 to ATSC 3.0 represents an incremental
7  or evolutionary, not revolutionary, change in television
8  technology?
9  A.    Do I agree with that?  Yes.
10 Q.    Now, have you seen what LG or Zenith, when they're
11 working together, have told the FCC about the same issue?
12 A.    Yes, I've seen that.
13 Q.    Okay.
14         MR. CALDWELL:  May I have slide 12, Mr. Diaz?
15 Q.    (BY MR. CALDWELL)  And this is at tab 11 of your binder
16 if you need to see the whole document.
17         Now, we talked earlier about -- back up.  I'm sorry.
18         Mr. Wayne Luplow, you guys worked together for years.  Is
19 that correct?
20 A.    That is correct.
21 Q.    I mean, approximately how many years did you know each
22 other at work?
23 A.    Twenty, 20-plus.
24 Q.    And, I mean, Mr. Luplow is not a low-level -- was not a
25 low-level employee at Zenith in the late 2010s.  Correct?

**Page 186**

1  A.    Correct.
2  Q.    Like approximately where was he in the hierarchy?
3  A.    I believe his title was director or vice president,
4  something of that nature.
5  Q.    Something pretty significant?
6  A.    Yeah.
7  Q.    And how high is your title now or is it comparable?
8  A.    Yes.
9  Q.    And who do you report to?
10 A.    I report to Jong Kim.
11 Q.    Thank you.  In 2017, do you agree with me that Zenith and
12 LG were telling the FCC, ATSC 3.0 is nothing short of
13 revolutionary, it is the future of broadcasting, and the
14 lifeblood of a transformation that will reap tremendous public
15 interest benefits?
16 A.    That's correct.  I agree.
17 Q.    And these are in public comments that are following up on
18 what Mr. Luplow said about how we should lobby the FCC.
19 Correct?
20 A.    That's correct.
21 Q.    But if your -- if LG's expert comes in here and testifies
22 that ATSC -- the transition to ATSC 3.0 represents an
23 incremental or evolutionary but not revolutionary change, do
24 you stand by his view or do you stand by the view that the LG
25 team and the Zenith team told the FCC?

**Page 187**

1  A.    Well, it kind of depends on which part of the standard
2  that we're talking about.  You know, the -- the A/322 part of
3  the standard is one thing.  The back channel and some of the
4  container that we talked about earlier, that's other parts of
5  the standard.  So in this filing it's ATSC 3.0 which is a
6  basket of technologies.
7  Q.    And in the filings LG and Zenith were talking about the
8  A/322 in point.
9  A.    Yes.
10 Q.    Well, they were talking about the A/322 because that is
11 the so-called physical layer, the part of the transmission
12 that the FCC has to approve.  Right?
13 A.    That's correct.
14 Q.    In fact, they pointed out to the FCC that A/322 defines
15 what it takes to receive and demodulate ATSC 3.0 signal as
16 well as the waveform that could impact potential interference
17 characteristics.  Correct?
18 A.    Correct.
19 Q.    And you remember how this came about in 2017 that LG or
20 Zenith were having this discussion and trying to persuade the
21 FCC?
22 A.    A vague recollection.  That wasn't my area of -- of
23 expertise.
24 Q.    Let's see if we can remember or we can agree on certain
25 parts of it.  You know there was another portion of the ATSC 3

**Page 188**

1  called the A/321 portion?
2  A.    Again, that wasn't my area, so I believe that -- I
3  believe if you say there was one, there was one.  I believe
4  that.
5  Q.    Well, does it ring a bell that it was a portion they
6  called the bootstrap?
7  A.    Bootstrap loader, I know that name, yes.  Again, I'm the
8  licensing guy, not the technical guy, so help me.
9  Q.    Fair enough.  And, first of all, I will try to do that,
10 but please also tell me if you -- if you just don't know.
11 That's fine, too.
12 A.    Yep.
13 Q.    So my understanding, and I want to see if you have the
14 same understanding, is the FCC was thinking about mandating or
15 had mandated 321, but there was concern that they might not
16 also mandate 322 at the same time.  Does that ring a bell?
17 A.    Yep.
18 Q.    And LG and Zenith were specifically going to the FCC to
19 say, no, no, no, you have to also do 322.  This is very, very
20 important.  Correct?
21 A.    Right.
22 Q.    So each of these FCC documents like the one I showed you
23 before, which was PTX 30, these documents are LG and Zenith
24 telling the FCC, You've got to get the A/322, you've got to
25 make that mandatory.  Right?

**Page 189**

1  A.   Yes.
2  Q.   In fact, it's Plaintiff's Trial Exhibit 29 that says
3  A/322 defines what it takes to receive and demodulate the ATSC
4  3.0 signal as well as the waveform that could impact potential
5  interference.  Correct?
6  A.   That's correct.
7  Q.   Interference characteristics.  Correct?
8  A.   Yes.
9  Q.   In Plaintiff's Trial Exhibit 30, LG told the FCC, A/322
10  is the component, the component, of ATSC 3.0 that ensures that
11  receivers in televisions and other consumer reception devices
12  are able to demodulate an ATSC 3.0 signal.  Correct?
13  A.   That is correct.
14  Q.   And what is your understanding of what it is that's the
15  receivers in televisions?
16  A.   I'm sorry?
17  Q.   Well, do you see the reference here, it says, A/322 is
18  the component of ATSC 3.0 that ensures that receivers in
19  televisions -- do you see that portion?
20  A.   Yep.
21  Q.   What is your understanding of what it is that are the
22  receivers in televisions?
23  A.   The receiver -- I just don't understand the question.
24  I'm sorry.  What is my understanding of what a receiver is?
25  Q.   Yes.  When LG and Zenith writes the United States Federal

**Page 190**

1  Communications Commission and says, A/322 is the component of
2  ATSC 3.0 that ensures that receivers in televisions and other
3  consumer reception devices are able to demodulate ATSC 3.0,
4  what are they referring to as the receivers in televisions?
5  A.   Got it now.  Thank you.  So they're referring to A/322
6  which is the over-the-air interface.  That's the part that the
7  bootstrap loader enables.  In other words, the bootstrap
8  loader is a thing that allows us to change -- you could have a
9  completely different 322, and that's why LG and Zenith are
10  saying, no, no, no, we need -- we need definition on the 322.
11  Don't let the bootstrap loader be defined to be able to change
12  what that is without actually defining one for right now.
13  Q.   Sir, I'm really just asking what are the receivers in
14  televisions.  Is it that chip we've been talking about on a
15  board inside the television?
16  A.   There's a tuner, there's an SoC.  So, yes, A/322 is the
17  standard that defines the receiving function, the over-the-air
18  receiving function in the television, yes.
19  Q.   Would you agree that A/322 is vitally important to the
20  physical layer?
21  A.   Absolutely.
22  Q.   Would you agree that A/322 carries the vast bulk of the
23  data payload that enables all the video, audio, and data
24  features delivered by ATSC 3.0?
25  A.   Could you just say the question again?  It's --

**Page 191**

1        MR. CALDWELL:  Mr. Diaz, can I have slide 43 just to
2  help --
3        THE WITNESS:  Thank you.
4  Q.   (BY MR. CALDWELL)  Thank you.  And this is, again, from
5  Plaintiff Trial Exhibit 29.  I'm just asking if you agree with
6  that the LG told the -- told the FCC.
7  A.   Yes.
8  Q.   And, in fact, you remember how I called this thing the
9  A/322.  It's sometimes referred -- I'm sorry.  The A/321
10  portion is sometimes called the bootstrap?
11  A.   Yep.
12  Q.   Do you remember how Zenith and LG describe A/322?
13  A.   Yes.
14  Q.   They said if A/321 is the bootstrap, A/322 is the full
15  boot.  Right?
16  A.   Yeah.  If A/321 is the bootstrapper, then A/322 is -- is
17  -- is the boot that it's bootstrapping, yes.
18  Q.   Do you remember the LG argument in this case that its
19  NextGen TVs don't actually incorporate ATSC 3.0 A/322?
20  A.   Yes.
21  Q.   And then also LG's lawyer through cross examination made
22  this -- this suggestion that each company has chips that are
23  super confidential and LG only knows what's going on in its
24  own chips.  Do you remember that?
25  A.   Yes.

**Page 192**

1  Q.   I mean, do you agree with that?
2  A.   Yes.
3  Q.   So do you also understand that LG has told the FCC that
4  since approval of the ATSC 3 standard, A/322, the part that
5  we've talked about with the constellations and whatnot --
6  right?
7  A.   Yes.
8  Q.   -- A/322 is, in fact, incorporated into chipsets?
9  A.   Yes.
10        MR. CALDWELL:  May I have slide 22, Mr. Diaz?
11  Q.   (BY MR. CALDWELL)  It's in Plaintiff's Trial Exhibit No.
12  29, which, I mean, again you have it if you -- if you need it.
13  A.   I'm sorry.  I'm a little hard of hearing so I apologize.
14  And I have a bad habit of walking away.  I'm sorry.
15        I'm just telling you that if you need to reference this,
16  it's Plaintiff's Trial Exhibit 29 and it's in your binder.
17        My point is this:  LG and Zenith told the FCC A/322 was
18  unanimously approved by the ATSC on September 7th, 2016.  Do
19  you see that?
20  A.   Yes.
21  Q.   Since then, A/322 has been a full-fledged ATSC final
22  standard in fact already incorporated into chipsets.  Correct?
23  A.   Yes.
24  Q.   And they're talking about their own LG chipsets?
25  A.   Well, yes.

Q. Were the folks that were writing these lobbying papers, I don't -- I don't know what to call them but these lobbying documents --

A. Replies to -- I'm sorry.

Q. No. Go ahead.

A. I believe they are mostly replies to notice a proposed rule making.

Q. Thank you. That's helpful. So basically the FCC says, hey, we're thinking about doing X.

A. Uh-huh.

Q. And if LG, like alarm bells go off, and they say, wait a minute, that's going to be a problem for us, then they can send in a letter that says, hang on, we saw what you said you were proposing to do, but we really think it's important that you do this, something along those lines. Right?

A. Yeah. An NP, notice for proposed rule making, is really a solicitation for comments from the industry.

Q. But what I want to know is: Are the people that are writing these things on behalf of LG and Zenith talking out of turn when they say all these things about we got the chipsets, it makes the receivers work, it's the full boot? Are the people who are writing this to the FCC speaking out of turn? Are they out of their own lane in terms of their job at LG?

A. No, I don't think so.

Q. Do you know who it is that's writing these things?

A. I believe that Mr. Wayne Luplow and Mr. John Taylor were involved.

MR. CALDWELL: May I have slide No. 28, Mr. Diaz?

Q. (BY MR. CALDWELL) This is looking at Plaintiff's Trial Exhibit No. 29, which I've cited a few times. Who's the person -- I mean, it's the electronic signature, but who's the person who signed on the left?

A. That's Jong Kim.

Q. And what is Jong Kim's relationship to you at Zenith?

A. Again, if you don't mind, can you speak up a little bit?

Q. What is Jong Kim's relationship to you at Zenith?

A. He's my boss.

Q. As it happens, LG and Zenith did not just submit comments to the FCC about how important A/322 is. They actually would go and meet in person with the FCC multiple times to impress upon them the importance of A/322 specifically. Correct?

A. Yes.

MR. CALDWELL: And may I see Plaintiff's Trial Exhibit 31? Do we have a translated version of it? Thank you.

Q. (BY MR. CALDWELL) Are you familiar with Joint Trial Exhibit --

MR. CALDWELL: I think it was Plaintiff's Trial Exhibit, Mr. Diaz. Sorry about that.

Q. (BY MR. CALDWELL) Are you familiar with Plaintiff's

Trial Exhibit No. 31, which is a letter from LG summarizing visits with the FCC?

A. I'm not familiar with this, no.

Q. Have you ever seen it before?

A. No.

Q. Okay. But --

MR. CALDWELL: And may I see Plaintiff's Trial Exhibit No. 32, Mr. Diaz?

Q. (BY MR. CALDWELL) Are you familiar with Plaintiff's Trial Exhibit 32?

A. No.

Q. Okay.

MR. CALDWELL: That's fine. You may take it down, Mr. Diaz.

Q. (BY MR. CALDWELL) I won't belabor it, but basically there's no dispute between us that not only was LG and Zenith writing the FCC saying, this is very important, they were also physically going to visit the FCC to try to impress upon them the importance of the A/322. Correct?

A. That's correct.

Q. And that second letter --

MR. CALDWELL: In fact, do you mind putting PTX 32 back up, Mr. Diaz, and zoom in on the date?

Q. (BY MR. CALDWELL) Do you see the date, November 6 of 2017?

A. I do.

Q. This is days before Mr. Luplow wrote us back when we told him we'd like to talk about ATSC 3.0 and he told us, zero/no interest. Right?

A. I don't have the -- date of the email, but -- or the communication, but I'll take your word for it, sure.

Q. Well, that communication with Mr. Luplow spanned right around New Year's at the end of the 2017 and beginning of 2018. Does that ring a bell?

A. That sounds right. Thank you.

Q. Thank you.

MR. CALDWELL: Thank you, Mr. Diaz.

Q. (BY MR. CALDWELL) And just to be clear, I have shown you some things from 2017, but it's also not the case that after 2017, LG just threw in the towel and said, we're done with ATSC 3.0, we're no longer going to try and influence the -- the way that this goes, we're done. Right? They continued to lobby the FCC, didn't they?

A. That's correct, yeah.

Q. And, in fact, even during the pendency of this case, LG and Zenith have impressed upon the FCC how important it is to adopt A/322. Correct?

A. I really don't know. Again, I'm the licensing guy. It's not my area.

Q. Okay. Yes, sir.

1    But you are familiar with the fact that in this court
2  LG's lawyers have basically suggested they are displeased with
3  the progress of ATSC 3.0 products in the market.  Right?
4  A.   No, I don't think that's what was said.
5  Q.   Will you agree with me that LG is pleased with the
6  progress of ATSC 3.0 in the market?
7  A.   No, I wouldn't agree with that, either.
8  Q.   Okay.
9       MR. CALDWELL:  May I see slide No. 35, Mr. Diaz?
10 Q.   (BY MR. CALDWELL)  Now, what I'd like to read to you from
11 Plaintiff's Trial Exhibit 33 are LG's comments to the FCC
12 during this case at the end of last summer.  Okay?  "LG is
13 pleased with the progress made in the ATSC 3.0 marketplace
14 thus far."  Did I read that correctly?
15 A.   You did.
16 Q.   And they continue, that "With NextGen TV's growing
17 momentum in mind, LG encourages the Commission to retain
18 permanently the requirement that television broadcasters
19 transmit their primary free video programming streams in
20 compliance with the Advanced Television Systems Committee's
21 ATSC A/322 physical layer protocol standard."
22      Did I read that correctly?
23 A.   You did.
24 Q.   So if there is any suggestion in this case that LG
25 actually is indifferent about including A/322 functionality in

1  its TVs, can we clear that up now and agree that LG is
2  absolutely not indifferent about that functionality?
3  A.   Yep.  As I -- as I said, I'm the licensing guy so I
4  clearly didn't see this, and it's clear what it says.
5  Q.   And it's not only that, is it?  LG actually is increasing
6  the number of models in which it includes this functionality.
7  Right?
8  A.   I don't track the models, so I couldn't comment.
9  Q.   Well, in the same comments from last summer, LG told the
10 FCC, "Coinciding with the growing number of ATSC 3.0 services
11 available around the country, LG doubled the number of NextGen
12 TV models for the U.S. market in 2022."  Do you see that?
13 A.   I do.
14 Q.   Did I read it correctly?
15 A.   Yep.
16 Q.   Do you disagree with it?
17 A.   Personally?  I don't know.  Like I said earlier, I -- I
18 don't track the models.  I'm the licensing guy, so that's my
19 area of expertise.
20 Q.   Well, had you seen the document before?
21 A.   I had not.
22 Q.   Okay.  And would you agree that actually the number of
23 markets -- television markets that are out there supporting
24 NextGen broadcasts is a laudable achievement?
25 A.   A laudable achievement?  Yes.

1  Q.   Because that's what they say on the exact same document
2  to the FCC.  Right?  "NextGen broadcasts are currently
3  available in approximately 68 markets nationwide, a laudable
4  achievement given the COVID-19 pandemic's significant
5  disruptive impact on the broadcast industry over the past two
6  years."
7       Did I read that correctly?
8  A.   You did.
9       MR. CALDWELL:  And that is Plaintiff's Trial Exhibit
10 33 just for the record.
11 Q.   (BY MR. CALDWELL)  And in case there's any doubt, LG
12 expects the number of ATSC 3.0-enabled TV sets to continue to
13 increase.  Correct?
14 A.   Yes.
15 Q.   Given that growing momentum, LG has expressly formally
16 requested that the FCC require the A/322 standard permanently,
17 haven't they?
18 A.   Yes.
19 Q.   You've heard some discussion in trial about LG having
20 patents at a general level?
21 A.   I did.
22 Q.   And there was some, I think, reference in opening of just
23 kind of pointing towards like a stack of papers on the table,
24 something like that.  Do you remember?
25 A.   Yep.

1  Q.   But you also heard the Court yesterday and understand
2  that the fact that LG has patents has absolutely nothing to do
3  with infringement in this case.  Correct?
4  A.   Infringement of Constellation Designs' patents?  I'm just
5  asking to understand.
6  Q.   Yes.
7  A.   Then, yes, they have nothing to do with that.
8  Q.   So LG's patents have nothing to do with infringement of
9  Dr. Chris Jones' patents, do they?
10 A.   That's correct.
11 Q.   And we know that any LG patents related to constellations
12 that anyone's alluded to, we saw it from LG's own slides,
13 those were filed--what?--six, seven years after Dr. Chris
14 Jones' patents.  Right?
15 A.   It sounds right.
16 Q.   So you'll agree with me that LG's patents they want to
17 talk about have nothing to do with invalidity of Dr. Chris
18 Jones' patents, do they?
19 A.   I'm not sure I can agree with that.
20 Q.   Well, they're not prior art to Dr. Chris Jones' patents.
21 Right?
22 A.   I'm not a patent expert, so I -- I couldn't say one way
23 or another.  I don't know.
24 Q.   So your point is that you literally -- you just don't
25 know.

1 A.   That's right.  I don't know.
2 Q.   And as far as you know, as the corporate rep, the fact
3 that LG can point to, I have some patents, has nothing to do
4 with willfulness in this case, does it?
5 A.   No.
6 Q.   Do you agree with what I said, that it does not have
7 anything to do with willfulness?
8 A.   Just repeat the question one more time.  Sorry.
9 Q.   I had a double negative so I will.
10 A.   Right.
11 Q.   Do you agree that LG's patents in this case have nothing
12 to do with willfulness?
13       MR. REGER:  Objection, Your Honor.  Calls for legal
14 speculation.
15       THE COURT:  He's the corporate representative of LG.
16 He's here to speak for the company.  I think it's appropriate
17 for him to take the position that LG either believes they do
18 or they don't have anything to do with these issues, be it
19 invalidity or willfulness.
20       He doesn't have to be an expert in those technical
21 fields, but he's here as the only spokesperson for the
22 company, and on that basis I think it's appropriate.  And I'll
23 overrule the objection.
24       MR. REGER:  Thank you.
25       THE WITNESS:  I don't believe they have anything to

1 do with willfulness.
2 Q.   (BY MR. CALDWELL)  But we did hear your lawyers talk
3 about LG patents.  No question there.  Correct?
4 A.   Correct.
5 Q.   And if it doesn't have anything to do with infringement
6 or willfulness and you don't have a view as to whether it has
7 anything to do with invalidity, maybe that's saved for the
8 expert.  Right?
9 A.   Yes.
10 Q.   That leaves, based on what the Court told us in our
11 preliminary instructions, money.  It's a money issue, isn't
12 it?
13 A.   It's a money what?
14 Q.   LG wants to talk about its patents to push money down in
15 this case.  Right?
16 A.   I don't think LG infringes.  That's our assertion.  So,
17 no, it wouldn't be a money thing.
18 Q.   Okay.  It's not an assertion you are making having never
19 read the patents, though.  Correct?
20 A.   That's correct.
21 Q.   And you remember the pile of patents.  That was sort of a
22 prop--right?--for the jury to see?
23 A.   I think it was meant to convey a message.
24 Q.   Would LG pad its stats by piling in or building up its
25 list of patents with just irrelevant stuff?

1 A.   I'm not sure I understand what you mean by development
2 stuff.
3 Q.   I'm sorry, I said irrelevant.  So let me ask you again.
4 A.   Again, I'm hard of hearing so I apologize.
5 Q.   It's okay.  Would LG just pad its stats by piling in
6 irrelevant stuff when it gives us a list?
7 A.   I don't believe LG would do that, no.
8 Q.   I mean, in order to make a list seem longer, would they
9 put in there like a flip phone camera?
10 A.   I don't believe so, no.
11 Q.   Would they put in there a patent like an electric circuit
12 for an HVAC compressor?
13 A.   No.
14 Q.   Would it make any sense to you if they did?
15 A.   It would not make sense to me.
16 Q.   Would they put in there a patent for an MRI machine?
17 A.   No.
18 Q.   Now, you remember that one expert you didn't know about,
19 Mr. Brian Napper?
20 A.   Yep.
21 Q.   Did you ever let Mr. Brian Napper, LG's expert, know that
22 it is not okay in LG's mind for him to pad his stats with MRI
23 patents, HVAC compressor circuits, and cameras for flip
24 phones?
25 A.   Well, again, it's going to depend on the technology

1 that's in there.  I mean, it was a very general question of a
2 patent for a flip phone.  If it's just -- it depends on what
3 it is, I guess.  But to answer your question directly, I did
4 not.
5 Q.   Well, let's be clear.  When I asked you if you pad your
6 stack that way, you said no.  And then when you got wind of
7 the fact that it might have something to do with Mr. Napper,
8 you said, well, I guess it depends on what we can find in it.
9       Is that kind of the way your testimony changed, sir?
10 A.   I believe that's correct.
11 Q.   Okay.  But the real answer is you've never had this
12 conversation with Mr. Napper, have you?
13 A.   No.
14 Q.   You're going to have plenty of time over the weekend?
15 A.   No.  I'm going to Dallas to visit my grandchildren.
16 Q.   Okay.
17       MR. CALDWELL:  Well, I'll pass the witness, Your
18 Honor.
19       THE COURT:  All right.  Let's proceed with cross
20 examination.
21       Mr. Reger, you may proceed.
22       Do you have binders to distribute?
23       MR. REGER:  Thank you, Your Honor.
24       Your Honor, may I approach?
25       THE COURT:  You may approach.

1    MR. REGER: Thank you.
2    THE COURT: All right. Let's proceed with what
3 technically is cross examination but will be presented in the
4 form of a direct examination.
5    MR. REGER: Thank you, Your Honor.
6    Good afternoon, everyone.

CROSS EXAMINATION

8 BY MR. REGER:
9 Q.   And good afternoon, Mr. Lewis.
10    Earlier in your direct -- cross examination, you were
11 asked a question about the rate and the base and all that.
12 You said the rate was the issue. Did I hear you right?
13 A.   I'm sorry.
14 Q.   Sure.
15 A.   Please speak up.
16 Q.   My apologies.
17 A.   You know me.
18 Q.   The rate was the issue.
19 A.   Yes.
20 Q.   Did I hear that right?
21 A.   Yes.
22 Q.   Someone who's negotiated hundreds of deals and was the
23 business lead for all these Zenith negotiations, what do you
24 think of their $6.75?
25 A.   Well, as the licensing guy, I don't think it's

1 so...
2 Q.   Now, you mentioned you have some family in Dallas. Do
3 you have any other family nearby?
4 A.   Yeah. So I have -- my daughter lives in Flower Mound,
5 and she has a husband obviously and four grandchildren. My
6 eldest grandson runs track at the university at Longview, so
7 we do get down this way on a regular basis.
8 Q.   All right. We've already heard a lot about Zenith.
9 We've heard about Zenith from -- from CD'S experts. Can you,
10 as someone who's worked there for a long time, can you
11 introduce Zenith, please?
12 A.   Yeah. So Zenith is -- you know, it started in, you know,
13 sort of 1919, and we were a radio company. And then, in
14 addition to radios, we started making televisions. We've been
15 innovators. We've been partners with broadcasters. We've
16 been innovators for many, many years.
17    We have a lot of firsts. You can see them on the slide
18 that I prepared. My personal favorite is the remote control
19 because, you know, we all like to flip channels and stuff.
20 But in addition to that, we created the -- for analog
21 television, we created the stereo audio system. We created
22 the first flat screen picture tube. And, of course, as we've
23 been talking about today, you know, we won an Emmy for our VSB
24 technology.
25 Q.   Mr. Lewis, why did you go to work for Zenith?

1 appropriate. The Zenith patents covered a complete receiver
2 system. So, you know, there's a lot of discussion about
3 constellations, which is certainly part of a receiver, but our
4 patents covered the end-to-end system, both modulation,
5 reception, all the elements of the receiver, and we charged
6 $5.
7    For part of a -- part of a receiver, I think back to
8 before our ATSC 1.0 license we had a tuner patent, which is
9 sort of a part of the receiver. If you're old enough, you'll
10 remember there was a little switch that you moved in order to
11 scan the UHF channels and the VHF channels. You'd do one,
12 then you'd switch and do the other ones.
13    And so Zenith came up with the idea of how to do that
14 automatically, and we went out and we licensed that program
15 for a dollar. So when I think -- you know, I'm not the
16 financial expert, I'm a licensing guy. So from a licensing
17 perspective, I know what I licensed for a dollar versus what I
18 licensed for $5.
19 Q.   Thank you, sir. And I know, again, it was kind of cross
20 examination and we just jumped right into it. So let's back
21 up for a moment if we can.
22    And have you ever testified at trial before?
23 A.   This is a first.
24 Q.   Is it as fun as you think it was?
25 A.   I'm regretting being the licensing guy at this point,

1 A.   Well, it's a little bit of a story, but I've always been
2 a TV guy. And I'm a little bit embarrassed to say that, you
3 know, as a kid I would go on my bicycle and I would get
4 televisions off the curb on trash day, take them home and fix
5 them as they were black and white.
6    And so when I had the opportunity, my friend went to
7 Zenith to work, and I had the opportunity to join her and be
8 involved in television. And it was around -- you know, joined
9 in 1997. Standard had been introduced or adopted. And so I
10 was sort of -- sitting in meetings and talking about the next
11 generation of televisions was -- was exciting to me. I
12 thought, gee, I got the best job in the world, till today.
13 Q.   Now, what about now? What is Zenith doing now?
14 A.   Right. So we're still a technology company. We make
15 software for -- well, primarily for hospital and hotel
16 television. So our technology focuses on the -- the
17 televisions that go into those. We call it B-to-B or
18 business-to-business televisions. Of course, we're still
19 involved, as we saw, with ATSC 3.0. We're advocates for
20 broadcasters. And so those are the two main things.
21 Q.   What do you mean, an advocate for broadcasters?
22 A.   Well, as you saw in our filings, you know, we're -- we're
23 -- we're bullish on issues that are important to broadcasters
24 and to television manufacturers.
25 Q.   When you said we saw that earlier, what were you

**[Page 209]**

1  referring to?
2  A.   Well, the -- the notice for -- for proposed rule making
3  responses, which is not my area, obviously, as we saw.
4  Q.   Was that what counsel called the FCC lobbying?
5  A.   Yes.
6  Q.   Okay.
7  A.   Yeah.
8  Q.   Now, are you involved in the development of the chips for
9  LG's televisions?
10  A.   I am not, thank goodness.
11  Q.   Now, we already talked about or you already talked about
12  during your direct examination with CD's counsel that LG
13  became a -- Zenith became an LG wholly-owned subsidiary.  So
14  let's talk about LG just a little bit.  All right?
15  A.   Sure.
16  Q.   It got a little messy.  I just want to clarify:  Do you
17  have a title with LG?
18  A.   I do.  I'm a vice president.  I make -- you know, I sign
19  documents and -- and execute things for LG as well as Zenith.
20  Q.   Okay.
21      THE COURT:  Mr. Reger, don't characterize prior
22  testimony as it got a little messy.  You're not here to make
23  statements.  You're here to ask questions.
24      MR. REGER:  Understood, Your Honor.
25      THE COURT:  If you want to clarify something that in

**[Page 210]**

1  your mind was a little messy, just ask the question.  Don't
2  comment on it.
3      MR. REGER:  Yes, sir.
4      THE COURT:  Thank you.
5  Q.   (BY MR. REGER)  What does LG do?
6  A.   So LG is a consumer products company.  Primary
7  businesses, as you can see from the slide I made, are home
8  appliance and home electronics, home appliance being washers,
9  dryers, refrigerators.  Home electronics are televisions we've
10  been talking a lot about, but it could be computer monitors,
11  audio systems, you know, all those things you see on the
12  slide.
13  Q.   And are any LG products made in America?
14  A.   Yeah.  So the front-loading washers are made in
15  Clarksville, Tennessee, uh-huh.
16  Q.   Where are LG's headquarters located?
17  A.   So the corporate headquarters is in Seoul, South Korea,
18  and the U.S. headquarters is in Englewood Cliffs, New Jersey.
19  Q.   Does LG have any other offices in the United States?
20  A.   Yeah, they do, and I've listed them here.  Lincolnshire
21  in Illinois is where I'm from.  That's up by Chicago.
22  Clarksville, we talked about.  There is also an interesting --
23  in Dallas, Texas, we had a phone repair facility and we exited
24  that business.  And now it's going to be an electric vehicle
25  battery plant so that's interesting.

**[Page 211]**

1  Q.   Now, how many people does LG employ in America?
2  A.   They employ about 2000 people.
3  Q.   Does LG invest in research and development?
4  A.   Yeah.  So we just talked about all those products, and
5  they are -- they are consumer products, and you got to keep
6  updating them.  It's kind of always evolving, new features,
7  new functionality.  And so research and development is a big
8  part of that.
9  Q.   Now, just generally, are you familiar with LG's current
10  patent portfolio?
11  A.   Familiar, yes.
12  Q.   Do you know roughly how many patents LG has that relate
13  to ATSC 3.0?
14  A.   They have about 5,000.
15  Q.   Now, just sticking with -- with televisions, can you tell
16  me a little bit about LG's TVs?
17  A.   Yeah.  So -- and we had some discussion about this
18  earlier.  You know, it's not really so much a television
19  anymore; it's more like a computer.  We have award-winning
20  technology, but that television could do -- can do all sorts
21  of things, and I think people talked enough about it today,
22  so...
23  Q.   I agree.  So let's just focus on one little row here.
24  A.   Yep.
25  Q.   Let's jump down to the bottom.  What kind of content can

**[Page 212]**

1  you watch on LG TVs?
2  A.   Right.  So contentwise, you can get all kinds of
3  streaming content like we just said--Netflix, YouTube, all
4  that.  We have -- we can actually have an application to cable
5  so you don't need a cable box or you can also connect your
6  cable box or your satellite box to it.
7      You, you know, if you're an Apple person, we've
8  incorporated AirPlay.  That's kind of like a screen casting
9  thing where you can send the video from your phone to the
10  screen.  And, you know, if you're willing to put up an
11  antenna, then of course you can get over-the-air broadcast
12  television.
13  Q.   Now, has LG received any awards for its televisions?
14  A.   Yes.  We received a lot of different awards.  Kind of as
15  they're laid out here, you know, the CES, that's a Consumer
16  Electronics Show, that's what's done in Las Vegas.  The Red
17  Dot Award is for industrial design.  It is an international
18  award, but there's a number of -- of website and magazine
19  awards that we've won.
20  Q.   And did Zenith win any awards for its work in television?
21  A.   We won a number of awards, yes.  I mean, you saw -- you
22  saw the Emmy for the ATSC 1.0.  It's not our only Emmy, but
23  it's the most relevant one for this.
24  Q.   Now, Mr. Lewis, how have TVs changed over the last two
25  decades since LG acquired Zenith?

A. Right. So you may not be able to tell on the left-hand side, but that's one big TV. I had it in 1997 -- or 1999, excuse me. That was the HD television. It was two feet thick. And I can't remember if it was as tall as me or taller, but it was expensive because we were just starting out, $15,000.

Today you can get -- you know, that was a 64-inch television, projection television, and today you can get a 65-inch television that is -- in some cases can be an inch thick and run all these applications that we just talked about, and it costs $522.

Q. I heard a suggestion about only certain models dropping in price and things like that. Are these the same model?

A. No, they're not the same. They're not even the same kind of technology. One is projection tubes. If you're old enough, you remember -- that's why it was so thick. They had little tubes and mirrors and things.

Q. Let's go back in time and let's talk about when broadcasts or over the air was the primary source of television. All right?

A. Yep.

Q. Now, do you recall watching analog broadcast television?

A. I did in my bedroom on a TV that I resurrected from the dead. You know, we had 50 years of optimization of analog television. Analog television was done a long time ago. It's

evolved over time. It was black and white, became color. We had stereo sound.

But there's some fundamental problems with it. You know, if you're old enough, you'll remember you might have interference, which is -- you kind of think of it as snow. We thought about snow, we see white things on the screen. You might have ghosting or it's a double image.

So it's really some of the reason why there was a drive to digital television because analog television had been optimized and there just wasn't much more room to go.

Q. So, again, we're talking back in time. Are we talking about like bunny ears and tin foil, things like that?

A. Yeah. So, yeah. I mean, you still have to have an antenna whether it's analog or digital. And, you know, at times it was -- I did it, I put the tin foil on it to help with the reception. In the digital world, it's -- it's different.

Q. Well, okay. So what do we use today?

A. What do we use today?

Q. Yeah.

A. We use digital television, ATSC 1.0. The difference there is that those receiver systems are more immune to this kind of noise, they'll give you a perfect picture and -- if you have enough signal strength. I mean, we heard about signal strength and all that before. But it's a completely

different approach.

Q. How difficult was the transition from digital -- from analog to digital?

A. Right. So this is kind of the heart of the matter. You know, a digital television in the U.S. didn't exist. There were a number of challenges. We weren't all going to go out and buy a new TV the next day so we could throw the switch from analog to digital. So there was a period of time when analog and digital televisions had to co-exist. The transmitters had to co-exist, and we had to -- we had to solve some science problems in order to -- to have that transition.

Q. And to make sure, was Zenith involved in a difficult transition from analog to digital?

A. Yes, we -- yes, we were.

Q. Okay. And did Zenith keep records of all this work?

A. We did. There is the logbooks and different documentation. Again, we have a patent portfolio, as we all know, and you have to have back-up materials and things like that.

Q. Did you review all these records as part of your job?

A. Yeah. Again, I think the gentleman earlier today said that, you know, it was a hard job for ATSC 1.0, and I can tell you it was. So I needed -- I needed to be able to explain to investments that have been done, I needed to explain what did the system -- what was it comprised of, not in the bits and

bytes that we've kind of been talking about, but more to licensing guys like me that, you know, we're technical but we're certainly not technical.

Q. So we're talking right now about transition from analog to digital. How did that digital transition start?

A. Right. So as I said, we have 50 years of optimization of analog TV. So the government, the FCC, the Federal Communications Commission, was quite skilled and knew all about analog TV. But now we're going to throw that out and we're going to move to digital, and, you know, they didn't have the expertise. So they had to turn to industry.

So what they did is they -- they created a committee of industry people to help define what that new system should be. Dick Wiley, former FCC chairman, was the government's sort of leader or honcho to, you know, ride herd on the -- on the committee.

Q. What did that committee do to start the process?

A. So they called for proposals, and they received 22 proposals. The first iteration or first round was really kind of a hybrid system. They wanted to, you know, we didn't really think about digital. We said, well, analog as it is isn't great, what can we do, but they were trying to avoid having to have everybody go out and buy a new TV. So they wanted a hybrid system. But time marched on, and then we needed to transition to digital to keep up.

Q.   And did Zenith submit a proposal?
A.   We did.
Q.   And did Zenith develop its own technology for that proposal?
A.   That's correct.  It actually started before the committee, yeah.
Q.   Now, just briefly, what are we seeing on this slide?
A.   On the left-hand side, you're seeing that first we called it a spectrum compatible HDTV system.  So that was our first submission.  Of that 22 different companies, we were one of those 22.
     And on the right side, you're going to see what we lovingly call the traveling road show.  So this is the prototypes of our transmitter and our receiver and some test equipment that allowed us to demonstrate the technology in the field.
Q.   Do you know the people who are in the picture on the left?
A.   I do.
Q.   And who are they?
A.   Well, there's Wayne Luplow and there is Rich Citta.
Q.   Is that the same Mr. Wayne Luplow that we've heard about a little bit today?
A.   It is, indeed.
Q.   There's a saying about like glass houses and throwing

217

stones, but is he the balding gentleman in the top left?
A.   He is the gentleman on the top left, yes.
Q.   All right.  And that's a picture of him from 1988.  How old is Mr. Luplow now?
A.   He's got to be -- he's got to be late 70s, early 80s.
Q.   Now, does he still work at Zenith?
A.   He does not.  He retired shortly after the email that we've all been talking about.
Q.   Now, before he retired, did you work with him?
A.   I worked with him for 20 years, and he reported to me many for -- directly for somewhere in the neighborhood of, I forget, eight years.
Q.   What was it like working with -- managing Mr. Wayne Luplow?
A.   Let me just say it this way.  It was one of the best days of my life when Wayne didn't work for me anymore.
Q.   Let's go back to Zenith's technology.  Just to make sure we're all on the same page, what was Zenith's digital broadcast system called?
A.   Right.  It was called VSB.
Q.   Did you hear earlier that VSB existed in 1984 before Zenith?
A.   I did.
Q.   Is that VSB that was suggested from 1984 and Zenith's VSB, were those the same thing?

218

A.   They were not.
Q.   Why do you say that?
A.   Well, you know, again, what we had was a complete receiver design, all the elements of the receiver.  And so, you know, you could call it a receiver, but it didn't really speak to the technology being used, so we kind of needed a nickname.  We needed to call it something, particularly in our license agreements, you know.  So, you know, it used a vestigial side band.  And that's a mouthful, but VSB was one of the pieces of technology inside.  It was a simple way to refer to it, to that basket of technology.
     So, you know, we developed a brand new system, and we called it VSB.
Q.   Now, you mentioned 22 proposals.  What happened to those 22 proposals?
A.   Right.  So, again, the 22 was kind of a hybrid system.  We wanted to be able to, you know, not make everybody buy a new TV because politicians would not be in favor if they told grandma, hey, sorry, your TV doesn't work anymore, go buy a new one.
     So -- but what happened was events in other parts of the world drove us to need a digital system.  So they kind of abandoned the hybrid approach and they went for a full digital approach.  And so those 22 proposals kind of got winnowed down because some of those people just -- you know, they didn't

219

have a digital system.  You know, we had -- we had to pivot.  We had to, you know, sort of change some of our elements to be fully digital.
     And so you see my slide here, in 1993 the best proposals formed the grand alliance.
Q.   And is that the end of the story?
A.   That is the end of the beginning of the story.
Q.   What else went into building this entire digital system?
A.   Right.  So the grand alliance was -- you know, you can see the companies down here at the bottom of the middle block there.  They got together, and they started to -- there were eight proposals for digital systems, and, you know, people kind of, they partnered up.  So Zenith was doing the receiver side.  AT&T for our proposal was doing what's called video compression, the video side of it.
     And so we went from 22 proposals down to eight, and then out of the grand alliance process of testing and evaluating these different systems, one sort of combination system was proposed.
Q.   And who was a part of that combination system?
A.   Well, Zenith was a part of that.  We were, again, the RF over-the-air interface side.
Q.   So from 22 to eight, and out of that Zenith's proposal ultimately wins out with the grand alliance.
A.   Right.

220

1  Q.   Now do we have digital television?

2  A.   No, we do not have digital television yet.  So, as I

3  said, we had 50 years of analog TV, and then now we're

4  switching digital.  It's kind of interesting because you take

5  1997 and you take your 2017 of ATSC 3.0, and it's another 40

6  or 50 years, roughly speaking.

7       So the point being, you know, the government just doesn't

8  say, oh, you made a standard, okay, great, implement it.  You

9  had to go out and build the prototypes, take them out in the

10  field, and basically present enough data to industry and to

11  the government, and this is the work that we had to do.

12      So that's kind of why it says, Pardon our dust, because

13  we literally had to go and build this selected system so it

14  could be tested.  And then if the results were good, you know,

15  this -- this is part of the risk that we undertook at Zenith.

16  You know, we could have been knocked out when it was 22, we

17  could have been knocked down when it was eight.  You know,

18  even when it was selected, we -- you know, the field testing

19  could have been bad, and we could have started over again.  So

20  a lot of risk.

21  Q.   You mentioned the risk.  What kind of investments did

22  Zenith make to build this entire digital television system?

23  A.   Right.  So -- well, obviously there's the -- cost of the

24  prototypes and the different things.  So you got to build and

25  then take it out in the field with the traveling road show

221

1  that we saw and do all those things.

2       But, you know, that's not the whole story.  Even after a

3  standard was selected, you know, Zenith had to help the

4  industry because no one knew how that digital system should

5  work.  So people would bring their televisions to our lab in

6  Chicago.  You know, they had their prototype of their new

7  ATSC -- you know, we didn't call it 1.0 at that time.  It was

8  just ATSC.  They bring it to Chicago and they test it.

9       And so we had to support a lot of education.  The

10  traveling road show went out again to test -- to teach people

11  how to do broadcasting.  So it's just a ton of investment from

12  development all the way through deployment.

13  Q.   What happened in 1996?

14  A.   So finally, finally, we had a standard that would allow

15  people to build an interoperable television.  You know, we

16  heard about it earlier.  Televisions have to be able -- you

17  know, like a Sony TV and an LG TV have to work with the same

18  modulator, and, you know, it has to work with different

19  modulators, all has to work together.  That's what the

20  standard's about.

21  Q.   Who could be a member of the ATSC?

22  A.   Well, anybody.  You know, there were -- there were

23  individuals that joined the ATSC.  I know Jae Lim, Dr. Jae

24  Lim from MIT, he contributed to part of the standard, the

25  signaling -- the little signaling thing.  I shouldn't call it

222

1  a thing, but signaling technology that was incorporated in the

2  standard.  So individuals could do it, companies could do it.

3       The point of a standard-setting body is to get the best

4  system, so you can't exclude people.  You know, you want to

5  encourage them to submit stuff.  Now, maybe you don't select

6  theirs, but you certainly wouldn't exclude individuals or

7  little companies or big companies.  Everyone's invited.

8  Q.   Let's be clear.  Was Zenith's VSB technology just a small

9  part of this ATSC standard?

10  A.   Well, it -- in those days we didn't have Netflix and Hulu

11  and all that stuff.  So it was really just a television.  You

12  know, that giant television we saw earlier, well, it didn't

13  have all the stuff we have today.  It did television.

14      A foundational element of that is the actual receiver,

15  the fact that it could receive the signal.  Right?  So we

16  weren't just a small part; we were a very big part of that.

17  Q.   Now, what are we seeing here on this slide?

18  A.   Well, you're seeing a discussion or some -- some

19  information about the tuner mandate.  Remember I said, you

20  know, we weren't going to take grandma's TV away, we had a

21  period of overlap.  But there was -- you know, now we're fast

22  forwarding to 2007.  Now we've got iPhones.  We've got devices

23  that are spectrum hungry.  And, you know, luckily other people

24  explained spectrum to you before so I don't have to do it.

25      But the government wanted to free up spectrum.  Like, for

223

1  example, your T-Mobile phone, the 4G transmission is in one of

2  the old television channel slots.  I don't remember the

3  number, 66, 68, whatever.  But the point being, we needed a

4  process to free up that spectrum, and this -- this is what it

5  was really about.

6       So at one point eventually we did take away grandma's

7  TVs, but what we did is we made sure they had access to a

8  converter box.  And maybe some of you, you know, got some of

9  those, but that's -- that's what this is about.

10      MR. REGER:  If we could take the slides down, Mr.

11  Jackson.

12  Q.   (BY MR. REGER)  Now did Zenith have patents that covered

13  its VSB system?

14  A.   Yes.  We had -- as I said, it was a full system.  Our

15  patents were about the full receiver, the full modulation, the

16  whole end-to-end system.

17  Q.   And did Zenith license these VSB patents?

18  A.   We did.

19  Q.   We heard a little bit about it, I believe.

20  A.   Yes.

21  Q.   And to clarify, what was your role in licensing Zenith's

22  VSB patents?

23  A.   So my good friend Jack Kale, who's not with us anymore,

24  and myself, he was the legal guy, I was the business guy.  We

25  flew around the world and, you know, we did the licensing

224

1 program for VSB for television manufacturers.
2 Q. And I believe you were, but were you here sitting at the
3 table when Doctor Sullivan described all the Zenith licenses
4 and the licensing program?
5 A. I was.
6 Q. In all of the negotiations, did you ever see Doctor
7 Sullivan at the real-world table?
8 A. No, I did not see him.
9     THE COURT: Let me interrupt at this point. We've
10 been back from lunch for over two hours. We're going to take
11 a short recess. This witness is going to be on the stand a
12 little longer.
13     So if you will, ladies and gentlemen, simply close your
14 notebooks, leave them in your chairs, follow all my
15 instructions, including, as you would expect me to remind you,
16 not to discuss the case with each other. And we'll be back
17 here shortly to continue.
18     The jury's excused for recess.
19         (Whereupon, the jury left the courtroom.)
20     THE COURT: How much more cross do you think you
21 have, Mr. Reger?
22     MR. REGER: Roughly 20 minutes, Your Honor.
23     THE COURT: Then I assume there will be some
24 redirect.
25     MR. CALDWELL: Yes, Your Honor.
                                                    225

1     THE COURT: All right. We stand in recess.
2     MR. REGER: Thank you.
3         (Brief recess.)
4     THE COURT: Be seated, please.
5     Are you prepared to continue with your cross examination,
6 Mr. Reger?
7     MR. REGER: I am, Your Honor.
8     THE COURT: All right. Let's bring in the jury,
9 please, Mr. Johnston.
10         (Whereupon, the jury entered the courtroom.)
11     THE COURT: Please be seated.
12     All right. We'll continue with the cross examination of
13 Mr. Richard Lewis by the Defendants.
14     Mr. Reger, please continue.
15     MR. REGER: Thank you, Your Honor.
16 Q. (BY MR. REGER) Now, Mr. Lewis, before the break, we were
17 talking about your real-world licensing. Do you remember
18 that?
19 A. I do.
20 Q. And we were talking about Doctor Sullivan. And I just
21 want to go back to that question right before the break. Was
22 Doctor Sullivan at the table for any of those negotiations?
23 A. No.
24 Q. Did he accurately describe Zenith's licensing program?
25 A. No, I don't think so.
                                                    226

1 Q. Okay.
2     MR. REGER: If I could have JTX 69, please.
3 Q. (BY MR. REGER) Can you tell me, what is JTX 69?
4 A. This is the presentation that we made to potential
5 licensees when we met with them.
6 Q. And what is the date on this licensing program
7 presentation?
8 A. This is 2007, but there were earlier versions that we
9 used.
10 Q. Now, who wrote some of this presentation?
11 A. So it was kind of two phases to it. There's the business
12 side which I did, and then there's the technical side which I
13 didn't do, which is really the patent infringement analysis to
14 help aid in the discussion.
15 Q. You did not write that part. You wrote the business part
16 of it?
17 A. That's correct.
18 Q. And what was the purpose of this presentation?
19 A. Well, as I said earlier, we had a tour program for a
20 dollar and I said it sound like it was simple to get people to
21 pay that. It wasn't. Jack had to fly around the world for
22 that one, too. But getting people to pay five times that --
23     THE COURT: Mr. Lewis --
24     THE WITNESS: I'm sorry, Your Honor.
25     THE COURT: -- you're lapsing back into first names
                                                    227

1 only. We've had that discussion. I need to understand that I
2 can rely on you when you tell me you won't do that again.
3     THE WITNESS: You can rely on me, sir. I promise.
4     THE COURT: All right. I'll take you at your word.
5     Let's continue.
6     THE WITNESS: Thank you, Your Honor.
7 Q. (BY MR. REGER) So I know you mentioned Mr. Jack Kale.
8     MR. REGER: Let's go ahead and let's go to slide 4
9 of this presentation, JTX 69.
10 Q. (BY MR. REGER) Mr. Lewis, is this one of the slides you
11 wrote?
12 A. It is.
13 Q. Okay. Let's talk about the development history. Can you
14 tell the jury what this slide was -- was meant to describe to
15 potential licensees in 2007?
16 A. Well, this is one of two pages, and it was really
17 outlining the efforts that Zenith had undertaken to develop
18 the receiver system. So there is references to some of the
19 internal parts of the receiver and also discussed about the
20 competition.
21     And then there was a reference at the end there you see.
22 It doesn't say it as clearly, but that was ATSC 2.0. And as
23 we all heard, ATSC 2.0 wasn't adopted. And that's goes again
24 to the risk. You know, you could do all this work and still
25 not be selected, or even if you're selected which some of our
                                                    228

229

1　technology was, it was never implemented as a standard.
2　Q.　Sure.
3　　　　　MR. REGER:　Now let's go to slide 6, please, of this
4　presentation that you helped write.
5　Q.　(BY MR. REGER)　Why was it important to discuss Zenith's
6　investments to potential licensees?
7　A.　Right.　As I was saying, you know, a dollar was a lot to
8　companies, and to get five times that, you really had to
9　describe to them not only the development history and what you
10　put into the technology, but the investments that you -- that
11　you did to help develop the system and -- and teach the
12　industry how to use it.
13　Q.　As part of these licensing presentations that you gave to
14　potential licensees, would you identify specific patents?
15　A.　We did.
16　Q.　How many licenses did Zenith enter into for its VSB
17　system?
18　A.　Well, again, it was two phases as everyone heard.　There
19　was our phase, and then we transitioned to MPEG LA, the
20　licensing pool.　In our phase, as was said, was 22, and then
21　as MPEG LA, it was literally hundreds.　I don't even know how
22　many.
23　Q.　I believe you mentioned it on your direct examination
24　with -- with CD'S counsel.　Did any licensees approach you,
25　approach Zenith, for a license?

229

1　A.　Yes.　And the initial three licensees were people that
2　actually just wrote to us and asked for a license.　Now, that
3　makes it sound like it's easy, you get people to write to you
4　and you give them a license.　But these are people who are
5　building the professional equipment needed to test and deploy
6　the system.　So it's kind of like the chicken or the egg.　You
7　got to have your professional system receivers before you can
8　have, you know, transmissions, and then you get to your
9　consumer electronics stuff.　So that's why they -- they were
10　anxious to, you know, hurry up and get a license.
11　Q.　Just again to orient ourselves, what rate did Zenith get
12　for its VSB system?
13　A.　$5 initially.
14　Q.　Now, once the mandate came into effect and everyone had
15　to use Zenith's technology, did Zenith change its rate?
16　A.　No.
17　Q.　Didn't increase its rate at all?
18　A.　Again, it's a tough industry.　So, no, the rate never
19　went up.
20　Q.　Has any company in the world, has any company in the
21　world, ever paid Zenith any royalties that were increased due
22　to inflation?
23　A.　No.
24　Q.　Now, when you were sitting at the real-world tables, did
25　you ever tell any potential licensees that you were going to

230

1　increase their rates based on the price of cheese?
2　A.　No.
3　Q.　No?
4　A.　No.
5　Q.　What about eggs?
6　A.　No.
7　Q.　So did you ever suggest that you were going to increase
8　the royalty rates for any TV manufacturers?
9　A.　No.
10　Q.　Now, even with Zenith's, you know, recognized
11　contributions, was that $5 rate sustainable?
12　A.　Unfortunately it was not.
13　Q.　Why not?
14　A.　Well, over time, and we saw the cost curves for
15　televisions and in my slide, you know, it was a way newer
16　example, 2023, but even in that time frame back then, '99,
17　2000, 2005, '07, whatever, TV prices were dropping.　And so it
18　became, even with, you know, my great job of explaining why
19　they should pay that much, there was a lot of industry
20　resistance.　You know, it's a tough industry to be in, the
21　margins are -- are quite small.　That's, you know...
22　Q.　So what did Zenith do?
23　A.　So that's -- that's why we joined MPEG LA because now it
24　was, you know, a basket of patents, you know, above and beyond
25　ours, and it made it a lot more attractive to people.　You

231

1　know, again, as we said, the overall rate for the pool did not
2　change; it was still $5, at least initially.　So people
3　were -- got a higher value, and we were able to get more
4　people to license.
5　Q.　Now, between Zenith's licenses, the 20-plus licenses and
6　the patent pool licenses, how many people actually licensed
7　Zenith's technology?
8　A.　Well, again, it's hundreds.
9　Q.　Hundreds licensed Zenith's system?
10　A.　That's right.
11　Q.　Now, you mentioned MPEG LA patent pool.　Was it limited
12　to certain types of companies?
13　A.　No.　It was very similar to standard sets.　You know,
14　when you form a pool, you want to make it as attractive as you
15　can to -- to companies.　And so, you know, if someone had some
16　essential technology, you'd want them in your pool.
17　Q.　Do you know roughly how many patents were licensed as
18　part of MPEG LA for ATSC 1.0?
19　A.　Yeah.　So there was 50 patent families.
20　Q.　Now, we heard -- again.　We heard that it was two Zenith
21　patents that drove MPEG LA, drove that rate.　Do you agree
22　with that?
23　A.　No.
24　Q.　Are you sure?
25　A.　I'm very sure.

232

Q. How many patents from Zenith actually drove the MPEG LA $5?

A. There were 13 patent families of those 50 patent families that were Zenith.

Q. And you said patent families. How is that different from a patent?

A. Right. So you might get a patent in the U.S., you might get a Canadian one and a Mexican one, but it's all the same patent, essentially. It's a foreign filing. And so that's a family. It doesn't really get to count as, you know, like a new idea. It's the same idea; it's just filed in different places. That's one example of a patent family.

Q. And how much did MPEG LA, the group, charge for all of those patents, including Zenith's 13 essential patent families?

A. Right. And so it was still initially the $5.

Q. Initially $5. I want to be clear: What was Zenith's portion of that $5?

A. It was $3.38.

Q. Not $3.75?

A. No. Again, what -- what people are glossing over is, you know, running a patent pool, it's not free. You know, they have money; they have to spend money, too. So they took 10 percent. So, you know, it's the $5, less 10 percent, and then we got 75 percent of that. And that works out -- the math

233

works out to $3.38, something like that.

Q. Did that MPEG LA rate ever increase?

A. It did not.

Q. Never increased because of inflation?

A. It did not.

Q. Moving on from ATSC 1.0 to 3.0, can you just briefly describe what roles LG and Zenith had with respect to 3.0?

A. So, again, we're -- you know, we're innovators and so we developed technology that read against ATSC 3.0 standard also.

Q. Now, have there been challenges with the deployment of ATSC 3.0.

A. Yeah. I mean, the adoption of technology is always a bumpy road.

Q. We heard a little bit of discussion of rate and base and things like that. Do you know the percentage of LG TVs sold in the United States that are compatible with ATSC 3.0?

A. Yeah. I think it's around two percent.

Q. Two percent?

A. Two percent.

Q. Why so low?

A. Well, again, I told you, the TV industry is a varied industry. And so ATSC 3.0 requires additional circuitry. There is royalties, as we've discussed. And so if you're adding that feature to a television and raising the cost, for someone who doesn't care about it, then, you know, you're at a

234

disadvantage.

If, you know, another manufacturer makes that sort of same functionality but doesn't include the technology so they don't have the cost, then they're going to be able to sell at a lower price than you. So we kind of have to match the technology and the adoption of it with the demand.

Q. Now, with only two percent, are you suggesting people are not watching their local channels anymore?

A. No, I'm not suggesting that at all. You know, local channels can come from any number of ways. They can come -- you know, there's Hulu, has some local channel capabilities. There is cable and satellite dish, Direct TV. All of these guys are carrying your local channels, so typically that's where most people get it from. Sorry. And, of course, ATSC 1.0 is there, and you can put up an antenna and watch it there.

Q. You can watch ATSC 1.0 without 3.0?

A. Yes.

Q. Now, earlier we had mentioned -- we had talked about how many patents related to ATSC 3.0 that LG has. Do you remember that?

A. I do.

MR. REGER: If I could have slide 14, please.

Q. (BY MR. REGER) Did LG publicly declare that it had patents related to ATSC 3.0?

235

A. It did.

Q. And what do we see on this slide here?

A. Well, you're just seeing cover sheets to disclosures. Remember, you know, a standard-setting body doesn't want to, you know, create a standard that encompasses technology -- proprietary technology that they can't license. And so you have to sort of make a RAND, as we've discussed, a RAND commitment, and here is LG saying, I have these patents and I'm willing to make a RAND or a FRAND commitment.

Q. So anyone -- what are we -- on the right, is that an ATSC website?

A. Yes, that's right.

Q. So anyone who wanted to find the patents related to ATSC from ATSC, could they go to that website?

A. Yeah. Ones that have been declared by the participants. You can see there's a number of dates. As patents issue, you know, that's why we made multiple submissions because you don't get all your patents at once, it doesn't happen overnight, and so here we're disclosing those.

Q. And these three disclosures, that DDX 138 -- am I reading that right?

A. I'm sorry?

Q. At the bottom, DDX 138, are those the three patent disclosures?

A. Oh, yes.

236

Q.  Okay.  And those disclosures, can you tell me when LG
publicly declared that it had patents related to ATSC 3.0?
A.  Yeah.  You can see -- on the right-hand side, you can see
some dates.  Those are the submission dates for these -- these
filings with the ATSC.
Q.  Who can license these patents?  Just who?  Who can
license these patents that LG declared to ATSC?
A.  Through the patent pool, anyone can.
Q.  Now, did LG ever offer a license to its patents that are
essential to ATSC 3.0?
A.  It did.
Q.  Who did LG offer a license to?
A.  They offered it to Sony.
Q.  And is that the television maker?
A.  Sony -- yes.
Q.  Did LG ever specify a rate to Sony during those
negotiations?
A.  They did.
Q.  And what was that rate, sir?
A.  It's like around ███████████
Q.  Okay.  Was that offer in writing?
A.  It was.
Q.  Okay.
      MR. REGER:  If I could have DTX 0042, please, .1
DTX 0042.1.

Q.  Now, has LG licensed its ATSC 3.0 patents to anyone?
A.  It has--to the Avanci patent pool.
Q.  And who's that licensee?
A.  I'm sorry?
Q.  Who was the licensee?
A.  Sony.
      MR. REGER:  If I could have slide 15 back up,
please.
Q.  (BY MR. REGER)  Why did LG agree to enter the Avanci
patent pool?
A.  Well, as I said, you know, patent licensing is -- is not
easy.  And so the other thing is when you have a patent pool,
what happens is, you know, it's sort of no one ever got fired
for buying IBM.  That was a slogan if you're old enough to
remember.  But basically a patent pool kind of brings some
validity to it:  Hey, here's these companies, they come
together, they put their patents in and, you know, the
industry can feel more comfortable that that royalty rate and
those patents are, you know, are kind of industry -- I don't
want to stay industry standard, but, you know, sort of norms.
Q.  Sure.  Who put their patents into the Avanci patent pool?
A.  Right.  So you can see on the slide I made here, on the
right-hand side the contributors.  So you can read them:  LG,
Samsung, Sharp, Panasonic, ETRI, NEC.
Q.  Now, does Avanci just take everybody's word for it that

Q.  (BY MR. REGER)  Is this the written offer that you were
referring to?
A.  Yes.
Q.  And was anything communicated to Sony along with this
standard rate?
A.  Yeah.  We supplied exemplary or a list of patents that
were, you know, associated with the offer, kind of ones where
they could understand what's being offered.  So, again,
it's -- it's a royalty amount and then the specific patents
that you're -- you're offering.
Q.  Okay.  Thank you.
      MR. REGER:  Now if I could have DDX 42.2.
Q.  (BY MR. REGER)  Is this that example list you are
referring to?
A.  It is.
Q.  Did Sony accept this offer?
A.  Unfortunately they did not.
Q.  Do you recall how many pages are on this -- actually
withdrawn.
    Do you recall how many patents were in this example
patent list?
A.  Yeah.  The example patent list was about 1200.
Q.  And Sony did not accept an offer for 1200 patents for
████████  Is that right?
A.  They did not.

their patents are standard essential?
A.  No, they do not.
Q.  What happens?
A.  Well, the patent pool is always about essential patents.
Essential patents just means, you know, there is -- there's no
way around it, they read on the standard.  And so Avanci will
hire a third party -- they don't just take your word, you
don't get to send it in and say, oh, these are my patents.
They don't accept that.  So they actually go and analyze your
patents against the standard.  You have to pay for that, by
the way.  And then, you know, they'll add you to the list as
essential.
Q.  When was the Avanci patent pool actually launched?
A.  March of this year, March of 2023.
Q.  Just a couple of months ago?
A.  Yeah.
Q.  And what is the current rate?
A.  Well, you can see --
Q.  My apologies.
A.  You can see on the left side.  Didn't mean to make a red
thing.
Q.  I think I did that.  My apologies.  Let's go back.
A.  The current rate, you know, if you sign before May 31st
of this year, is $2.10.  And if you signed after May 31st,
it's $3.00.  There is some representation in the license that

**[Page 241]**

1  it could go down to $2.75.
2  Q.   So if you signed before May 31st, it's $2.10.  If you
3  signed after May 31st, it's $3.00.  And you get all the
4  patents from the contributors?
5  A.   Yeah.
6  Q.   Who can join the Avanci patent pool?
7  A.   Well, anybody.  I mean, again, it's a pool like we said
8  earlier.  They want everybody, as many as they can.
9  Q.   Now, on direct examination you were asked some questions,
10  and I've got a follow-up on that.  Are you a patent lawyer?
11  A.   I am definitely not a patent lawyer.
12  Q.   Do you want to be?
13  A.   Not anymore.
14  Q.   So you were asked some questions -- you understand that
15  the Judge will provide the jury instructions about certain
16  legal issues, that the Judge provides the law.  Right?
17  A.   That's what I understand.
18  Q.   And they will hear from the Judge about things like
19  willfulness?
20  A.   Yes.
21  Q.   Okay.  Now, on direct examination you heard from CD's
22  counsel about a few emails and LinkedIn messages that -- that
23  Constellation sent to LG.  Do you recall that?
24  A.   I do recall it.
25  Q.   Now, they also showed you some of your deposition

**[Page 242]**

1  testimony about these communications, these contacts.  Do you
2  remember that?
3  A.   That's correct.
4  Q.   How long was your deposition, sir?  Do you remember?
5  A.   My deposition in elapsed time was 11 hours.
6  Q.   Did they ever show you these --
7  A.   They did not.
8  Q.   In 11 hours, they never showed them to you.
9  A.   They asked me a lot of questions about them, but they
10  never showed them to me.
11  Q.   Well, let's walk through them a little bit, should we?
12  A.   Okay.
13  Q.   What do we see here on this slide?
14  A.   Well, we see the two, let's say, chains of communication.
15  One on the left is an email from David Bailey to Wayne Luplow.
16  And on the right, you see some LinkedIn messaging with David
17  Bailey.
18  Q.   Are you on any of these?
19  A.   I am not.
20  Q.   You were the head of licensing at Zenith.  They didn't
21  send you an email?
22  A.   They did not.
23  Q.   No LinkedIn contacts?
24  A.   No.
25  Q.   What about Twitter?  Did they -- did they tweet you?

**[Page 243]**

1  A.   I don't -- I'm not a big social media guy, so I don't
2  have any of those things.  No.
3  Q.   But you have reviewed these.  Is that right?
4  A.   I'm sorry?
5  Q.   You have reviewed these?
6  A.   I have.
7  Q.   Okay.  And let's go to another slide.  What are we seeing
8  here?
9  A.   Well, it's a -- it's another email from William Marino to
10  Yongjin Jung, talking about new opportunities.
11  Q.   What do you have highlighted here?
12  A.   Well, it really says, you know, that they're aware of our
13  success basically, you know, the work that I did in 1.0, and
14  you know, they want to work together.
15  Q.   Just to make sure, are you on this email?
16  A.   I am not on this email.
17  Q.   They're talking about your licensing program.  Did you
18  receive an email related to this?
19  A.   I did not.
20  Q.   And let's go back a slide and let's talk about these for
21  a moment.  What do you have highlighted here?
22  A.   Well, on the left, it's, you know, interested in
23  discussing opportunities for partnering with Zenith.  And then
24  on the right, it's writing to connect.
25  Q.   Now, someone who has negotiated hundreds of deals, do you

**[Page 244]**

1  consider any of these messages to be an actual offer for a
2  patent license?
3  A.   I do not.
4  Q.   Why not?
5  A.   Well, if you go back to our presentation, there was an
6  explanation of the technology, and then there were specific
7  patents.  And then, you don't see it in the presentation, but
8  there's a royalty rate.  So it's really, you know, really two
9  things, I guess--how much and what do I get for it.  And
10  that -- you know, when you go to the store, you don't -- you
11  know, you got to know what you're going to get and how much it
12  costs.
13  Q.   Now, when Zenith or LG wanted someone to take a patent
14  license, did you ever reach out like this ever?
15  A.   No.
16       MR. REGER:  Thank you, Your Honor.  Pass the
17  witness.
18       THE COURT:  Redirect?
19       MR. CALDWELL:  Yes, Your Honor.  May we approach the
20  bench first?
21       THE COURT:  Approach the bench, counsel.
22       (The following was had outside the hearing of the
23  jury.)
24       THE COURT:  What is it, Mr. Caldwell?
25       MR. CALDWELL:  I think there's a few things that

1 happened. I think there are a few things that happened.
2 One is Mr. Reger's emphasis on you weren't on these
3 emails. Well, we didn't know who the corporate representative
4 was for the deposition and we didn't pick who the corporate
5 representative was for this trial. So I think I ought to be able
6 to observe that. I don't intend to try the empty chair and
7 speculate on what someone else would say, but --
8 THE COURT: It's perfectly fine to make it clear
9 that LG designates its corporate representative for both trial
10 and for deposition.
11 MR. REGER: Your Honor, if I may, it seems to be
12 different than an empty chair line of questioning.
13 THE COURT: Well, I think you've opened the door by
14 asking was he on any of these emails. You know, if -- I mean,
15 you have made -- you have made that an issue, and the
16 implication is Constellation went to the wrong person or went
17 around the right person intentionally.
18 He's entitled to explain how they chose to contact who
19 they did and who they chose not to contact, and he's entitled
20 to explain why those people are not the corporate
21 representative here, because the company gets to designate
22 them. I'm not going to let you go any further than that, but
23 I think the door to that's been opened.
24 MR. REGER: Thank you, Your Honor.
25 MR. CALDWELL: And I think there's another issue. I
245

1 mean, first of all, this Avanci -- and he said -- had him say
2 Avanci looks at it and determines they're essential. I mean,
3 this is literally what we've been talking about with you
4 in chambers and the Court so many times.
5 And although they didn't say, we got a letter back saying
6 that our stuff was essential, this is precisely the agreement
7 that Mr. Cassady articulated up here at the lectern at this
8 last break is they have submitted stuff for review by Avanci
9 and no one has ever written them back saying that it's
10 essential.
11 And I don't want to go afoul of anything, I don't want to
12 be opening up a door, but I mean, boy, this suggestion was
13 absolutely that because they are now in the Avanci pool,
14 Avanci has made a determination that they're essential. And
15 that is clearly not happening. I want to --
16 THE COURT: What are you proposing?
17 MR. CALDWELL: I want to make sure that I can say
18 without fear of some mistrial or him blurting out something
19 that we've never been disclosed and notified of, that that has
20 not happened, Avanci has not told them that their patents are
21 essential because that's what they --
22 THE COURT: Do you know that's the case or are you
23 fishing?
24 MR. CALDWELL: Well, they have indicated to us
25 today, and that's what Mr. Cassady was announcing at the
246

1 lectern, they have indicated to us today they have not heard
2 back from Avanci, they have not been told that any of their
3 stuff was -- that any of their patents are essential.
4 And what I'm afraid of is, because this line of
5 questioning was clearly inconsistent with the parties'
6 agreement, I'm afraid that basically they're baiting me
7 opening into, well, guess what we got today.
8 MR. REGER: Your Honor, I tried to not interrupt.
9 If I could suggest a few points.
10 THE COURT: Go ahead. Go ahead.
11 MR. REGER: Thank you, Your Honor.
12 Most importantly, the agreement was we were not going to
13 come in and say, guess what, we've had patents reviewed and
14 they're done and they're essential. That's not the
15 implication.
16 What I didn't ask Mr. Lewis to explain is that the
17 agreement itself spells out that Avanci is going to verify the
18 patents. That's what determines the point system they are
19 going to hear by Mr. Napper. They are not surprised by this,
20 Your Honor. There's no surprise.
21 THE COURT: Mr. Lewis did say that Avanci had
22 determined that the patents were essential.
23 MR. REGER: I don't believe -- I mean, he --
24 THE COURT: My hearing of it was that it had been
25 done, not that it would be done or that it might be done. And
247

1 we can look at the transcript, but my recollection of the
2 testimony was that he said Avanci has determined or --
3 MR. CALDWELL: I don't think he actually said that
4 in Mr. Reger's defense.
5 THE COURT: Maybe we need to get the transcript out
6 and look at it.
7 MR. REGER: My question was, does Avanci take
8 everyone's word for it. And he says, no, Avanci's got to
9 review -- reviews the -- patents. And that's spelled out
10 in the agreement. It's a joint exhibit. He used the exhibit
11 in front of Mr. Lewis.
12 THE COURT: All right. What specifically is it you
13 are proposing to do, Mr. Caldwell?
14 MR. CALDWELL: I just want to get a confirmation
15 consistent with the parties' agreement that Avanci has not
16 told them any of their patents are essential as we sit here
17 today.
18 THE COURT: Are you aware of any communication to LG
19 from Avanci indicating that Avanci has determined the LG
20 patents contributed as being essential?
21 MR. REGER: Let me say this, Your Honor. No. And
22 I'm not -- we're going to stand by our agreement. We're not
23 aware of that.
24 THE COURT: I mean, I don't want anybody from either
25 side walking into an ambush. If we need to take the witness
248

1 on voir dire, I can send the jury out, you can find the answer
2 of that before you ask it in front of the jury.
3          MR. CALDWELL:  I think we need to.
4          MR. REGER:  He wouldn't know.  He's not the one
5 involved, Your Honor.  So the answer is no.
6          MR. CALDWELL:  I mean, there is so much
7 equivocation, and I hate to disrupt events Friday afternoon.
8 I hate to do with the jury.  But I'm -- it feels very
9 inconsistent with the parties' agreement, and I feel like it
10 was baited.  I, like you, had the -- the same way that I heard
11 it.
12      I tried to review the transcript.  I think it was very
13 carefully phrased to where it left the implication that that
14 had been done when they came in.  Either way, I think the fact
15 that we share that confusion is the reason I want to at least
16 just make sure it's clear and I don't want to --
17          THE COURT:  Hang on just a second.
18              (Pause in proceedings.)
19          MR. REGER:  Your Honor, Mr. Lewis was just talking
20 about the process as spelled out in the joint exhibit and the
21 process that's spelled out in Mr. Napper's report.  There is
22 no surprise here, Your Honor.
23          THE COURT:  Well, I don't see the harm in confirming
24 that you're not going to be surprised and I'm not going to be
25 surprised and Mr. Caldwell's not going to be surprised before

1 the jury hears the answer.
2      I don't see any problem with sending the jury out,
3 letting Mr. Caldwell ask that question and get Mr. Lewis on
4 the record, and then bring the jury back in and we all know.
5 That way we don't take any risk.
6          MR. CALDWELL:  Yes, sir.
7          MR. REGER:  Understood, Your Honor.  Thank you.
8          MR. CALDWELL:  And the third one -- and the third
9 one was there is a standard motion in limine about other
10 litigation.  What the suggestion was, was that when people
11 wanted to take a Zenith license, they solved it by getting in
12 a pool.  And they also gilded it a little with the emphasis on
13 the fact that several parties just reached out to them to
14 voluntarily take a license.
15      They absolutely sued people.  I don't want to talk about
16 them as looking desperate.  I'm not trying to paint my client
17 as a bad actor, either.  But I think it is fair to say in some
18 instances they had to file a lawsuit in order to be able to
19 work out their differences with the company.  And that's as
20 far as I'd like to go with it.  That -- that binary point.
21 But I mean --
22          MR. REGER:  I never mentioned lawsuit, Your Honor.
23 Never mentioned any of the lawsuits.  I did not open the door,
24 did not violate the MIL, which it sounded like what he
25 suggested.
250

1          MR. CALDWELL:  No, that's not the problem.  The
2 problem is you suggested that you solved everything by going
3 into a pool, the implication being that there's something
4 wrong with us filing a lawsuit when Zenith has done the exact
5 same thing.  And I don't -- I'm obviously not going to
6 celebrate it because --
7          THE COURT:  I've seen that.
8          MR. CALDWELL:  So I would like to just make the
9 observation that there are instances where they had to file a
10 lawsuit.  That is nothing about them being litigious.
11          THE COURT:  He's testified that he and Jack, when I
12 called him down the fourth time for using first names only, he
13 said, we traveled the world licensing this stuff.
14      So obviously Zenith doesn't think there's anything wrong
15 with licensing patents to third parties.  And given the
16 testimony about, you know, as soon as we got this email chain
17 and it stopped, then we got sued and how much time went by
18 before we got sued.  We've been through all this before.
19      I don't think there's anything highly prejudicial about
20 asking, did Zenith ever bring a lawsuit when a third party
21 wouldn't take a license, but that's as far as you can go with
22 it, Mr. Caldwell.
23          MR. CALDWELL:  Yes, Your Honor.  Understood.
24          THE COURT:  All right.
25          MR. REGER:  Thank you, Your Honor.
251

1          THE COURT:  All right.  You-all take your seats.
2 I'm going to send the jury out.
3              (Whereupon, the jury left the courtroom.)
4          THE COURT:  Ladies and gentlemen, I do have one
5 thing I need to take up outside your presence.  I promise you
6 this will be very short.
7      I'm going to ask you simply to leave your notebooks
8 closed and retire to the jury room.  You get to stretch your
9 legs and get a drink of water while the rest of us are still
10 seated in here, but I'll have you back in here as soon as I
11 can.  Please follow all my prior instructions.
12      The jury should retire to the jury room at this time.
13              (Whereupon, the jury left the courtroom.)
14          THE COURT:  All right.  Be seated, please.
15      Based on my conference with counsel at the bench, I'm
16 going to allow Mr. Caldwell to take Mr. Lewis on voir dire for
17 the very limited purpose of asking a single question to
18 confirm an issue.
19      Mr. Caldwell, why don't you go to the podium and ask your
20 question of Mr. Lewis.
21          MR. CALDWELL:  Thank you.
22              VOIR DIRE EXAMINATION
23 BY MR. CALDWELL:
24 Q.  Mr. Lewis, for context, I'm going to ask you about the
25 Avanci interaction.  Has LG or Zenith heard anything back from
252

1  Avanci indicating whether or not any LG or Zenith patents have
2  been determined to be essential?
3  A.  Not to my knowledge.
4        THE COURT:  All right.
5        MR. CALDWELL:  Thank you, Your Honor.
6        THE COURT:  Let's bring the jury back in,
7  Mr. Johnston.
8        (Whereupon, the jury entered the courtroom.)
9        THE COURT:  I told you it would be short.  Please
10  have a seat, ladies and gentlemen.
11     All right.  We're going to proceed with redirect
12  examination of the witness by the Plaintiff at this juncture.
13  Mr. Caldwell, you may proceed with redirect.
14        MR. CALDWELL:  Thank you, Your Honor.
15             REDIRECT EXAMINATION
16  BY MR. CALDWELL:
17  Q.  Mr. Lewis, good afternoon again.
18     You mentioned something in your cross about the
19  questioning by counsel for LG about how you guys at LG have
20  tried to enter this Avanci patent pool.  Correct?  And you've
21  submitted patents for them to review.
22  A.  Yes.
23  Q.  Correct?
24  A.  That's correct.
25  Q.  Okay.  And Avanci has not, to your knowledge, identified

1  a single LG or Zenith patent as being essential to the ATSC
2  3.0 standard, as you testified today, have they?
3  A.  Not to my knowledge, no.
4  Q.  There was also a little bit of questioning about how you
5  weren't even on those notice emails from 2017 and 2018.
6  Correct?
7  A.  Yes.
8  Q.  To back up a little bit, that was in your deposition
9  where you were appearing as a corporate representative for LG.
10  Correct?
11  A.  Yes.
12  Q.  And our side, Constellation Designs, had given topics for
13  preparation and they identified you as the witness for that
14  deposition.  Correct?
15  A.  Yes.
16  Q.  If there's any implication that we ambushed you by
17  talking about the notice correspondence, that would certainly
18  be untrue, wouldn't it?
19  A.  I don't think I can agree with that, no.
20  Q.  You knew you were the person that LG had decided to put
21  up in a deposition on the topics of notice of Constellation
22  Designs' patents.  Correct?
23  A.  Correct.
24  Q.  And in preparation for your deposition, you had even
25  reviewed the 2017 emails involving Mr. Luplow, hadn't you?

1  A.  Yes.
2  Q.  So in case there's any suggestion you got ambushed with
3  these 2017 emails, you had actually reviewed them in
4  preparation for that deposition based on specific topics in
5  our deposition notice.  Correct?
6  A.  I can't agree, but I'd be happy to explain why I'm saying
7  that.
8  Q.  Let me ask it differently; go about it differently.
9     Mr. Lewis, did Constellation Designs get to pick who LG
10  would bring as its corporate representative for this trial?
11  A.  No.
12  Q.  Will you agree with me that Zenith's receiver patents did
13  not cover the entire ATSC 1.0 standard?
14  A.  Yes.
15  Q.  They kind of related to a section of the standard that
16  was -- went by the moniker of A/53.  Correct?
17  A.  Correct.  The whole receiver design was outlined in there
18  and Zenith had the receiver design, yes.
19  Q.  And A/53 is sort of -- A/53 is to ATSC 1 as like A/322 is
20  to ATSC 3.  Correct?
21  A.  I think that, you know -- as a licensing guy, I think
22  that's a fair characterization.  I'm not the technical expert.
23  Q.  And the royalty that Zenith was getting for just its ATSC
24  receiver patents was $5 per TV.  Correct?
25  A.  Yes.

1  Q.  The Zenith receiver patents related to that A/53
2  standard.
3        MR. CALDWELL:  Which I would like to put up, if I
4  could, my slide No. 3, Mr. Diaz.  Thank you.
5  Q.  (BY MR. CALDWELL)  And these are excerpts.  We have --
6  it's tab 5 in your binder.  But these are excerpts from that
7  agreement that Zenith actually did with LG.  Are you familiar
8  with these portions?
9  A.  Yes.
10  Q.  Okay.  It's got a section called like the essential
11  Zenith receiver patents.  Do you remember that?
12  A.  I do.
13  Q.  And the way that this license was structured, aren't I
14  correct that Zenith would get $5 if the counterparty to the
15  license used a single one of Zenith's essential patents?
16  A.  Yes.
17  Q.  Do you remember telling us that during that licensing
18  campaign there were some folks that -- some companies that
19  reached out to Zenith to take a license?
20  A.  Yes.
21  Q.  And then there was also -- maybe you encountered some
22  obstinance or something and some people wouldn't take a
23  license and you addressed that by entering a patent pool?  Do
24  you recall that discussion?
25  A.  Yes.

1  Q.  There was also a third option where Zenith filed patent
2  infringement lawsuits.  Correct?
3  A.  Yes.
4  Q.  Is there anything wrong with Constellation Designs having
5  done that?
6  A.  No.
7  Q.  Later there was a point in which Zenith, rather than
8  exclusively doing licenses on a one-on-one basis, they entered
9  a patent pool called the MPEG LA patent pool.  Correct?
10  A.  Yes.
11  Q.  And I believe you were asked a question by Mr. Reger that
12  said you've heard that you guys got $3.75 for just two
13  patents, and the suggestion was that was untrue.  Do you
14  recall that discussion?
15  A.  I do.
16  Q.  What was the overall MPEG LA licensing in terms of
17  dollars per unit?
18  A.  $5.
19  Q.  Okay.  And how much is 75 percent of $5?
20  A.  Well, it's $3.75.
21  Q.  And you got that for just two patents, didn't you?
22  A.  No.
23  Q.  Okay.  Mr. Lewis, to entice Zenith to come to MPEG LA, to
24  the MPEG LA 1.0 patent pool, they pulled out two of Zenith's
25  patents and allocated 75 percent of the royalty to Zenith for
257

1  a head up and down doesn't get into the transcript as an
2  answer.  I know this is the first time you've testified, but
3  you'll need to answer out loud.
4       THE WITNESS:  I understand, Your Honor.  Thank you.
5       THE COURT:  And while we're at it, just for
6  edification purposes, 'uh-huh' doesn't translate very well
7  either.  'Yes' and 'no' is much better.
8       THE WITNESS:  Appreciate that.
9       THE COURT:  Thank you.
10       THE WITNESS:  Yes, Your Honor.
11  Q.  (BY MR. CALDWELL)  And Mr. Lewis, I do recognize it's
12  your first time.  You understand -- at no point have I tried
13  to be discourteous to you.  Do you understand that?
14  A.  I don't feel that way.  I know you're respectful.  I
15  appreciate it.
16       THE COURT:  Let's continue.
17  Q.  (BY Mr. CALDWELL)  You've never negotiated a patent
18  license on behalf of LG.  Correct?
19  A.  No.
20  Q.  But yet you testified on direct about the Avanci patent
21  pool.  Correct?
22  A.  Yes.
23  Q.  Do you have any understanding of how the Avanci patent
24  pool rate is connected to LG's expert's damages model?
25  A.  No.
259

1  those patents.  Is that correct?
2  A.  No.
3  Q.  May I direct you to your deposition at page 230?
4  A.  Tab, please?
5  Q.  I think it's Tab No. 1 in the binder that I gave you.
6  A.  Sorry.
7  Q.  That's okay.
8  A.  What page again?
9  Q.  I don't know if it's the manuscript one, but it's the
10  deposition page 230.
11  A.  Yeah.  Okay.
12  Q.  And it's at line 8 on that page.  Do you see it, sir?
13       I'd like to read the question you were asked, if you are
14  there.  Are you?
15       "So to entice Zenith to come to MPEG LA to the MPEG
16  LA 1.0 patent pool, they pulled out two Zenith patents and
17  allocated 75 percent of the royalty to Zenith for those
18  patents.  Is that correct?"
19       And what was your answer?
20  A.  My answer was "Yes."
21  Q.  And you were under oath there, as you were here.
22  Correct?  Yes, sir?
23  A.  Yes.  Sorry.
24  Q.  Thank you.
25       THE COURT:  Just so you'll know, Mr. Lewis, nodding
258

1  Q.  Well, do you think it would be fair to take whatever the
2  going rate for the Avanci pool is and force Constellation
3  Designs to have its patents included in that pool at the same
4  rate?
5  A.  Again, I am not the economic analysis guy, I'm a
6  licensing guy.  Of course the rate licensing rate is part of
7  that, but in terms of determining the correct rate, I don't
8  think I have an opinion.
9  Q.  So you won't sit here on behalf of LG and say that is
10  fair, will you?
11  A.  That I won't -- sorry?
12  Q.  You won't sit here on behalf of LG and say it is fair to
13  simply force Constellation Designs' patents into the Avanci
14  pool at the overall package rate that other parties
15  disconnected from Constellation Designs have set.
16  A.  That's correct.  I would not.
17  Q.  Did you hear the discussion when Doctor Sullivan was
18  testifying about the concept of a hypothetical negotiation?
19  A.  I did.
20  Q.  And you understand the hypothetical negotiation was quite
21  some time ago--back when LG first started to infringe?
22  A.  Yes.
23  Q.  Was LG even in the Avanci patent pool then?
24  A.  If you could remind me of the date that that hypothetical
25  was.
260

Q.   Let's say it's 2020, sir.  Was LG even in an Avanci pool
then?

A.   They were not in the pool.  They were in discussions with
them.

Q.   Okay.  And those discussions persisted for what?  Two and
a half years?

A.   Roughly, yeah.

Q.   But LG didn't even tell Avanci about the existence of
Dr. Chris Jones' patents, did they?

A.   Not to my knowledge.

Q.   To your knowledge, the first time that Constellation
Designs found out about an Avanci pool was after a deal was
already done from negotiations that did not involve
Constellation Designs.  Right?

A.   Yes.

Q.   So correct me if I'm wrong on LG's positions.  First is
you don't want to pay Constellation Designs at all.  Right?

A.   We don't think we infringe.

Q.   Okay.  But if you have to pay Constellation Designs, you
want to pay us a sliver of this Avanci group rate that other
people negotiated.  Right?

A.   Again, I'm not the economic analysis person, so you'd
have to talk to them about that.

Q.   Is it LG's position that an Avanci license gets a TV
manufacturer every patent they need to make an ATSC 3.0

television?

A.   No.

Q.   You know that's not true.  Right?

A.   Yes.

Q.   Because I don't know if people were picking up on this,
but in your slides it indicates even Sony, who was in the
standards meetings, has not put their patents into the Avanci
pool.  Right?

A.   I did research that, and Sony doesn't have any ATSC 3.0
patents.

Q.   I see.  Sony, do you know if they were contributing
constellations to the design for A/322?

A.   I don't know.

Q.   There are certainly patents needed for ATSC 3.0 that are
not in the Avanci pool.  Correct?

A.   Correct.

Q.   All right.  I want to do one last module and maybe we'll
be done.

I think there was a point in the cross of Mr. Bill Marino
where counsel for LG said something like LG had fundamental
patents for the ATSC 1.0 standard.  And I don't know if I
misunderstood or if it was a misstatement, but the truth was
it was Zenith, not LG.  Correct?

A.   Zenith is a wholly-owned subsidiary of LG, so to that
extent...

Q.   But they were Zenith's patents.  They were the assignee
on the patent.  Correct?

A.   Yes.  That is correct.

Q.   Zenith was the owner of those patents and Zenith was the
one who would have to countersign an agreement to do a
license.  Right?

A.   That's correct, yeah.

Q.   In fact, Zenith and LG even negotiated license for LG to
use Zenith's patents.  Right?

A.   That's correct.

Q.   So it was certainly not the case that LG by virtue of
some relationship in 2004 already automatically had the right
to use Zenith's patents.

A.   That's correct.

Q.   All right.  And Zenith, when they did those licenses in
2004-2005 for $5, was not selling TVs, were they?

A.   2004-2005, I think that's correct.

Q.   So, sir --

MR. CALDWELL:  Your Honor, may I use the flip chart?

THE COURT:  You may.

MR. CALDWELL:  Can you hear me okay?  Can the court
reporter hear okay?  I'll try to make sure I project.  I would
like to talk about Zenith on the flip chart.

May I pull it forward just a tad?

THE WITNESS:  Maybe just that way a little bit.

Q.   (BY MR. CALDWELL)  Does that help a little bit?

THE COURT:  Mr. Lewis, if you can't see anything,
you have leave to stand up where you are so you can see
better.

THE WITNESS:  He doesn't need to bring it forward;
just more to the right I'll be fine, sir.  Thank you.  That's
perfect.  Yeah.

Q.   (BY MR. CALDWELL)  So I would like to talk to you, for
example, about that late 2004-2005 time frame when there were
$5 licenses with Zenith.  Are you with me so far?

A.   I am.

Q.   In that time frame Zenith was not making televisions.

A.   That's correct.

Q.   Zenith was making a one-way license out of its patents.
Correct?

A.   Yes.  If I understand your term 'one way', you mean
Zenith didn't receive -- it wasn't a cross license is maybe
the right way to say it.  Is that your intention?

Q.   Zenith got no license-back, no --

A.   No cross license, yeah.

Q.   No license-back.  Is that a fair terminology?

A.   That's a fair terminology, yeah.

Q.   And before I forget, is there anything wrong with the
fact that Zenith was doing licensing while also not making a
TV?

Page 265:

1  A.  No.
2  Q.  Had Zenith done claim charts, like you showed us during
3  your direct, mapping its patents to the ATSC standard?
4  A.  Yes.
5  Q.  Was Zenith in late 2004-2005 in a pool?
6  A.  No.
7  Q.  Is there anything wrong with that?
8  A.  No.
9  Q.  And Zenith got paid $5 per television.  Correct?  In
10 those licenses.
11 A.  In those licenses, yes.
12 Q.  And they got paid whether or not an antenna came in the
13 box or somebody hooked up an antenna.  Right?
14 A.  I can't agree with that.  Sorry.  Let me correct.  Ask
15 your question again, because there was a situation where there
16 was a disabling function, and I just want to make sure I
17 understand your question.
18 Q.  Okay.  I won't ask you about -- we'll talk about the
19 licenses that Mr. Sullivan -- or Doctor Sullivan said were
20 most comparable.  Do you remember that--the Sharp and Toshiba
21 and LG?
22 A.  Yep.
23 Q.  Just to focus our discussion, let's focus on the ones he
24 focused on.
25 A.  Yeah.

265

Page 266:

1  Q.  Zenith got paid $5 a TV whether or not an antenna was
2  involved?
3  A.  Absolutely.  That's right.
4  Q.  Now, sir, I want to ask you a little bit about LG as the
5  corporate representative for LG.
6     LG is making ATSC 3.0 compliant TVs.  Correct?
7  A.  That's correct.
8  Q.  And they're selling them in the U.S.  Correct?
9  A.  That's correct.
10 Q.  LG, because they're making and selling ATSC 3.0 TVs in
11 the United States, gets value out of a license back to the
12 other patents that are in the pool.  Right?
13 A.  They pay the same, so yes.
14 Q.  It's meaningful to LG to get a cross license back to
15 Samsung patents, for example.  Correct?
16 A.  It's not technically a cross license; it's more -- they
17 are a licensee and a licensor, so they pay a license fee just
18 like all the other licensees in the pool, and they receive an
19 allocated amount based on their patent -- there's points -- I
20 don't understand all of it, but I know the high-level thought
21 is they receive back some of that money.
22 Q.  Let me try it a little bit differently.  Is it good not
23 to get sued by Samsung on Samsung's patents?
24 A.  Yes.
25 Q.  That provides value to LG.  Correct?

266

Page 267:

1  A.  Well, they pay money for it, for that value, yes.
2  Q.  We haven't seen any patents in the ATSC 3.0 tool at
3  Avanci charted on the standard, have we?
4  A.  Could you clarify 'charted on the standard'?  You mean
5  determined to be essential?  Is that --
6  Q.  Yes, sir.
7  A.  Then yes, if that's what you're saying.
8  Q.  When LG gets paid money because someone joins the pool,
9  they get paid way less than the $5 per TV that Zenith was
10 getting.  Correct?
11 A.  The rate is smaller than $5, so yes.
12 Q.  Okay.  And how much is it?
13 A.  How much is what?
14 Q.  The amount that LG gets.
15 A.  I don't think it could be determined yet because of your
16 previous point that they haven't determined how many essential
17 patents there are, that -- I mean, Sony believes -- by taking
18 a license they believe there are going to be some, and that's
19 -- for example, so they're willing to pay, but the ratio of
20 how it gets paid out hasn't been determined because all the
21 patents haven't been reviewed by third parties to determine if
22 they are essential.
23 Q.  If Sony were to pay royalties right now on an ATSC 3.0 TV
24 through the Avanci patent pool, how much money per TV will LG
25 get?

267

Page 268:

1  A.  It's not determined yet.
2  Q.  We just know it's a lot smaller than $5 a TV.  Right?
3  A.  That's right.
4  Q.  And LG still gets paid whether or not that TV is hooked
5  up to an antenna.  Right?
6  A.  Yes.
7  Q.  As LG's corporate representative, sir, factually which
8  situation is more like Constellation Designs, who's not a
9  member of a pool, not making televisions, does not need a
10 cross license-back, and has presented evidence of why it
11 believes its patents are essential to the standard--today's LG
12 world or the Zenith licensing model we talked about?
13 A.  Well, other than the fact that the Zenith one is for a
14 whole receiver instead of constellations, the Zenith one.
15 Q.  When you were doing licensing negotiations, was there
16 ever a time that maybe you had to -- even if you had technical
17 support from other engineers, you would kind of look at some
18 patents and at least make a passing determination as to
19 whether something was comparable or useful or an interesting
20 data point from a technological perspective?
21 A.  No.
22 Q.  Never?
23 A.  Not me.  I'm the licensing guy, not the technical guy.
24 Q.  I want to ask you a question.  If you don't know the
25 answer, it's totally fine.

268

MR. CALDWELL:  May I see slide 70, Mr. Diaz?  I'm
sorry; 79.  Thank you.
Q.   (BY MR. CALDWELL)  So what I've got on the left is I've
got a Samsung patent for a magnetic resonance imaging
apparatus and magnetic resonance imaging processing method,
and on the right I've got a patent for digital television
synchronization system and method.
     As LG's corporate representative, do you have a position
on which one of those two is more technically comparable to
what we're talking about for Dr. Chris Jones' inventions?
A.   You'd have to do a claims analysis, so I don't know.
I'm not the technical guy that's able to read the claims and
understand them, really.
Q.   Sir, as LG's corporate representative, you can't tell me
if a digital television patent is more comparable than an MRI
machine technically to the patents in this case?
A.   Without looking at the claims in detail, no.
     MR. CALDWELL:  Go to the next slide, Mr. Diaz.
Q.   (BY MR. CALDWELL)  As LG's corporate representative, can
you tell me which is more technically comparable to the
patents at issue in this case--a patent on data frame
structures and synchronization system for digital television,
or a camera lens module and portable wireless terminal having
same?
A.   Again, without looking at the claims -- sorry.

THE COURT:  Go ahead, counsel.
     MR. REGER:  I'm sorry, Your Honor.  Objection.  This
is outside the scope of my cross examination.
     THE COURT:  Overruled.
     MR. REGER:  Thank you.
     THE COURT:  Why don't you restate the question,
counsel.
     MR. CALDWELL:  Yes, sir.
Q.   (BY MR. CALDWELL)  As LG's corporate representative, can
you tell me which is more technically comparable to the
inventions at issue in this case--data frame structures and
synchronization system for digital television signal or a
camera lens module and portable wireless terminal having same?
A.   Without looking at the detailed claims, no.
Q.   You would not be able to assign any comparability or
perform any sort of analysis of their licensing utility
without looking at the claims.  Right?
A.   That's correct.
Q.   Okay.
     MR. CALDWELL:  I'll pass the witness.
     THE COURT:  Additional cross examination?
     MR. REGER:  Yes, Your Honor.
     THE COURT:  All right.
     MR. REGER:  Actually, Your Honor, may we approach?
     THE COURT:  Approach the bench, please.

     (The following was had outside the hearing of the
     jury.)
     MR. REGER:  Just one brief question, Your Honor, to
ensure we don't violate a motion in limine.
     You allowed him to ask one question about Zenith suing
people who did not license.  I would like to ask one follow-up
question to that.
     THE COURT:  What would you like to ask him?
     MR. REGER:  Did you always offer a license before
you sued?
     THE COURT:  I think that's fair.
     MR. REGER:  Thank you, Your Honor.
     THE COURT:  All right.  Let's proceed.
     (The following was had in the presence and hearing
     of the jury.)
     THE COURT:  All right.  Let's proceed with
additional cross examination, Mr. Reger.
     MR. REGER:  Thank you, Your Honor.
     THE COURT:  Are you going to use this chart in your
additional cross?
     MR. REGER:  No, Your Honor; no need.
     THE COURT:  Let's turn it to a clean sheet and move
it back, please.
     MR. REGER:  May I approach, Your Honor?
     THE COURT:  Please do.

     MR. REGER:  Thank you.
     Should I return?
     THE COURT:  Please.
     All right.  Now let's proceed with additional cross.
                    RECROSS EXAMINATION
BY MR. REGER:
Q.   Mr. Lewis, we are in the home stretch.  I have a couple
of questions.
     So you were asked a question about how many patents drove
the MPEG LA ATSC 1.0 licenses.  Do you recall that?
A.   I do.
Q.   AND then on redirect they asked you a question from your
deposition and you had indicated two.  Is that right?
A.   That's correct.
Q.   Now, at your deposition, they -- this is JTX 36.  Can you
tell me the date at the top of this agreement?  Can you read
that?
A.   18th day of July, 2007.
Q.   Okay.  And then part of this you were asked about list 1.
And how many Zenith patents are on this list?
A.   That is two.
Q.   Two.  All right.
     Now, with DTX 127.005, we have list 1 again.  What's the
date at the top of this?
A.   October 1st, 2008.

1   Q.   And how many patents are on this list?  No need to count.
2   Is it more than two?
3   A.   More than two.  I believe that's the complete list by
4   that time.
5   Q.   Were you shown this at your deposition?
6   A.   I was not.
7   Q.   Thank you, sir.
8        One last question.  You were asked if Zenith ever had to
9   sue anyone.  Do you recall that?
10  A.   I do.
11  Q.   Did Zenith ever sue anyone without first offering a
12  patent license?
13  A.   No.
14  Q.   Thank you.
15       MR. REGER:  No further questions, Your Honor.
16       THE COURT:  All right.  Any additional direct?
17       MR. CALDWELL:  Yes.
18              REDIRECT EXAMINATION
19  BY MR. CALDWELL:
20  Q.   Was Constellation Designs going to give you a
21  presentation and offer you a license if you ever responded
22  to them any of the times they reached out to you?
23  A.   You know, as a licensing guy, if I'd known those patents,
24  potentially.
25  Q.   We don't know because you wouldn't get back to them.

273

1   Right?  That was generally the course of events--Zenith would
2   not get back to Constellation Designs.
3   A.   Well, I think, first off, the first two communications
4   were not to the IP center.  The last one said, in essence, at
5   the end that it was a little early, so I took that to be, you
6   know, there was potential there.
7   Q.   You took LG telling us it's too early to talk about this
8   as potential?
9   A.   Yeah.  I think -- I know there was a lot made about the
10  number of TVs being sold as being too early, but I don't think
11  that was what they said, you know, or what they meant.  What
12  they meant was all these patent pools and things weren't
13  worked out yet.  You know, at that time things weren't
14  settled.  People need to -- they need some time to get
15  comfortable what the rates are going to be.  Maybe, you know
16  -- that's all I'm saying.
17  Q.   What gave LG the right to not read our patents and keep
18  importing televisions after we told them time and time again
19  that they needed a license because we had ATSC 3.0 patents.
20  A.   What LG needed a formal patent assertion--here, we
21  think you're infringing these patents, here's the numbers, you
22  know.  Products aside -- okay.  Products would be useful and
23  helpful, but I think there could have been more progress made
24  by Constellation Designs by listing the patents and doing the
25  analysis against the standard that you've done now.  That's my

274

1   personal opinion as a licensing person.
2   Q.   Ultimately are you saying that Constellation Designs just
3   wasn't threatening enough when it wrote LG?
4   A.   No, I'm not at all saying that.  I'm saying that there's
5   a way in the television industry, you know, there's a process
6   that we go through.  Part of it's having a formal infringement
7   assertion and then you -- you know, you know what -- you know
8   how much it's going to cost and you know what the patents or
9   what you're buying, what the patents are.
10  Q.   Does part of the process involve you guys engaging by
11  responding to emails or returning a phone call?  Isn't that a
12  reasonable part of the process for Constellation Designs to
13  expect?
14  A.   Well, again, I get tons and tons of solicitations like
15  that, and so I think that the IP center did respond and said,
16  you know, it's a little early.  You know, Mr. Wayne Luplow,
17  you know, he -- it's not his area and he just -- he put it to
18  the side.
19  Q.   The IP center, the people you told us we should have been
20  contacting, they set us to the side four years after we first
21  tried to reach out to LG or Zenith.  Correct?
22  A.   Correct.
23       MR. CALDWELL:  Pass the witness.
24       THE COURT:  Additional cross?
25       MR. REGER:  No, Your Honor.

275

1        THE COURT:  All right.  You may step down,
2   Mr. Lewis.
3        THE WITNESS:  Thank you, Your Honor.
4        THE COURT:  Please return to the Defendants' table.
5   Plaintiff, call your next witness.
6        MR. CASSADY:  Your Honor, the Plaintiff rests its
7   case.
8        THE COURT:  All right.  Plaintiff having rested the
9   Plaintiff's case in chief, we'll proceed with the Defendants'
10  case in chief.
11       Defendants, call your first witness.
12       MR. McKEON:  Your Honor, can we have a brief
13  sidebar?
14       THE COURT:  You may approach the bench.
15       (The following was had outside the hearing of the
16  jury.)
17       MR. McKEON:  So I just want to get an idea of the
18  schedule.  We have 30 minutes, like 27 minutes of video, and
19  our next live witness will be a translated from Korean --
20       THE COURT:  You're going to use an interpreter.
21       MR. McKEON:  It's going to be an hour, and then
22  we'll have cross.  So I'm just trying to get a guide for
23  timing, because if you want to go 30 more minutes, I'd prefer
24  to just do the video, and then -- but if you want to go
25  longer --

276

1    THE COURT:  Why don't you do the videos and then
2  we'll see where we are.
3    MR. McKEON:  Okay.  Thank you, Your Honor.
4    (The following was had in the presence and hearing
5    of the jury.)
6    THE COURT:  All right.  Call your next witness.
7    MR. McKEON:  Thank you, Your Honor.  Our first
8  witness will be by video deposition.  It's Mr. David Bailey,
9  and there's 10 minutes, 29 seconds for Defendant and zero for
10  the Plaintiff.
11    THE COURT:  Please proceed.
12    MR. McKEON:  And Your Honor, if I may, he's the
13  corporate secretary of Constellation Designs, Inc.
14    THE COURT:  Duly noted.
15    Let's proceed with this witness by deposition.
16    DAVID BAILEY
17    BY VIDEO DEPOSITION
18  Q.  Good.  Could you just state your full name and your home
19  address for the record, please?
20  A.  Certainly.  My name is David James Bailey, and I live at
21  4015 San Rafael Avenue, that's R-A-F-A-E-L, Avenue, in Los
22  Angeles, California.
23  Q.  Now, so since you've been deposed and you're a lawyer, I
24  won't review the rules, but you understand sort of the process
25  today and that you're under oath.  Correct?
                                                    277

1  A.  I do.
2  Q.  You're a partner there, I assume.  Correct?  At KPPB.
3  A.  That is correct, yes.
4  Q.  Okay.  And do you hold any other positions at any other
5  entities other than KPPB?
6  A.  I am the corporate secretary at Constellation Designs,
7  Inc., and I've held that role since -- I believe it's 2019.
8  Sorry.  I'm trying to think of whether I have any other roles
9  in any other organizations, and there's none that come to mind
10  at this point.
11  Q.  Okay.  So when did you get involved in the actual work
12  with respect to Constellation Designs inventions at the Patent
13  Office?  When did you get involved in that?
14  A.  Well, I was involved with the Patent Office after we
15  filed the patent application in 2008.
16  Q.  Okay.  And then you've been involved, is it fair to say,
17  with -- with prosecuting and the filings of the various patent
18  applications in the portfolio since that time?
19  A.  Yes, that is correct.
20  Q.  And what financial upside do you have under this
21  agreement?
22  A.  I -- I personally don't have any financial upside through
23  this agreement directly.
24  Q.  Well, that's right, directly, but you do indirectly.
25  Correct?
                                                    278

1  A.  Yes, as a shareholder of Constellation Designs, Inc., I
2  receive a distribution of proceeds.
3  Q.  With respect to the CD, you know, portfolio that was
4  owned by Inc., now owned by LLC, have you reached out to any
5  party other than LG?
6  A.  In my capacity as counsel for Constellation Designs,
7  Inc., I have reached out to third parties regarding the
8  Constellation Designs patent portfolio that at the time was
9  owned by Constellation Designs, Inc.
10  Q.  All right.  So other than LG, who have you reached out
11  to?
12  A.  I personally reached out to TiVo, Xperi, InterDigital,
13  Dolby, MPEG LA, and sorry, I don't recall -- Zenith.  Sorry.
14  Was your question people other than LG?
15  Q.  Yeah.
16  A.  LG and Zenith I reached out to.  I -- I believe that is a
17  complete list.
18  Q.  All right.  And what -- what did you -- what was your
19  intent in reaching out in these various communications?
20  A.  Our goal was to find a partner to -- for Constellation
21  Designs, Inc., to assist them with the successful
22  commercialization of their intellectual property.
23  Q.  So with LG and Zenith, is it correct that you're -- at
24  that point, it was -- your interest was to -- to engage them
25  in the hopes that you'd partner with them -- CD, Inc., would
                                                    279

1  partner with them in moving the technology forward jointly?
2  A.  That is correct.  At the time, LG and Zenith played a
3  very prominent role in the licensing of a small portfolio of
4  patents related to the ATSC 1 standard.  And based on their
5  experience in licensing to television manufacturers, we
6  thought that they would be ideally positioned to work with
7  Constellation Designs, Inc., in putting in place a licensing
8  program with respect to this new technology that is the
9  foundation of the next generation television standard ATSC
10  3.0.
11  Q.  You figured out that there was this ATSC 3.0.  And then
12  what did you do next?
13  A.  My recollection is that we tried to learn more about the
14  ATSC 3 standard.
15  Q.  And what was that -- what did that involve?
16  A.  Reviewing websites and media coverage to understand more
17  about the standard and -- and the extent to which the standard
18  would be adopted.  And attending trade shows to talk to
19  engineers and business executives -- you know, business
20  representatives for broadcasters and consumer electronics
21  companies to find out more about the deployment of the ATSC 3
22  standard.
23  Q.  Yeah.  And then this is this email you sent to Zenith.
24  Is that right?
25  A.  This is an email that I sent to Wayne Luplow at Zenith,
                                                    280

1  yes.
2  Q.  And then what was -- just what we went through was a bit
3  erratic, but just so we have a clear record, the intent of
4  -- what was your intent when you sent this email?
5  A.  Let me just review the email.  I think we state in the --
6  the final sentence of the first paragraph there that, "The
7  team at Constellation Designs is interested in discussing
8  opportunities for partnering with Zenith in the licensing of
9  its intellectual property with respect to the ATSC 3.0
10 standard."
11 Q.  And what kind of role would you -- did you contemplate
12 when you sent this email that Zenith would have in that
13 effort?
14 A.  I believe that we were open to a variety of roles.  Our
15 goal was to partner with -- with Zenith based on their
16 experience in licensing intellectual property with respect to
17 the earlier ATSC 1.0 standard.
18 Q.  And at the time you sent this email, did you know that
19 the Zenith LG company, did you know that they were also
20 involved and active in 3.0?
21 A.  Yes.
22 Q.  So it was a part of your hope to leverage that experience
23 as well, their work with 3.0?
24 A.  Yes.
25 Q.  Now, in this communication, is it fair to say it wasn't

281

1  your intent to sort of put Zenith or LG on notice of patents
2  and accuse them of infringing anything?  That wasn't the
3  intent of this communication.  Is that right?
4  A.  That is correct.  I think it's quite clear that we were
5  hoping to partner with Zenith to license the patents.
6  Certainly we wanted to make them aware that we had patents and
7  that those patents were relative -- relevant to the ATSC 3
8  standard.  But it was in the context of partnering with them
9  to license the patents.
10 Q.  Okay.  And any -- it's obvious, but just to get a clear
11 answer on this, there's no -- you don't identify any
12 particular patents or intellectual property rights
13 specifically in this email.  Correct?
14 A.  We do not identify any patents, but we do identify that
15 we -- that Constellation Designs, Inc., had intellectual
16 property rights that were relevant to the non-uniform QAMs in
17 the ATSC 3.0 standard.
18 Q.  And you also don't identify any particular products by
19 Zenith or LG in this email.  Correct?
20 A.  That is correct.
21 Q.  Is it fair to say, sir, that your awareness of the
22 standard, you had actually studied the standard and you were
23 quite familiar with the standard during the time you were
24 prosecuting these applications?  Isn't that right?
25 A.  Yes, I was familiar with the ATSC 3 standard when I was

282

1  prosecuting the '700, '509, '922 Patents.
2  Q.  And you were familiar with the constellations that were
3  very specifically disclosed in the ATSC 3.0 standard during
4  the prosecution of these patent applications.  Correct?
5  A.  I was aware of the constellations that were disclosed in
6  the ATSC 3 standard during the prosecution of the '700, '509,
7  '922 Patents.
8  Q.  So you mentioned that you got an equity stake in CD, Inc.
9  Isn't that right?
10 A.  Yes, I am a shareholder in Constellation Designs.
11      THE COURT:  Does that complete this witness by
12 deposition?
13      MR. McKEON:  Yes, it does, Your Honor.
14      THE COURT:  Call your next witness.
15      MS. SMITH:  Your Honor, LG calls Mr. David Loo.
16 Mr. Loo is general counsel and chief operating officer of
17 Constellation Designs, LLC.  Your Honor, Mr. Loo's run time
18 is 3 minutes and 8 seconds for Defendant and nothing for
19 Plaintiff.
20      THE COURT:  Please proceed.
21      MS. SMITH:  Thank you.
22                      DAVID LOO
23                 BY VIDEO DEPOSITION
24 Q.  Good morning, sir.
25 A.  Good morning.

283

1  Q.  Can you please state your name for the record?
2  A.  David Loo.
3  Q.  And I understand that you're a lawyer, sir.  Is that
4  right?
5  A.  That's correct.
6  Q.  And I understand, sir, you are currently the general
7  counsel for Constellation Designs, LLC.  Is that right?
8  A.  That's correct.
9  Q.  Okay.  Do you have any other positions within
10 Constellation Designs, LLC?
11 A.  I do.
12 Q.  And what positions are those?
13 A.  I'm also the chief operating officer.
14 Q.  Okay.  I understand, sir, today that you're testifying
15 both in your personal capacity and as a representative of
16 Constellation Designs.  Is that right?
17 A.  (No audible answer played.)
18 Q.  And do you understand, sir, that the testimony you're
19 going to give today is the same as if you were giving it in a
20 court before the judge and the jury?
21 A.  I do.
22 Q.  You mentioned that you hold two positions within
23 Constellation Designs, LLC.  Do you have a financial interest
24 in the outcome of this litigation?
25 A.  Could you help define that a little bit more?

284

1  Q.   Sure.  If Constellation Designs wins, do you get a bonus?
2  A.   Yes.  There is compensation that's associated with income
3  to the ending.
4  Q.   Okay.  Does Constellation Designs, LLC, have any
5  licensees to the patents at asserted in this case?
6  A.   I believe so.
7  Q.   Who are those licensees?
8  A.   I believe that the U.S. government has a license-back.
9  That's what I believe.
10  Q.   Has Constellation Designs, LLC, entered into a license
11  with any entity for the patents asserted in this case?
12  A.   Constellation Designs, LLC, the entity, has not entered
13  into a license.
14  Q.   From 2019 to date, Constellation Designs has not
15  generated any revenue.  Is that fair?
16  A.   That's fair.
17  Q.   Okay.  Constellation Designs, LLC, has not yet licensed
18  any of the patents asserted in this case.  Right?
19  A.   Constellation Designs, LLC, has not signed any license
20  agreements.  That's correct.
21  Q.   Maybe the way to streamline this is the only business
22  that Constellation Designs is in is the sale and licensing of
23  patents.  Right?
24  A.   I think it's fair to say that our primary source of
25  revenue is expected to be patent licensing.

285

1  Q.   It's the only source of revenue, isn't it?
2  A.   To date, yes.
3  Q.   Okay.
4       THE COURT:  Does that complete this witness by
5  deposition?
6       MS. SMITH:  It does, Your Honor.
7       THE COURT:  Please call your next witness.
8       MS. SMITH:  Your Honor, LG calls Ms. Kirsten
9  Burrell.  Ms. Burrell is the production manager at John Wiley
10  & Sons.  Your Honor, Defendants' run time is 7 minutes, 16
11  seconds, and none for Plaintiff.
12       THE COURT:  Please proceed with this witness by
13  deposition.
14       MS. SMITH:  Thank you, Your Honor.
15                KRISTEN BURRELL
16              BY VIDEO DEPOSITION
17  Q.   Okay.  So are you currently employed by John Wiley &
18  Sons, limited in the UK?  Is that right?
19  A.   Yes, that's correct.
20  Q.   What are your job responsibilities in the -- in your
21  current role?
22  A.   I am over -- I manage a group of journals within the
23  physical sciences portfolio of research business, and that to
24  me is overseeing everything from initial receipt of
25  manuscripts through the production process to publication

286

1  online and in print.
2  Q.   I would like to introduce as Exhibit 2 a document bearing
3  the Bates number WILEY0000001.  Let me know when you receive
4  it and can open it.
5  A.   Yes, I can see that.
6  Q.   And do you recognize this document?
7  A.   Yes.
8  Q.   Can you tell us how?
9  A.   This is the article page on Wiley Online Library for the
10  article in European Transactions on Telecommunications.  This
11  would be the first article, first page you could see.
12  Q.   Let's move -- there's a gray box on the right and it says
13  "manuscript accepted" and then date 10 January 2007.  Do you
14  see that?
15  A.   I do, yes.
16  Q.   Can you tell us what is the manuscript accepted date is?
17  A.   This is the date when the final version of the manuscript
18  was accepted by the editorial office for publication.  So it's
19  reached -- it's gone through peer review and has been deemed
20  to reach the standards allowed for publication.
21  Q.   Going back to the document, in the same gray box there's
22  a -- it says "version of record online" and the date April 12,
23  2007.  Can you tell us what does "version of record online"
24  means?
25  A.   This is when the final article is published on the early

287

1  review section of Wiley Online Library.  So this is the date
2  by which it is deemed to have published.
3  Q.   I would like to introduce as Exhibit 3 the document
4  bearing Bates numbers WILEY0000002 through WILEY0000007.  I've
5  uploaded through the chat feature.  Let me know when you
6  receive it and open.
7  A.   Okay.
8  Q.   Do you have the document in front of you?
9  A.   Yes.
10  Q.   And do you recognize this document?
11  A.   Yes, I do, yeah.
12  Q.   And can you tell us how you recognize this document?
13  A.   I recognize the document because it is -- I know this is
14  the layout for the PDF of this journal.
15  Q.   And by "this journal," you mean European Transactions on
16  Telecommunications.  Right?
17  A.   Yes, that's correct.
18  Q.   And do you see "published online 12 April 2007 in Wiley
19  InterScience" in the top left corner?
20  A.   Yeah.
21  Q.   And you earlier said that April 12, 2007, is the earliest
22  date when this article is published online.  Is that right?
23  A.   Yes, that's correct.
24  Q.   And in April 2007, it would be searchable through Wiley
25  InterScience.  Right?

288

| | |
|---|---|
| 1 A. Yes. | 1 A. Yes, I am. |
| 2 Q. Moving on, I would like to introduce as an Exhibit 5 a | 2 Q. And what is your current title? |
| 3 document bearing Bates number WILEY0000008. Let me know when | 3 A. I'm IEEE's director of board governance and policy |
| 4 you have it open and in front of you. | 4 development for IEEE's publications division. |
| 5 A. Okay. Yes. | 5 Q. All right. Let's take a look at paragraph 2 on the first |
| 6 Q. Do you recognize this document? | 6 page. Paragraph 2 says you act as a custodian of certain |
| 7 A. Yes. | 7 records for IEEE. Is that right? |
| 8 Q. Can you tell us what it is? | 8 A. Yes. |
| 9 A. It's the first page online, the landing page of the | 9 Q. What does it mean? |
| 10 article in Security and Privacy. | 10 A. Well, I interpret this very -- very narrowly, as I'm the |
| 11 Q. Okay. I'd like to introduce as Exhibit 6 a document with | 11 custodian of the PSPB operations manual which lays out -- lays |
| 12 the Bates numbers WILEY0000009 through WILEY0000029. | 12 out the rules of the road for IEEE publications. And, as |
| 13 A. Yes. Okay. | 13 such, I'm considered a subject matter expert on publication |
| 14 Q. Do you see it in front of you? | 14 dates and the meaning of certain metadata values that are |
| 15 A. Yeah. | 15 displayed on IEEE Xplore. |
| 16 Q. Do you recognize this? Do you recognize this document? | 16 Q. Paragraph 5 says that it has been the regular practice of |
| 17 A. Yes. | 17 IEEE to publish articles and other publications and that |
| 18 Q. Can you tell us what it is? | 18 they're made available to the public through the IEEE Xplore. |
| 19 A. This is the PDF version of the article in SAT, | 19 Is that right? |
| 20 International Journal of Satellite Communications and | 20 A. Yes, that's right. |
| 21 Networking. | 21 Q. Can you explain what is IEEE Xplore? |
| 22 Q. This Exhibit 6 relates to the same article reflected in | 22 A. IEEE Xplore is an electronic library maintained -- |
| 23 Exhibit 5. Right? | 23 developed and maintained by IEEE, and it's a searchable |
| 24 A. Yeah. | 24 database of articles that concern mostly the subject areas of |
| 25 Q. At the top of this document it says, "published online 19 | 25 electronic engineer -- electronics, electrical engineering, |

| | |
|---|---|
| 1 May 2006 in Wiley InterScience." Do you see that? | 1 computer science, telecommunications, and relevant subjects. |
| 2 A. Yes. | 2 So it's a research database. |
| 3 Q. And that would be the date when this document was first | 3 Q. Is it available online? |
| 4 available through Wiley InterScience for searching. Is that | 4 A. Yes, it is. |
| 5 right? | 5 Q. Can you explain what is the IEEE's definition of |
| 6 A. Yes, that's right, yes. | 6 'publication date'? |
| 7     THE COURT: Does that complete this witness by | 7 A. 'Publication date' is the date at which content was first |
| 8 deposition? | 8 made available to interested audience. |
| 9     MS. SMITH: It does, Your Honor. | 9 Q. Okay. Let's move on to the next Exhibit E. It starts on |
| 10     THE COURT: Call your next witness, please. | 10 page 99 of the declaration. |
| 11     MS. SMITH: Thank you, Your Honor. | 11 A. Okay. I have it. |
| 12 LG calls Mr. Gordon MacPherson. Mr. MacPherson is the | 12 Q. As before, it has two documents, the landing page and the |
| 13 director of board governance and policy development for IEEE's | 13 actual article. Is that right? |
| 14 publication division. And Your Honor, Defendant's run time is | 14 A. Yes. |
| 15 4 minutes and 28 seconds and Plaintiff's run time is zero. | 15 Q. Do you recognize both of these documents? |
| 16     THE COURT: Please proceed with this witness. | 16 A. Yes, I do. |
| 17     MS. SMITH: Thank you. | 17 Q. What is the publication date for this article? |
| 18         GORDON MACPHERSON | 18 A. It's June 24th, 2007. |
| 19         BY VIDEO DEPOSITION | 19 Q. And how do you know this? |
| 20 Q. Just for the record, can you please state your full name, | 20 A. That was the opening day of the conference. |
| 21 first and last? | 21 Q. If you look at the first page of the actual article which |
| 22 A. It's Gordon MacPherson. | 22 -- on page IEEE_00100, is it the same date as appears in the |
| 23 Q. So you understand that you're under oath today. Right? | 23 upper corner -- |
| 24 A. Yes. | 24 A. Yes, it is. |
| 25 Q. Okay. Are you currently employed by IEEE? | 25 Q. -- of the -- |

1      THE COURT: Does that complete this witness by
2 deposition?
3      MS. SMITH: It does, Your Honor.
4      THE COURT: Am I correct, Defendants, your next
5 witness is a live witness?
6      MS. SMITH: Yes, Your Honor.
7      THE COURT: All right. Ladies and gentlemen of the
8 jury, the next anticipated witness from the Defendants is a
9 live witness who will testify with the aid of an interpreter
10 who will be on the stand between an hour and a half and two
11 hours. We're going to wait until Monday morning to begin that
12 process.
13      We're going to recess for the day. I'm going to ask you
14 to take your notebooks in just a minute to the jury room and
15 leave them closed there so they will be there Monday when you
16 get here. I'm going to ask you to have a good weekend, but
17 remember, all the instructions I've given you are still in
18 effect. The Plaintiff has rested their case in chief. We're
19 into the Defendants' case. We are making substantial
20 progress. It would be an absolute travesty if the work,
21 effort, time, toil, and resources that have been contributed
22 were to be put in jeopardy because any of my instructions were
23 violated. So please be vigilant over the weekend in following
24 all of my instructions, including not to communicate about
25 this case in any way with anyone, including the eight of

1 yourselves.
2      Please plan to be back Monday morning assembled as you
3 have been so we can start right at 8:30. I want to compliment
4 you for your timeliness so far in this trial. Please keep it
5 up. It's made it easier for the Court, and I'm not unaware
6 that it takes time to come and go from your homes and be here
7 when I've asked you to be here, and I appreciate your
8 timeliness.
9      We will reconvene Monday morning at 8:30. Until then,
10 you are excused until Monday morning.
11      The jury is excused.
12      (Whereupon, the jury left the courtroom.)
13      THE COURT: Counsel, be seated, please.
14      We have used 6 hours and 35 minutes and 56 seconds of
15 designated trial time today. As of this moment, the Plaintiff
16 has 2 hours, 33 minutes, and 27 seconds of trial time
17 remaining, the Defendant has 7 hours and 7 minutes of trial
18 time remaining.
19      Also let me remind you that I will be looking for your
20 updated joint submission the proposed final jury
21 instruction and charge by 12:00 noon on Sunday, and we will
22 pick up with this trial on Monday morning and the next witness
23 to be called by the Defendants.
24      Are there any issues the Court needs to be made aware of
25 from either side before we recess for the weekend?

1      MR. CASSADY: Not from the Plaintiff, Your Honor.
2      THE COURT: Anything from the Defendants?
3      MR. McKEON: Nothing from Defendants. Thank you,
4 Your Honor.
5      THE COURT: Let me encourage both sides to
6 diligently use the time over the weekend to work out any
7 remaining disputes regarding demonstratives and other issues.
8 We're getting close to the end of the case. We've got a lot
9 to do in the time that remains, and to the extent you can work
10 through those issues, it would be most helpful and
11 appreciated.
12      In the event you need my guidance, I will be available
13 Monday morning in advance of starting trial, as I have been
14 throughout the trial, to give you guidance where it's
15 necessary.
16      If I misspoke earlier, I'm sorry. The Defendants have
17 remaining 5 hours and 7 minutes. If I said something
18 different, I stand corrected. That's designated trial time.
19      All right. Have a good weekend. I will see you Monday
20 morning.
21      The Court stands in recess.
22      (The proceedings were concluded at 5:30 p.m.)
23
24
25

1      I HEREBY CERTIFY THAT THE FOREGOING IS A
2      CORRECT TRANSCRIPT FROM THE RECORD OF
3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES
5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE
6      COURT AND THE JUDICIAL CONFERENCE OF THE
7      UNITED STATES.
8
9      S/Shawn McRoberts      07/07/2023
10      DATE_____
     SHAWN McROBERTS, RMR, CRR
11      FEDERAL OFFICIAL COURT REPORTER
12
13
14
15
16
17
18
19
20
21
22
23
24
25