**MAYER BROWN LLP**
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
CLIFF A. MAIER (SBN 248858)
cmaier@mayerbrown.com
GRAHAM (GRAY) M. BUCCIGROSS (SBN 234558)
gbuccigross@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California  94306-2112
Telephone: (650) 331-2000

MICHAEL A. MOLANO (SBN 171057)
mmolano@mayerbrown.com
575 Market Street, Suite 2500
San Francisco, California  94105
Telephone: (415) 874-4230

Attorneys for Plaintiff MAXELL, LTD.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MAXELL, LTD., | Case No. 5:24-cv-04972-EKL |
|                Plaintiff, | **DECLARATION OF DR. MAHDI ESLAMIMEHR IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
|        vs. | |
| LG ELECTRONICS INC. and LG ELECTRONICS U.S.A., INC., | |
|            Defendants. | Judge:     Hon. Judge Eumi K. Lee<br>Date:      March 26, 2025<br>Time:      10:00 a.m.<br>Location:  Courtroom 7, 4th Floor |

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

I, Dr. Mahdi Eslamimehr, declare as follows:

## I.    INTRODUCTION

1.    I have been retained by Maxell, Ltd. ("Maxell") as an expert witness in this litigation against LG Electronics Inc. and LG Electronics U.S.A., Inc. (collectively "LG").

## II.    QUALIFICATIONS AND EXPERIENCE

2.    A detailed record of my educational background, career history, publications, and other relevant qualifications, including the patents on which I am a named inventor and the academic and professional publications for which I am an author, is set forth in my curriculum vitae attached to this Declaration as Exhibit 1.

3.    I hold a Ph.D. in Computer Science from the University of California, Los Angeles (UCLA), where my research focused on software and program analysis. During my time at UCLA, I developed several tools for identifying software errors, including those that may happen in software user interfaces. These tools were instrumental in advancing methodologies for software quality of service, providing innovative solutions to challenges in complex systems. Prior to my Ph.D., I earned a master's degree in computer science from Linköping University, Sweden.

4.    My academic career has been expanded through postdoctoral research at SAP Labs, Viewpoints Research Institute, and Y-Combinators' Human Advancement Research Community (HARC), where I explored the intersection of software user interface and testing. In parallel, I served as visiting faculty at California Polytechnique Institute, Pomona.  I am currently an Adjunct professor at the University of Southern California (USC), teaching advanced courses in software engineering and requirements engineering. These experiences reflect my ability to connect theoretical knowledge with practical applications and my commitment to mentoring the next generation of software engineers.

5.    In addition to my academic roles, I gained substantial industry experience early in my career through positions at Ericsson AB and Samsung Electronics. At Ericsson, I was involved in designing a user interface and model-based testing framework to improve the accuracy and performance of telecommunications systems. My time at Samsung provided exposure to scalable system architectures, where I developed a topology language for multi-core processors, later

adopted as the Samsung Parallel Real-Time Architecture (SPARTA). These roles honed my skills in building large-scale, high-performance systems and gave me a strong foundation in software architecture and engineering practices.

6.    Over the years, I transitioned from engineering to executive leadership, taking on roles such as Chief Technology Officer (CTO) and Chief Operating Officer (COO) at Clarity Global. I managed regional headquarters across EMEA and APAC, steering the organization's operational strategies and technology roadmaps. I oversaw three R&D centers in Australia, Bulgaria, and Sri Lanka.

7.    I currently serve as the Executive Vice President at Quandary Peak Research, where I lead our software consulting services, including expert testimony services for high-profile cases involving patent infringement, trade secret disputes, software malfunctions, and breach-of-contract issues. Over the course of my career, I have been retained as an expert in more than 70 cases, partnering with top law firms and Fortune 100 companies. My role involves delivering independent and unbiased, clear, detailed technical analyses in complex court proceedings, arbitration settings, and mediation, ensuring that all stakeholders have a thorough understanding of the software-related issues at hand.

8.    Leading the technical due diligence division at Quandary Peak, I also advise venture capitalists, private equity firms, and corporate clients on technology investments, IP valuations, and software audits. My team conducts comprehensive assessments in mergers and acquisitions, providing insights on software scalability, intellectual property risks, and the feasibility of technical roadmaps. My ability to connect technical details with business strategy has been essential in helping clients make informed investment decisions.

9.    Throughout my career, I have contributed to the software field, including the user interface field, through publications in prestigious conferences and journals. My research has been recognized with awards, including a best paper award at the IEEE International Symposium on Software Reliability Engineering (ISSRE). I have presented my work at conferences like ACM SIGSOFT and the IEEE International Symposium on Software Engineering, sharing insights on

1    concurrent programming, software reliability, and cross-language testing frameworks. These

2    contributions reflect my dedication to advancing the state of the art in software engineering.

3       10. In addition to my technical expertise, I hold an MBA certificate from the London

4    School of Economics and executive certifications from Harvard Business School. These credentials

5    complement my engineering background by equipping me with strategic leadership skills that

6    enhance my ability to manage interdisciplinary teams and align technical efforts with business

7    objectives.

8       11. Beyond my professional responsibilities, I remain actively engaged with the broader

9    technology and business communities. I am a member of the World Economic Forum's Emerging

10   Technology Professionals group and serve on the advisory council of the Harvard Business Review.

11   These affiliations allow me to stay at the forefront of emerging trends and contribute to shaping the

12   future of technology. My involvement with professional organizations, combined with my

13   academic, industrial, and consulting experience, provides a comprehensive foundation for my role

14   as an expert witness and consultant.

15      12. I was a member of Y Combinator's Human Advancement Research Community

16   (HARC), an initiative initially dedicated to exploring advanced user interface (UI) technologies.

17   The lab's mission centered around reimagining how humans interact with digital systems, pushing

18   beyond conventional paradigms to create more intuitive, efficient, and meaningful user interfaces.

19   As part of this pioneering research community, I collaborated with experts from institutions such

20   as MIT Media Lab, SAP Labs, and the University of Washington, working at the intersection of

21   human-computer interaction (HCI), user experience design, and software engineering.

22      13. My work at HARC focused entirely on the development of novel UI frameworks

23   that could enhance how users engage with complex digital environments. I contributed to projects

24   aimed at creating interactive systems that respond naturally to user input through advanced

25   techniques like gesture recognition, voice control, and NLP-driven interfaces. One of my key

26   contributions involved developing tools and frameworks that optimized the usability and

27   accessibility of software systems. These tools allowed designers and engineers to prototype new

28   interface ideas rapidly and test them in real-world applications, streamlining the innovation process.

14.     Through my involvement in HARC, I also contributed to the broader UI research community by sharing insights and best practices with other researchers and practitioners. I actively participated in discussions on emerging trends in user interfaces and collaborated on open-source projects to democratize access to cutting-edge UI technologies.

15.     As the Chief Technology Officer (CTO) of Clarity Global, a software solutions company, a crucial aspect of my role involved designing and building efficient user interfaces (UI) for the company's software products. I recognized that an intuitive, responsive, and aesthetically pleasing interface is not just an enhancement but a fundamental component of a product's success, directly impacting user adoption, satisfaction, and long-term engagement. My team and I worked to create UIs that offered seamless user experiences, ensuring that even complex functionalities were presented in a way that felt accessible and easy to navigate.

16.     One of my primary responsibilities was bridging the gap between technical complexity and usability. I led the design and development of modular UI frameworks that could be reused across multiple products, allowing for consistency in user interaction while reducing development time. These efforts were particularly critical as we transitioned from legacy systems to modern, cloud-based architectures, where user expectations were evolving rapidly. We embraced emerging technologies such as microservice-based front ends, AI-powered user personalization, and responsive design principles to ensure that our interfaces performed well across devices and platforms.

17.     To achieve these goals, I collaborated closely with product managers, designers, and engineers, fostering a cross-disciplinary approach to UI development. I implemented agile methodologies that emphasized iterative design, user feedback loops, and rapid prototyping, ensuring that our products continuously aligned with user needs. Additionally, I mentored UI/UX teams on best practices, empowering them to think creatively about solving user challenges. This focus on user interface design was integral to the company's growth, improving customer satisfaction and enabling us to stand out in a competitive market.

18.     Additionally, I have led numerous technical due diligence projects for mergers and acquisitions (M&A), providing critical insights to venture capital (VC) and private equity (PE)

firms. A key focus of these evaluations was the quality of the user interface, as it plays a crucial role in user adoption, customer retention, and product scalability. My responsibilities included reviewing the design and source code of UIs to assess functionality, maintainability, and alignment with industry standards, identifying potential risks or opportunities. These insights enabled investors to make informed decisions and optimize product value post-acquisition, reinforcing my expertise in evaluating UIs as a strategic driver of business success.

19.    I have been retained as an expert witness in multiple high-profile cases involving user interface (UI) patents, where I was tasked with providing technical analysis and expert opinions on the design, implementation, and functionality of software UIs. In these cases, I reviewed the source code of software products developed by leading companies to determine whether the UI elements and interactions infringed upon existing patents or met the criteria for originality and non-obviousness. This required an in-depth understanding of both the visual and technical components that underpin modern user interfaces, including front-end frameworks, design patterns, and user interaction workflows.

### III.    PREVIOUS TESTIFYING EXPERIENCE

20.    A list of all other cases in which, during the previous 5 years, I have testified as an expert at trial or by deposition can be found in my curriculum vitae attached to this Declaration as Exhibit 1.

### IV.    COMPENSATION

21.    I am being compensated for my work at a rate of $610 per hour, and $305 per hour for non-working travel. I am being separately reimbursed for any out-of-pocket expenses.    My compensation does not depend in any way on the outcome of this litigation or the testimony or opinions that I express.

### V.    MATERIALS CONSIDERED

22.    My opinions are based on my experience in this field, and are necessarily formed by my own experiences, materials I have read over the years, and discussions I have had with colleagues during my career.  In addition, I have reviewed and considered the following materials in forming my opinion:

a.  U.S. Patent No. 7,421,188 ("the '188 Patent");

b.  The prosecution history of the '188 Patent;

c.  U.S. Patent No. 10,199,072 ("the '072 Patent");

d.  The prosecution history of the '072 Patent;

e.  U.S. Patent No. 9,818,449 ("the '449 Patent");

f.  The prosecution history of the '449 Patent;

g.  Defendants' Motion For Judgment On The Pleadings Pursuant to Fed. R. Civ. P. 12(c) filed in this action; and

h.  [In Chambers] Order Regarding Defendant's Motion to Dismiss For Failure to State a Claim (Dkt. 44) in *Maxell, Ltd. v. Fandango Media, LLC*, No. CV 17-07534 AG (SSX), 2018 WL 5085141 (C.D. Cal. Mar. 21, 2018).

## VI.    THE '188 PATENT

### a.    BACKGROUND OF THE '188 PATENT

23.    The '188 Patent discloses an innovative enhancement to user interfaces specifically tailored for computing devices that are involved in editing and managing multimedia content. More precisely, the '188 Patent introduces improvements to the functionality of a tangible apparatus designed for editing information—which includes at least image information—that is recorded on a recording medium such as an optical disc. This invention addresses specific deficiencies in prior art devices by implementing mechanisms that prevent unintended modifications to thumbnail images representing recorded content.

24.    The '188 Patent claims priority to a Japanese patent application filed on March 5, 2002. At the time of this invention, recordable optical discs, particularly those used for video content, were gaining significant popularity.[1,2] Consumers were increasingly utilizing systems that allowed them to edit video footage and write it onto such discs, enabling playback on conventional DVD players

---

[1] John Lehmann, *Captains of Video: Cheap DVD Players May Be Worth the Battle*, *N.Y. Post* (Dec. 9, 2003), https://nypost.com/2003/12/09/captains-of-video-cheap-dvd-players-may-be-worth-the-battle/.

[2] DVD Sales Jump in 2003, *Tampa Bay Times* (Jan. 12, 2004), https://www.tampabay.com/archive/2004/01/12/dvd-sales-jump-in-2003/.

widely available in the market. This trend marked a shift towards greater user engagement in content creation and distribution, facilitated by advancements in recording and storage technologies.[3]

25.     Based on my education, professional experience, and thorough understanding of the technological landscape around 2002, I will provide a detailed exposition of the state of the art during that period. This context is essential for appreciating the technological advancements introduced by the '188 Patent and understanding how it offers benefits over the conventional user interfaces prevalent at the time.

26.     The Digital Video/Versatile Disk (DVD) format was introduced in 1995 and quickly gained significant attention from both academia[4,5,6] and the market.[7] The DVD-R format, introduced in 1997,[8] was among the first writable DVD formats to achieve widespread acceptance.

---

[3] John Markoff, *News Watch; Storage in a Single DVD Changer: Hundreds of Movies and MP3s*, *N.Y. Times* (Jan. 23, 2003), https://www.nytimes.com/2003/01/23/technology/news-watch-storage-in-a-single-dvd-changer-hundreds-of-movies-and-mp3-s.html.

[4] Hisashi Yamada, *DVD Overview*, in *Digest of Technical Papers, Int'l Conf. on Consumer Elecs.*, IEEE (1996).

[5] Verhoeven, JA Th. "Prospects of DVD." *Fourth International Symposium on Optical Storage (ISOS'96)*. Vol. 2931. SPIE, 1996.

[6] Bell, Alan E. "Next-generation compact discs." *Scientific American* 275.1 (1996): 42-46.

[7] Erik Kreifeldt, *New Optical Disk Format Poised for Retail Sales*, *Optics & Photonics News* 7, no. 9, 8 (1996).

[8] *New DVD Format Announced*, CNET (last visited Oct. 29, 2024), https://www.cnet.com/tech/tech-industry/new-dvd-format-announced/.

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

**CNET** — YOUR GUIDE TO A BETTER FUTURE

Trending    AI    Tech    Money    Home    Wellness    Home Internet    Deals

Tech > Tech Industry

# New DVD format announced

The recordable format is aimed at creating DVD titles.

Sept. 26, 1997 1:20 p.m. PT                    2 min read

A recordable format from the DVD Forum will help the producers of multimedia software bring content to the mass market, but technology that consumers can afford isn't in the cards.

The DVD Forum, an industry consortium, has announced a new format called DVD-R which can be used to make DVD titles. The technology records data once and allows storage of up to 3.95GB of information on a disk.

27.    DVD-R (Digital Versatile Disc-Recordable) allowed users to write data onto a disc a single time. Once data was inscribed onto a DVD-R disc, it became a permanent record; the data could not be erased, modified, or overwritten. This write-once capability was particularly advantageous for archiving finalized video content or distributing media in a tamper-proof format, ensuring data integrity and longevity.

28.    In contrast, the DVD-RW format (Digital Versatile Disc-Rewritable) became available in 1999[9] with the release of DVD-RW version 1.0.

---

[9] *Pioneer Press Release*, *Pioneer Electronics* (Nov. 29, 2002), https://global.pioneer/en/corp/news/press/index/1470/.

About Us ⊕    Company Overview ⊕  Group Companies ⊕  News and Events ⊕  Sustainability ⊕  Procure

**Pioneer**

November 25, 1999
Pioneer Corporation

## Pioneer Introduces the Industry''s First DVD Recorder

Tokyo, Japan, November 25, 1999 --- Pioneer Corporation announced its introduction of the industry's first consumer-use DVD Recorder to the Japanese domestic market.

DVR-1000

| Product | Model No | S.R.P. | Launch Date | Monthly Production |
|---------|----------|--------|-------------|--------------------|
| DVD Recorder | DVR-1000 | 250,000 yen | Early Dec. 1999 | 10,000 pcs |
| DVD-RW Disc | DVS-RW47 | 3,000 yen | Early Dec. 1999 | 60,000 pcs |

29.     Subsequent versions, such as version 1.1 in 2000 and version 1.2 in late 2003, introduced incremental improvements. DVD-RW discs provided the capability to erase and rewrite data multiple times—up to approximately 1,000 rewrites per disc—offering significantly greater flexibility compared to their DVD-R counterparts. This rewritable functionality allowed users to remove, amend, or replace information on the disc, making it suitable for iterative editing processes, temporary data storage, and applications requiring frequent updates.

30.     Another format, DVD+R, emerged in 2002 as an alternative to DVD-R. While DVD+R also permitted data to be written onto a disc only once, it differed from DVD-R in several technical aspects[10]. One key difference was in the way the recording laser tracked and focused on the disc's surface. DVD+R utilized a more precise addressing system called ADIP (Address in Pregroove),[11] whereas DVD-R employed the Land Pre-Pit (LPP)[12] method. From the consumer's perspective, both formats served a similar purpose in storing video content, but compatibility with various DVD players could vary, prompting manufacturers to produce multi-format drives that supported both standards.

---

[10] Matthew Rothenberg, *Sony's Next-Generation DVD Writer: A First Look*, *ZDNet* (last visited Oct. 29, 2024), https://www.zdnet.com/article/sonys-next-generation-dvd-writer-a-first-look/.

[11] Jan J.L.M. Van Vlerken & W. De Kimpe, *Format Detection for DVD+ ReWritable 4.7 GB*, in *2000 Digest of Technical Papers, Int'l Conf. on Consumer Elecs.*, IEEE (2000).

[12] Masahiro Kato et al., *Physical Characteristics and Format of Digital Versatile Disc Re-Recordable*, *Jpn. J. Applied Phys.* 40, no. 3S, 1803 (2001).

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

31.     By the time of the invention detailed in the '188 Patent, most standard DVD players had evolved to read DVD-R discs seamlessly, treating them similarly to commercially produced DVDs. This compatibility allowed users with appropriate information editing apparatuses—such as personal computers equipped with DVD burners and authoring software—to create their own DVDs[13]. These user-authored DVDs could be played back on conventional DVD players, providing an experience akin to watching a professionally produced film purchased or rented from a store. This technological advancement significantly broadened the scope for personal content creation, enabling individuals to distribute high-quality video content without professional equipment.

32.     During this period, consumer-oriented software for authoring DVD content and writing it onto optical discs was becoming increasingly accessible and sophisticated. While DVD authoring software had been publicly available since at least 1998, its initial adoption was limited to enthusiasts and professionals due to its complexity and cost. An example is WinDVD Creator, a DVD authoring application for Windows-based computers, which offered tools for capturing, editing, and burning video content onto DVDs.



---

[13] *Burning DVDs at Home Getting Cheaper*, *Tampa Bay Times* (Apr. 21, 2003), https://www.tampabay.com/archive/2003/04/21/burning-dvds-at-home-getting-cheaper/.

33.    However, the landscape began to change with the introduction of more user-friendly and integrated software solutions. In early 2001, Apple released iDVD for its Mac computers,[14] revolutionizing the DVD authoring experience for consumers. iDVD provided an intuitive interface with drag-and-drop functionality, pre-designed templates, and straightforward workflows, making it possible for users with minimal technical expertise to create professional-looking DVDs complete with custom menus and interactive features.



34.    iDVD and similar software applications typically allowed users to customize the on-screen menus that appeared when the disc was loaded into a DVD player. Users could adjust a variety of elements, including background images, menu layouts, navigational structures, fonts, and color schemes. These menus often included a scene selection submenu—also known as a "chapter" selection menu—which displayed thumbnail images corresponding to different scenes or segments of the video content. By selecting a thumbnail using the DVD player's remote control, viewers could navigate directly to specific parts of the video, enhancing the user experience through interactive content access. Some software allowed users to select specific frames from the video to serve as thumbnail images, providing a visual cue representative of each scene's content. Alternatively, users could assign custom images, such as movie posters or photographs, to represent the entire movie when displaying a list of available titles on the disc.

---

[14] *Apple Ships Industry's First SuperDrive*, *Apple Newsroom* (Feb. 19, 2001), https://www.apple.com/newsroom/2001/02/19Apple-Ships-Industrys-First-SuperDrive/.

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

35.     In certain workflows, separate software applications were utilized to divide the movie into scenes or chapters and to determine the associated thumbnails, which were then imported into the DVD authoring software. For example, Apple's iMovie, initially released in 1999, was a video editing application that enabled users to capture, edit, and organize video clips.



36.     iMovie allowed users to create chapter markers within a movie, effectively segmenting the video into discrete scenes for easier navigation. These chapters and their associated thumbnail images could then be seamlessly integrated into iDVD to create interactive menus and navigation structures on the final DVD. This integration between iMovie and iDVD exemplified the trend towards more comprehensive and user-friendly multimedia production tools.

37.     At the time of the invention, information editing devices that facilitated the creation of playlists based on information recorded on optical discs were well-established. As described in the '188 Patent at column 1, lines 20-31, conventional devices allowed users to compile and manage lists of video content recorded on media such as DVD-R or DVD-RW discs. These devices generated thumbnail images derived from the recorded content, as indicated in the '188 Patent at column 1, lines 32-38. The thumbnails typically represented frames extracted from the video or pre-existing images provided by the user, such as cover art or promotional graphics.

38.     Conventional devices also allowed users to reset or change the thumbnail images associated with the recorded content, as stated in the '188 Patent at column 1, lines 39-43. However, these

systems lacked mechanisms to regulate or control the modification of thumbnail images. Specifically, they did not consider whether changing a thumbnail image should be permitted or prohibited under certain conditions. As a result, users could inadvertently alter or overwrite thumbnail images, leading to confusion, loss of desired visual representations, or inconsistent user experiences. The '188 Patent at column 1, lines 43-46, highlights this issue by noting that in conventional devices, a thumbnail image set by the user could accidentally be changed by mistake, without any preventive measures in place to safeguard against unintended modifications.

39.     In summary, conventional systems at the time did not provide a mechanism to prevent thumbnail images from being modified unintentionally. There was an absence of control over editing permissions related to thumbnail images, which could result in accidental alterations and a diminished user experience. This gap in functionality presented challenges for users who desired consistency and reliability in how their multimedia content was presented and navigated.

40.     The '188 Patent addresses this deficiency by introducing an apparatus and method that includes "change permission information" to decide whether a thumbnail image can be changed or not. This innovation enhances the reliability and usability of information editing devices by ensuring that thumbnail images remain consistent unless intentional changes are authorized. The system incorporates a deciding and decoding process based on the change permission information, which acts as a control mechanism to prohibit or allow modifications to thumbnail images. By implementing this feature, the invention prevents accidental changes, preserves the integrity of user-defined visual representations, and improves the overall functionality of multimedia editing and playback systems. This advancement represents a significant technical improvement over prior art devices by providing a solution to a specific problem in the field of user interface design for multimedia content management.

## b.  THE '188 PATENT INVENTION AND ITS BENEFITS

41.     The claims of the '188 Patent are specifically directed toward resolving a notable problem that existed in conventional information editing devices at the time of the invention. Traditional systems allowed thumbnail images—visual representations of recorded content—to be accidentally changed or overwritten by users without any preventative measures in place. This issue is explicitly

1  highlighted in the '188 Patent at column 1, lines 55-67, where the shortcomings of prior art devices
2  are discussed in detail. The inability to prevent unintended modifications to thumbnail images led
3  to user frustration and inefficiencies in content management.

4  42.    The invention disclosed in the '188 Patent introduces an improved, non-conventional
5  device and method for editing recorded information, particularly focusing on enhancing the
6  reliability and user experience of multimedia content management systems. By implementing a
7  mechanism that controls whether a thumbnail image can be changed based on specific permission
8  information, the invention provides a technological solution to the identified problem.

9  43.    To understand the innovation in depth, consider Claim 4 of the '188 Patent, which recites:

10     4. An information editing method, comprising:

11         a deciding process for deciding whether a thumbnail image can be changed or not
           based on *change permission information* indicating whether a change can be made
12         on the thumbnail image showing contents of recorded information which includes
           at least image information and is recorded on a recording medium, and
13

14         a change prohibiting process for prohibiting a change of the thumbnail image when
           the deciding device decides that a change is not permitted,
15

16         wherein editing is performed on a reproduced form of the recorded information
           recorded on the recording medium. (Emphasis added).
17

18  44.    Fundamentally, this claim is directed toward a method that either prevents or permits the
19  alteration of thumbnail image depending on the outcome of a specific determination process. The
20  method relies on "**change permission information**," which serves as a form of system "**state**"
21  indicating whether modifications to the thumbnail image are allowed. This state information is
22  integral to the device's functionality and has no direct analog outside the context of computers such
23  as multimedia editing apparatuses.

24  45.    The "**deciding process**" assesses the change permission information to determine if a
25  thumbnail image can be altered. If the process concludes that changes are not permitted, the
26  "**change prohibiting process**" actively prevents any modification to the thumbnail image. This
27  approach ensures that thumbnail images remain consistent and unaltered unless expressly allowed,
28  thereby preventing accidental changes that could disrupt the user's organization of content.

46.    Importantly, this method is not an abstract algorithm but is directed toward improving the functionality of a tangible device—a specialized apparatus for editing information that includes image data recorded on a physical recording medium, such as an optical disc. The invention provides a concrete technological solution to a practical problem in the field of multimedia content management.

47.    Further emphasizing the focus on user interface functionality, Claim 4 recites specific behaviors related to changing thumbnail images. It outlines how the user interface responds based on the system's state information (the "**change permission information**"), directly affecting how users interact with the device. This specificity indicates that the claim is directed toward a particular user interface design that enhances user experience by preventing unintended actions.

48.    The direction toward a specific user interface is further illustrated by examining Claim 5, which depends on Claim 4 and recites:

> 5. The information editing method according to claim 4, further comprising a generating process which generates a display signal for displaying a warning indicating that the thumbnail image cannot be changed when the deciding device decides that a change is not permitted.

49.    This claim adds more detail to the user interface by specifying that if a user attempts to change a thumbnail image when such a change is not permitted, the system generates a display signal to present a warning message. This feature provides immediate feedback to the user, informing them of the restriction and preventing confusion or frustration that could arise from unresponsive or unexplained system behavior.

50.    The claims thus describe multiple facets of the user interface:

> i. Device Reaction to User Input: The system actively monitors user attempts to change thumbnail images and determines the appropriate response based on the change permission information. If changes are allowed, the system permits the modification; if not, it prevents the change.
>
> ii. Visual Indicators Provided to the User: By generating warning messages when changes are not permitted, the system maintains clear communication

1    with the user. This transparency enhances usability by ensuring that users

2    understand the reasons behind the system's actions.

3    51.    The specification of the '188 Patent further supports the conclusion that the claims disclose

4    an improved and unconventional user interface. As discussed earlier, prior information editing

5    devices allowed users to create playlists and generate thumbnail images from recorded content,

6    such as frames from a movie or provided images like movie posters ('188 Patent, 1:32-38).

7    However, these conventional devices lacked mechanisms to control or restrict changes to thumbnail

8    images ('188 Patent, 1:39-43). As a result, users could inadvertently alter thumbnail images, leading

9    to inconsistencies and potential confusion in content navigation.

10    52.    By introducing the concept of "change permission information," the invention addresses

11    this deficiency in prior art devices. The system now incorporates a method for deciding whether a

12    thumbnail image can be changed, and if not, it actively prohibits such changes. This control

13    mechanism is a significant improvement over conventional systems, as it adds a layer of protection

14    against accidental modifications, thereby enhancing the integrity and reliability of the user's

15    content organization.

16    53.    Moreover, the invention's approach to handling thumbnail images is rooted in the technical

17    field of Multimedia Content Management, User Interface Design, and Human-Computer

18    Interaction. It involves specific processes executed by the device—deciding based on permission

19    information, prohibiting changes when necessary, and generating display signals for warnings—all

20    of which require implementation through hardware and software components working in concert.

21    54.    In my professional opinion, the claims of the '188 Patent recite an improved user interface

22    with functionality directly related to the structure and operation of the user interface. The invention

23    provides a technological solution to a technological problem by introducing a novel method of

24    controlling thumbnail image modifications based on permission information. This method

25    enhances the device's functionality, offering a more reliable and user-friendly experience compared

26    to conventional systems.

27    55.    The invention is not merely an abstract idea or a generic computer implementation of a

28    known practice. Instead, it presents a specific and practical application that improves the way

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

1   information editing devices operate. By focusing on the interaction between the user interface and

2   the underlying system processes, the invention delivers tangible benefits, such as preventing

3   unintended changes, providing clear feedback to users, and maintaining the consistency of visual

4   content representations.

5   56.     In conclusion, the '188 Patent offers a meaningful technological advancement over prior art

6   devices by addressing a specific problem in multimedia content management. The claims detail a

7   method and apparatus that prevent unintended modifications to thumbnail images through the use

8   of change permission information, enhancing both the functionality and usability of information

9   editing devices. This invention represents a significant contribution to the field, providing a solution

10  that improves user interaction and device reliability in managing recorded content.

11          **VII.    THE '072 AND '449 PATENTS**

12  57.     U.S. Patent No. 10,199,072 ("the '072 Patent") and U.S. Patent No. 9,818,449 ("the '449

13  Patent"), collectively referred to as the "Yoshida Patents," disclose innovative improvements to

14  user interfaces for managing and editing video data in computing devices. These patents are part of

15  the same patent family, sharing a common specification and substantially similar claims. The '072

16  Patent is a continuation of the '449 Patent, as indicated on the cover page of the '072 Patent:

17  "Continuation of application No. 15/176,435 filed on Jun. 8, 2016, now Pat. No. 9,818,449…". '072

18  Patent, Cover Page.

19          **a.  BACKGROUND OF THE YOSHIDA PATENTS**

20  58.     The Yoshida Patents both claim priority to Japanese patent applications filed on December

21  2, 2004, as noted on their respective cover pages. This priority date situates the inventions at a

22  pivotal time in the evolution of digital video technology, where advancements in recording, storage,

23  and user interface design were rapidly progressing.

24  59.     Based on my education and professional experience in computer science and multimedia

25  systems, I will now provide a detailed analysis of the state of the art around 2004 concerning user

26  interfaces for video information. This analysis is crucial to understanding the technological context

27  in which the Yoshida Patents were conceived and the specific problems they sought to address.

28

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

60.    As previously discussed in relation to the '188 Patent, the early 2000s saw significant proliferation of optical disc recording media for video information. Formats such as DVD-R, DVD-RW, and DVD+R became increasingly popular among consumers, allowing them to record and edit video content on optical discs. However, between 2002 and 2005, there were substantial advancements not only in storage media[15] (e.g., Blue-ray disc,[16] advancements in USB Flash Drives, and early development of Solid-State Drives) but also in the processing and transmission of digital video data (e.g., adoption of High Definition Video content transfer), which are directly relevant to the inventions disclosed in the Yoshida Patents.

61.    Around 2002, a significant technological advancement occurred with the introduction of video streaming formats compatible with Adobe Flash technology.[17] Adobe Flash enabled websites to embed interactive and multimedia content directly into web pages, and its video streaming capabilities allowed for the playback of video and audio data over the Internet. Websites could now offer embedded video players, significantly enhancing the user experience.

62.    At this time, however, streaming video was typically of low resolution, with quality comparable to that of VHS tapes. This limitation was due to several factors, including the nascent state of compression technologies and the limited bandwidth available to most Internet users. Nonetheless, the ability to stream video content marked a turning point in digital media consumption, laying the groundwork for future developments in online video platforms.

63.    Concurrently, there were significant advancements in audio-video compression technologies, which played a critical role in the efficient storage and transmission of digital video data. The MPEG-2 standard,[18] developed in the early 1990s, was widely adopted for encoding and

---

[15] *Memory & Storage Timeline*, *Computer History Museum*, https://www.computerhistory.org/timeline/memory-storage/ (last visited Oct. 29, 2024).
[16] *Sony Press Release*, *Sony Global* (Feb. 19, 2002), https://www.sony.com/en/SonyInfo/News/Press/200202/02-0219E/.
[17] *Macromedia Flash MX Video*, *Adobe* (June 18, 2006) (archived), https://web.archive.org/web/20060618191724/http://www.adobe.com/macromedia/proom/pr/2002/flash_mx_video.html.
[18] *ISO/IEC 13818-2 MPEG-2 Coding of Moving Pictures*, ANSI Blog, https://blog.ansi.org/iso-iec-13818-mpeg-2-coding-moving-pictures/ (last visited Oct. 29, 2024).

1  compressing video content for DVDs and digital television broadcasts. MPEG-2 provided high-

2  quality video but required substantial storage capacity and bandwidth.

3  64.    The introduction of the MPEG-4 standard[19] in 1999 represented a major leap forward.

4  MPEG-4 offered improved compression efficiency, allowing for higher-quality video at lower

5  bitrates compared to MPEG-2. This advancement enabled more video data to be stored on existing

6  storage media and facilitated the streaming of higher-quality video over the Internet and to

7  emerging mobile devices.

8  65.    MPEG-4 has become the de facto standard for Internet video,[20] and was instrumental in

9  enabling video content to be delivered efficiently across various platforms, including computers

10  and mobile devices. The improved compression algorithms allowed for better utilization of storage

11  media and bandwidth, directly influencing the capabilities of recording and playback devices.

12  66.    In addition to advancements in compression technologies, the broadcasting industry was

13  undergoing a significant transformation with the introduction of High-Definition Television

14  (HDTV) in the United States. HDTV was first introduced in 1998, offering a substantial

15  improvement in picture quality over standard-definition television. In 2000, the Super Bowl was

16  broadcast in HD for the first time, marking a milestone in mainstream adoption.

17

18

19

20

21

22

23

24

---

25  [19] *ISO/IEC 13818-2:2000*, *International Organization for Standardization*,
    https://www.iso.org/standard/42739.html (last visited Oct. 29, 2024).

26  [20] AAC-ELD: New Standard for High-Quality Communication, Fraunhofer Institute for Integrated

27  Circuits, https://www.iis.fraunhofer.de/content/dam/iis/de/doc/ame/conference/AES-125-
    Convention_AAC-ELD-NewStandardForHighQualityCommunication_AES7503.pdf (last visited

28  Oct. 29, 2024).

- 20 -



67.    HDTV broadcasts relied on the transmission of digital data, utilizing compression standards like MPEG-2 to deliver high-quality video content over the airwaves. The shift from analog to digital broadcasting required new infrastructure and consumer equipment capable of decoding and displaying HD content.

68.    This transition to digital broadcasting highlighted the need for advanced recording and playback devices that could handle high-definition content. Consumers sought devices that could not only receive and display HD broadcasts but also record, store, and manage HD video content effectively. However, the user interfaces of existing devices were often inadequate for managing the increased complexity and volume of high-definition content.

69.    For consumers who relied on cable or satellite services rather than over-the-air broadcasts, the digital transmission of audio-video data was already well established. Companies like Dish Network and DirecTV had been offering digital broadcasts since the mid-1990s. The digital nature of these broadcasts paved the way for the development of digital video recorders (DVRs).

70.    In 1999, TiVo introduced one of the first commercially successful DVRs.[21] The TiVo DVR stored digital video on an internal hard disk drive (HDD), allowing users to "time-shift" television

---

[21] *The Consumer Electronics Hall of Fame: TiVo*, *IEEE Spectrum*, https://spectrum.ieee.org/the-consumer-electronics-hall-of-fame-tivo (last visited Oct. 29, 2024).



DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

1  programming—that is, to record broadcasts and watch them at a later time. This capability
2  revolutionized television viewing habits by providing greater flexibility and control to the
3  consumer.



15  71.    Initially, TiVo devices digitized analog broadcasts for storage. However, in 2000, TiVo
16  released a device that could store digital broadcasts from DirecTV directly onto the HDD. This
17  advancement improved recording quality and storage efficiency, as the digital signal could be stored
18  without the degradation associated with analog-to-digital conversion.

19  72.    Despite these technological advancements, the user interfaces of DVRs were relatively
20  rudimentary. Users often faced challenges in organizing recorded content, creating playlists, and
21  navigating through their stored video library. The interfaces lacked sophistication, especially in
22  supporting multiple users within a household, each with their preferences and viewing habits.

23  73.    In April 2005, YouTube was launched, initially utilizing a Flash-based player for video
24  streaming.[22] YouTube capitalized on the widespread adoption of broadband Internet and the
25  improved video compression provided by MPEG-4. The platform allowed users to upload, share,
26  and view videos easily, fostering a new era of user-generated content.

27

28  [22] *The History of YouTube*, *Business Insider* (last visited Oct. 29, 2024),
https://www.businessinsider.com/history-of-youtube.

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

74.     The success of YouTube and similar platforms demonstrated the growing demand for online video content and highlighted the importance of effective user interfaces for content discovery and management. Users needed intuitive interfaces to navigate vast libraries of video content, create playlists, and share videos with others.

75.     Moreover, the increasing capabilities of mobile devices introduced new challenges and opportunities. Mobile phones and portable media players were becoming more powerful, with improved screens and processing capabilities. Consumers expected to access and manage video content on these devices, necessitating user interfaces optimized for smaller screens and touch-based interactions.



76.     Despite the technological progress in video compression, storage, and transmission, user interface design had not advanced at the same pace. Many devices still relied on basic menu systems

and hierarchical file structures that were not user-friendly, particularly when dealing with large volumes of content or multiple users.

77.    For example, in households where multiple family members used the same DVR or media device, there was no efficient way to manage individual preferences, playlists, or viewing histories. Users could not easily create personalized collections of video content or edit the playback order of recorded programs. Deleting a video from one user's playlist could inadvertently remove it from the device entirely, affecting other users.

78.    These limitations highlighted a clear need for improved user interfaces that could handle complex content management tasks. Devices required more sophisticated methods for organizing video data, supporting multiple users, and providing intuitive navigation and editing capabilities.

79.    By December 2004, when the Yoshida Patents were filed, the landscape of digital video technology was ripe with innovation but also faced significant challenges in user interface design. The advancements in digital broadcasting, video compression, and storage technologies had outpaced the development of intuitive and efficient interfaces for managing video content.

80.    The Yoshida Patents sought to address these challenges by introducing novel methods and apparatuses for editing and managing video data through improved user interfaces. Specifically, they focused on enabling users to create and manipulate playlists, manage video content hierarchically, and support multiple users on a single device without interference.

81.    These inventions provided technological solutions to the problems of content organization, user-specific preferences, and efficient navigation within large video libraries. By enhancing the user interface, the Yoshida Patents contributed to making video content management more intuitive, customizable, and responsive to the needs of diverse users.

82.    The context provided by the state of the art around 2004 underscores the significance of the Yoshida Patents' contributions. They addressed specific technical problems that were not resolved by existing technologies:

- **User-Centric Content Management**: The patents introduced methods for managing video content that recognized individual user preferences, allowing for personalized playlists and viewing experiences.

- **Hierarchical Organization of Video Data**: They provided a system for organizing video information in a hierarchical structure, facilitating easier navigation and editing of content, even in large libraries.

- **Protection Against Unintended Modifications**: The patents included mechanisms to prevent unintended changes to shared content, ensuring that actions by one user did not adversely affect others.

- **Enhanced User Interface Functionality**: By improving the user interface, the patents enabled more efficient interactions with the device, reducing the complexity of managing video content and enhancing overall usability.

83.    These innovations represented a meaningful advancement over the prior art, offering practical solutions to the deficiencies in conventional user interfaces for video data. They exemplified how thoughtful design in user interfaces could significantly improve the functionality and user experience of digital video devices.

84.    In summary, the Yoshida Patents emerged at a time when there was a need for improved user interfaces in digital video devices. The technological advancements in video recording and transmission had created new opportunities but also exposed gaps in how users could interact with and manage their content. The Yoshida Patents addressed these gaps by introducing inventive concepts that enhanced the functionality, usability, and user experience of video data management systems. Their contributions were not only timely but also pivotal in advancing the field of multimedia user interface design.

**b.    THE INVENTIONS IN THE YOSHIDA PATENTS AND THEIR BENEFITS**

85.    As described in the specifications of the Yoshida Patents, at the time of the inventions, it had become technologically feasible to record audio and video (AV) data onto recording media in real-time as the data was being received. This advancement is documented in the '072 Patent at column 1, lines 36-45, and in the '449 Patent at column 1, lines 29-38. Devices such as TiVo exemplified this capability, allowing users to record broadcast programs in real-time, effectively enabling time-shifting of content consumption.

86.    Conventional devices for recording and reproducing AV data not only stored the raw AV data but also wrote associated "**management information**" onto the same recording medium. This is specified in the '072 Patent at column 1, lines 46-49, and the '449 Patent at column 1, lines 39-42. Management information included metadata such as the source of the video, duration, time of recording, and titles. It also encompassed operational data essential for the device's functionality, such as indexing information and playback sequences.

87.    For instance, the management information might include data indicating the sequence in which different videos should be reproduced—essentially a "**playlist**" ('072 Patent, 1:58-60; '449 Patent, 1:51-53). Provided the recording medium was rewritable, users could edit this sequence through the device's user interface ('072 Patent, 1:49-54; '449 Patent, 1:42-47). This editing capability allowed users to customize the playback order of their recorded content, enhancing the flexibility and personalization of the viewing experience.

88.    The patent specifications explain that the conventional technique involved the playlist indicating the reproduction sequence by linking portions of the AV data together ('072 Patent, 1:58-60; '449 Patent, 1:51-53). This method essentially created a linear sequence where each piece of AV data was linked in the order it was to be played. While functional, this approach was limited in its flexibility and did not support more complex organizational structures or user interactions.



FIG.2
PRIOR ART

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

89.    Figure 2 in the Yoshida Patents illustrates a conventional system, labeled as "**PRIOR ART**." In this figure, the AV data (reference numeral 201) is stored on the recording medium ('072 Patent, 1:60-62; '449 Patent, 1:53-55). Each "**program**" represents a video file or segment of AV data. Reference numeral 202 depicts one of several hierarchical levels of management information ('072 Patent, 1:65-2:1; '449 Patent, 1:58-61).

90.    On the left side of reference numeral 202, the "**ORIGINAL CELL INFORMATION**" corresponds to the "**original**" sequence in which the videos should be played. Each "**original cell**" points to a different program (e.g., video files). When cells #1 through #3 are activated sequentially, the entirety of the recorded AV data (PROGRAM #1 through PROGRAM #3) is played in order ('072 Patent, 2:1-3; '449 Patent, 1:61-63). This structure mirrors the sequence in which content was originally recorded or intended to be viewed.

91.    On the right side of reference numeral 202 are "**USER-DEFINED CELL INFORMATION**" entries. These allow the user to associate different programs with each sequential cell, thereby customizing the playback sequence ('072 Patent, 2:3-10; '449 Patent, 1:63-2:2). Users could rearrange the order of programs or select specific segments to create a *personalized* viewing experience. However, this customization was limited by the hierarchical structure of the management information.

92.    Reference numeral 203 represents another hierarchical level of management data. On the left, "**PROGRAM SET INFORMATION**" links to each "**ORIGINAL CELL INFORMATION**" (#1 to #3). When activated, "**PROGRAM SET INFORMATION**" results in the entire AV data set being played in the original sequence ('072 Patent, 2:10-16; '449 Patent, 2:2-8). This level serves as a container for the original playback sequence.

93.    On the right, "**PLAY LIST INFORMATION**" entries (#1 to #K) represent alternative sequences and selections of programs to be played ('072 Patent, 2:16-18; '449 Patent, 2:8-10). These playlists allow for user-defined playback orders but are managed at the same hierarchical level as the program set information. This structural organization poses limitations on how users can interact with and manage playlists.

94.    As explained in the patent specifications, in ***conventional*** devices, the playlist information is placed at the same hierarchical level as the program set information. Consequently, user interfaces were designed to manage both the original sequences and user-defined playlists at the same level ('072 Patent, 2:24-28; '449 Patent, 2:17-19). This same-level hierarchy imposed constraints on the flexibility and functionality of the user interface.

95.    By way of analogy, consider a single-user streaming video account (e.g., YouTube) that does not support multiple user profiles. The account allows the user to manage their videos through the user interface, playing them either in the original sequence provided or in a user-defined order. However, multiple users cannot generate, select, delete, or manage videos independently. Additionally, videos cannot be arbitrarily selected and played out of sequence without modifying the single user's settings or preferences. This analogy illustrates the limitations imposed by managing content at the same hierarchical level without accommodating multiple users or more advanced organizational structures.

96.    As a result of this "**same-level hierarchy**" scheme, the Yoshida Patents describe several problems with conventional devices at the time of the inventions:

- **Inability to Alter Playlist Display Order:** Users could not modify the order in which playlists were displayed when they had created multiple playlists ('072 Patent, 2:28-30; '449 Patent, 2:21-23). This limitation hindered personalization and efficient navigation through playlists.

- **Lack of Support for Multiple Users:** Conventional devices did not accommodate multiple users generating, selecting, and managing their own playlists independently ('072 Patent, 2:36-38; '449 Patent, 2:29-31). This was particularly problematic in households where several family members shared a single recording device.

- **Restriction on Selecting Arbitrary Playlists:** Users were unable to select arbitrary playlists from among multiple playlists and manage them effectively ('072 Patent, 2:41-43; '449 Patent, 2:35-37). This restricted the flexibility of content management and limited the user experience.

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

97.     The Yoshida Patents are directed at solving these problems by introducing a **_three-level_** management hierarchy, as shown in FIG. 1 of the patents, as opposed to the two-level hierarchy depicted in prior art FIG. 2. This new management scheme provides users with greater control over the manipulation and rearrangement of their video data, especially when multiple users are sharing a single recording device ('072 Patent, 2:44-67; '449 Patent, 2:38-61). The implementation of the three-level hierarchy is discussed below:

- **Third Level - Program Information**: This level contains "a reproduction range of the whole or a part of a program arbitrarily specified by the user." FIG. 1 (reference number 102); '072 Patent, 3:60-61; '449 Patent, 3:52-53.

- **Second Level – Playlist Information:** Playlists created by users are organized at this level. FIG. 1 (reference number 103); '072 Patent, 4:4-11; '449 Patent, 3:63-4:3. Playlists are no longer on the same level as the program set information but are subordinate to it, allowing for better organization and management.

- **First Level - Individual Content Items:** Within each playlist, users can select, arrange, and edit individual content items (e.g., video files or segments). FIG. 1 (reference number 104); '072 Patent, 4:12-37; '449 Patent, 4:4-29.This level provides granular control over the content within each playlist. **Playlist management information for each user**: Users can select, arrange, and edit individual playlists and individual content items (e.g., the whole or part of  video files). FIG. 1 (reference number 104); '072 Patent, 4:12-37; '449 Patent, 4:4-29. This level also manages all playlists and all contents.

98.     The Yoshida patents have several benefits for users, including:

- **First Benefit - Altering Playlist Display Order:** The Yoshida Patents allow users to alter the order in which playlists are displayed when they have created a catalog of different playlists. This is achieved through specific display requirements and user interface controls, such as:

  - **Outputting a Menu Display**: The device outputs a menu that allows users to select among various playlists ('449 Patent, Claim 9; '072 Patent, Claim 11).

DECLARATION OF DR. MAHDI ESLAMIMEHR
CASE NO. 5:24-CV-04972-EKL

1         o **Controlling the Display of Thumbnails**: The output unit displays thumbnails

2          corresponding to particular video information, facilitating easy identification and

3          selection.

4         o **Editable State of Thumbnails**: The order of thumbnails within a playlist is editable,

5          enabling users to rearrange content as desired.

6    99.    These features enhance the user experience by providing flexibility and personalization in

7    how playlists are organized and accessed.

8       • **Second Benefit - Supporting Multiple Users:** The Yoshida Patents accommodate multiple

9        users generating, selecting, and managing their own playlists. This is accomplished through

10       claim limitations that manage video information for "first" and "second" groups (e.g.,

11       playlists for different family members). Notably, when video information is deleted from

12       one group, it is not deleted from another ('449 Patent, Claim 9; '072 Patent, Claim 11). This

13       ensures that actions by one user do not adversely affect the content available to other users,

14       supporting a shared device environment. In addition, the storage capacity needed for

15       multiple users is reduced since each content can be referenced by multiple users rather than

16       having each user individually generate and store content.

17      • **Third Benefit - Selecting and Managing Arbitrary Playlists:** The Yoshida Patents allow

18       users to select arbitrary playlists from among a plurality of playlists and manage them

19       effectively. This is facilitated by:

20        o **Groups of Video Information:** Users can create and select from multiple groups or

21         collections of video content.

22        o **Menu Displays and Thumbnails:** The user interface employs menu displays and

23         thumbnails to enable intuitive selection and management of content ('449 Patent,

24         Claim 9; '072 Patent, Claim 11).

25   100.    These features address the limitations of conventional devices by providing users with the

26   ability to manage content more dynamically and interactively.

27

28

101.    Returning to the YouTube analogy, the Yoshida Patents' innovations contributed to the realization of multiple user profiles within a single account that is analogous to a multiple-user Netflix account. Each user can:

- **Alter the Order of Videos**: Users can rearrange the order in which their videos are played through the user interface.
- **Generate and Manage Content Independently**: Users can create, select, and manage their own sets of videos without affecting others.
- **Play Videos Out of Sequence:** Users have the freedom to play videos in any order, independently of the original sequence or other users' preferences.

102.    These benefits were not available before the claimed inventions of the Yoshida Patents, representing a significant advancement in user interface design and device functionality.

103.    Claim 11 of the '072 Patent and Claim 9 of the '449 Patent contain specific claim limitations that embody the benefits described above. These claims detail the methods and apparatuses that enable the improved functionalities, including recording video data, outputting menu displays, reproducing selected video data, and controlling the display of thumbnails corresponding to different groups of video data. Claim 11 of the '072 Patent claims these benefits (as bolded):

> 11. An information processing method comprising: recording, by a recording unit, a plurality of video data on a recording medium;
>
> **outputting a menu display for a user to select one group of video data among a plurality of groups of video data** by specifying a position of a character corresponding to the one group of video data;
>
> reproducing selected video data read out from the recording medium;
>
> controlling display, *when a first group of video data is selected* in the menu display by specifying a position of a character corresponding to the first group of video data, a first group of thumbnails corresponding to the first group of video data in a state **that the order of the first group of thumbnails is editable,**
>
> controlling to display, *when a second group of video data is selected* in the menu display by specifying a position of a character corresponding to the second group of video data, a second group of thumbnails corresponding to the second group of video data in a state **that the order of the second group of thumbnails is editable,**
>
> wherein, *when one video data recorded on the recording medium that is included in both the first group of video data and the second group of video data is deleted from the first group of video data, the controller continues to include the one video data in the second group of video data,*

and a thumbnail corresponding to the one video data is displayed as one of the thumbnails of the second group of thumbnails when the controller controls to display the second group of thumbnails.

104.    This claim outlines the method by which the device records video data, presents user interfaces for group selection, allows for editable playlists, and ensures that content management actions by one user do not affect other users.

105.    Similarly, Claim 9 of the '449 Patent also claims these benefits (as bolded):

9. An information processing method comprising:

recording, by a recording unit, a plurality of video information on a recording medium;

**outputting, by an output unit, a menu display for a user to select one group of video** information among a plurality of groups of video information by specifying a position of a character corresponding to the one group of video information;

reproducing, by a reproducing unit, selected video information read out from the recording medium;

**controlling, by a controller, the output unit to display a first group of thumbnails corresponding to the first group of video information**, *when a first group of video information is selected* in the menu display by specifying a position of a character corresponding to the first group of video information,

controlling, by a controller, the output unit to display a second group of thumbnails corresponding to the second group of video information, *when a second group of video information is selected* in the menu display by specifying a position of a character corresponding to the second group of video information,

wherein, *when one video information recorded on the recording medium that is included in both the first group of video information and the second group of video information is deleted from the first group of video information, the controller continues to include the one video information in the second group of video information*, and a thumbnail corresponding to the one video information is displayed as one of the thumbnails of the second group of thumbnails when the controller controls the output unit to display the second group of thumbnails.

106.    This claim similarly provides for recording, user interface output, reproduction, and controlled display of video information, with an emphasis on maintaining content in one group when deleted from another.

107.    Moreover, these claims are directed to an improved user interface for recording and reproduction devices, where the functionality is directly related to the user interface's structure and operation. They address and resolve several specifically identified problems in the prior state of the art:

- **Hierarchical Structure of Playlists**: Conventional systems treated playlists hierarchically identical to the program set, limiting the ability to rearrange the display order of playlists.

- **Support for Multiple Users**: It was not possible for multiple users to generate, select and manage their own playlist information.

- **Bulk Manipulation of Playlists:** Conventional systems could not allow multiple playlists to be manipulated in bulk or provide efficient management tools for large content libraries.

108.    The user interface reflects an underlying organization of management data, as expressed in the claim language. It is directed at functionality required to effectively solve the aforementioned problems. For example, the claims provide functionality that permits a user to remove a video from one playlist without that video being removed from a second playlist. The user interface facilitates this process in a manner that is predictable and understandable for the user, enhancing usability and efficiency. By enabling these capabilities, the invention improves the functionality of recording and reproduction devices, making them more advanced and user-friendly compared to conventional devices.

109.    Claim 11 also recites the editable "**state**" of video data. This state information is specific to the context of the devices addressed by the patent and has no direct analog outside this domain. Rather than being an abstract algorithm, the claim is directed toward improving the functionality of a tangible device—namely, a recording and reproduction device with the ability to maintain and manage playlists or collections of recordings.

110.    Other claims, such as Claim 12, recite specific hardware components, such as an encoder. A person of ordinary skill in the art would understand that encoding inputted video data necessitates hardware (either standalone or in combination with software) to perform the required encoding functions. The volume of data involved in even short video sequences demands specialized

1    hardware, such as dedicated electronic circuits or computers running optimized software, to process

2    efficiently.

3    111.    Other claims address various aspects of the problems identified in conventional devices.

4    For example, dependent Claim 14 adds that two playlists or collections of thumbnails should be

5    displayed simultaneously in separate areas. This feature facilitates working with multiple playlists

6    or collections at once, further enhancing the user interface and device functionality.

7    112.    In my professional opinion, the claims of the Yoshida Patents recite an improved user

8    interface with functionality directly related to the structure and operation of the user interface. They

9    address and resolve specifically identified problems in the prior art, as detailed in the specifications

10    of the Yoshida Patents. Conventional systems did not allow multiple users to generate, select, and

11    manage video data arbitrarily through the user interface, particularly with features like editable

12    playlists, independent content management, and intuitive navigation.

13    113.    The inventions provide technological solutions to these technical problems by introducing

14    a novel hierarchical management structure, advanced user interface controls, and functionality that

15    enhances the usability and flexibility of recording and reproduction devices. These improvements

16    are rooted in computer technology and represent a significant advancement over prior art systems.

17    114.    By enabling multiple users to manage content independently, allowing for customizable and

18    editable playlists, and facilitating efficient content organization and manipulation, the Yoshida

19    Patents contribute meaningfully to the field of multimedia device interfaces. The claims are not

20    directed to abstract ideas but to specific implementations that improve the operation of tangible

21    devices, satisfying the criteria for patent eligibility under relevant legal standards.

22                  **b.  FILE HISTORIES OF THE YOSHIDA PATENTS**

23    115.    As stated earlier, I have reviewed NOA documents for the '449 and '072 patents. My

24    analysis of these documents reinforces the conclusions presented in this declaration. I specifically

25    refer to the Notices of Allowance and Issue Fee Due ("NOA") for each of the Yoshida Patents.

26    These notices support my assertion that the inventions constitute an improved and unconventional

27    user interface for computing devices.

28

116.    In the NOA for the '449 Patent (attached as Exhibit 2), the Examiner identified and cited the closest prior art—Honkaniemi—in the reasons for allowance, describing it as a "**user interface**" reference. This aligns with my conclusion that the invention is directed toward an enhanced user interface. The relevant paragraph from page 2 of the NOA (Exhibit 2) is provided below (highlight added):

1.    The following is an examiner's statement of reasons for allowance:

For claims 2, 6, 10 and 14, Honkaniemi (US 20070022382) discloses user interface includes items, each item having a media file and arranged to be visible as a thumbnail to the user interface. The items are arranged to establish at least one playlist so that a series of thumbnails are arranged to establish the playlist. See figures 1-3 and the record of patent 8644684 (12/567898) for more detail. The prior arts did not disclose continue to include deleted information of the first group in the second group when the deleted information recorded on the recording medium was included in both the first group and the second.

117.    The Examiner provided a similar reason for allowance in the file history of the '072 Patent (see Exhibit 3, page 2). Therefore, the prosecution histories of the Yoshida Patents align with my interpretation that these patents pertain to improvements in user interface inventions.

118.    The file histories of the Yoshida Patents are therefore consistent with my interpretation of patents as improved user interface inventions.

### c.    COURT ORDER ON PATENT ELIGIBILITY ON PATENT RELATED TO THE YOSHIDA PATENTS

119.    My conclusions in this declaration are consistent with the court's order dated March 21, 2018, in the case of *Maxell, Ltd. v. Fandango Media, LLC*, No. CV 17-07534 AG (SSX), 2018 WL 5085141 (C.D. Cal. Mar. 21, 2018) . This order analyzed U.S. Patent No. 9,384,783 (the '783 Patent) to determine its eligibility under 35 U.S.C. § 101. *Fandango*, 2018 WL 5085141, at *7.

120.    The '449 Patent is a continuation of application No. 12/141,417, filed on December 26, 2013, which issued as Pat. No. 9,384,783. Similarly, the '072 Patent is a continuation of the '449

Patent, making it part of the same patent family as the '783 Patent (see the cover pages of the '449 and '072 Patents). Given that the Yoshida Patents and the '783 Patent are related, it is not surprising that the independent claims of the '783 Patent have very similar limitations to those of the '449 Patent, as shown below.

| '783 Patent, Claim 2 | '449 Patent, Claim 9 |
|---|---|
| A method comprising:<br><br>reproducing selected video information from among a plurality of video information recorded on a recording medium by the recording unit,<br><br>displaying, on a display device, a user interface for a user to select desired video information to be reproduced from among the plurality of video information recorded on the recording medium by the recording unit;<br><br>reproducing the selected video information read out from the recording medium, wherein a first area and a second area are displayed within a menu display,<br><br>wherein the first area is configured to display at least first indication associated with a first group of video information for a first classification and second indication associated with a second group of video information for a second classification different from the first classification, and | An information processing method comprising:<br><br>recording, by a recording unit, a plurality of video information on a recording medium;<br><br>outputting, by an output unit, a menu display for a user to select one group of video information among a plurality of groups of video information by specifying a position of a character corresponding to the one group of video information;<br><br>reproducing, by a reproducing unit, selected video information read out from the recording medium;<br><br>controlling, by a controller, the output unit to display a first group of thumbnails corresponding to the first group of video information, when a first group of video information is selected in the menu display by specifying a position of a character corresponding to the first group of video information, |

| '783 Patent, Claim 2 | '449 Patent, Claim 9 |
|---|---|
| wherein the second area is configured to display thumbnails corresponding to video information recorded on the recording medium by the recording unit;<br><br>wherein, when the first indication shown in the first area is selected, displaying, in the second area, a first group of thumbnails corresponding to the first group of video information;<br><br>wherein, when the second indication shown in the first area is selected, displaying, in the second area, a second group of thumbnails corresponding to the second group of video information,<br><br>wherein, even if one video information recorded on the recording medium included in both the first group of video information and the second group of video information is deleted from the first group of video information, the one video information continue to be included in the second group of video information. | controlling, by a controller, the output unit to display a second group of thumbnails corresponding to the second group of video information, when a second group of video information is selected in the menu display by specifying a position of a character corresponding to the second group of video information,<br><br>wherein, when one video information recorded on the recording medium that is included in both the first group of video information and the second group of video information is deleted from the first group of video information, the controller continues to include the one video information in the second group of video information, and a thumbnail corresponding to the one video information is displayed as one of the thumbnails of the second group of thumbnails when the controller controls the output unit to display the second group of thumbnails. |

121.    In the Order, the Court examined the technical benefits of the invention described in the '783 Patent, which shares the same specification as the Yoshida Patents. The Court's findings regarding these benefits are consistent with the conclusions presented in this declaration. Specifically, the Court noted (see Exhibit 4, Order at pages 12–14):

The '783 Patent describes shortcomings with "conventional technique[s]" for devices that allow users to manage data playlists. '783 Patent at 1:48–2:31. The '783 Patent then purports to provide a solution to these shortcomings by proposing systems such that "[e]ven in the case where a plurality of users share a single recording medium . . . each user can manage favorite reproduction contents, resulting in improved usage." *Id.* at 2:50–55. To do so, the '783 Patent specification refers to "a unit of management for managing all registered play list information and an upper management hierarchical level." *Id.* at 2:37–39.

Similar to Claim 3 of the '583 Patent, the particularized display requirements and combination of steps disclosed in Claim 2 of the '783 Patent support the conclusion of an inventive concept at the motion to dismiss stage. *Bascom Glob. Internet Servs.*, 827 F.3d at 1350. Claim 2 of the '783 Patent requires specific display areas that depict either (1) "group[s] of video information" for a particular classification or (2) thumbnails corresponding to the particular video information. The claim further includes limitations related to what happens when video information is deleted from a particular group. Defendant argues Claim 2 is essentially equivalent to a mom and dad having separate video playlists. (Dkt. 50 at 19.) But at the very least, this argument ignores the combination of graphical interface requirements in the claims. *Core Wireless*, 880 F.3d at 1362 ("Although the generic idea of summarizing information certainly existed prior to the invention, these claims are directed to a particular manner of summarizing and presenting information in electronic devices.") A patent-eligibility determination at this stage is premature.

122.    The technical analysis of the court aligns with the conclusions presented in this declaration. Specifically, as stated in paragraph 65, the Yoshida Patents describe an improved user interface with functionality directly related to its structure. They address and resolve a specific problem identified in both their specifications and the prior art: conventional systems did not allow multiple users to arbitrarily generate, select, and manage video data or information through the user interface, such as menu displays.

I declare under penalty of perjury that, to the best of my knowledge and recollection, the foregoing is true and correct.

Executed this 1st day of November, 2024 in Los Angeles, California.

_____

Dr. Mahdi Eslamimehr